IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 14-2883

_____

DENIS F. SHEILS, on Behalf of Himself And
On Behalf of M.D.S., A Minor Child,
Appellant

v.

PENNSBURY SCHOOL DISTRICT,
Appellee

_____

On Appeal from the United States District Court
for the District of Pennsylvania, No. 2:14-cv-027376

_____

BRIEF FOR APPELLANT
AND JOINT APPENDIX VOLUME 1

Denis F. Sheils
The Philadelphian
2401 Pennsylvania Avenue
Unit #3A1
Philadelphia, Pennsylvania 19130
(215) 238-1700 (Work)
(267) 467-8331 (Cell)
Email:  dsheils@kohnswift.com

*Pro se and on behalf of M.D.S.,
a minor child*

## CORPORATE DISCLOSURE STATEMENT

Denis F. Sheils and his minor child M.D.S., are natural persons.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................... iv

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ............................3

STATEMENT OF RELATED CASES ....................................................3

STATEMENT OF THE CASE AND STATEMENT OF FACTS ..........................4

I.     BACKGROUND .........................................................................4

    A.     The First Unfounded Report of Child Abuse .........................7

    B.     The Second Unfounded Report of Child Abuse ................. 10

II.    THE SCHOOL DISTRICT AND M.D.S. ...................................... 19

III.   THE JUNE 2013 IEP................................................................ 20

IV.    THE DECEMBER 2013 IEP AND APPELLANT'S DUE PROCESS
       DEMANDS............................................................................... 21

V.     THE "DUE PROCESS HEARING" AND ADMINISTRATIVE
       DECISION AND ORDER .......................................................... 23

VI.    THE PROCEEDINGS BEFORE THE DISTRICT COURT AND
       THIS COURT ........................................................................... 26

VII.   APPELLANT'S REQUESTS UNDER PENNSYLVANIA'S RIGHT
       TO KNOW LAW PENDING IN THE STATE COURTS ......................... 28

VIII.  SUBSEQUENT EVENTS CONCERNING M.D.S. ...................... 30

STATEMENT OF SCOPE AND STANDARD OF REVIEW ............................ 30

SUMMARY OF ARGUMENT ............................................................ 31

ARGUMENT ...................................................................................... 32

I.     THE "STAY-PUT RULE" REQUIRES ENTRY OF THE STAY ............. 32

II.    THE STATUS QUO SHOULD BE PRESERVED PENDING
       CONCLUSION OF THE REVIEW PROCEEDINGS TO  AVOID
       IRREPARABLE HARM .............................................................. 32

III.   APPELLANT ESTABLISHED THAT HE WILL LIKELY SUCCEED
       ON THE MERITS ..................................................................... 34

i

A.  The "Due Process Hearing" Did Not Provide "Due Process" ........... 34

    1.  Burden of Proof ........................................................................ 34

    2.  The IEP Team Is Biased, Conflicted And Not Disinterested .. 35

    3.  The Scope Of The Issues Heard And Relief Permitted
        Were Improperly Limited ........................................................ 36

    4.  Appellant Was Denied The Opportunity To Subpoena
        And Examine Important Witnesses ......................................... 37

    5.  Appellant Was Denied Access To Important And Relevant
        Documents ................................................................................ 38

    6.  The School District Did Not Produce Relevant Documents ... 39

    7.  Unreasonable Time Limits Were Placed Regarding
        Examination of Witnesses ....................................................... 40

    8.  Documents Were Admitted That Should Not Have Been
        Admitted And Documents Were Excluded That Should
        Have Been Admitted ................................................................ 40

    9.  Witnesses Were Permitted To Refuse To Answer Relevant
        Questions ................................................................................. 40

    10.  Insufficient Time Was Provided To Obtain Necessary
        Documents And To Retain An Expert To Review And Write
        A Report ................................................................................... 40

B.  Even Upon The Record As It Currently Exists, Appellant Has
    Shown That He Will Likely Succeed On The Merits ........................ 41

    1.  A Functional Behavioral Assessment Cannot Be Performed .. 42

    2.  M.D.S. Should Continue To Be Mainstreamed ...................... 46

        i.  M.D.S. Should Continue To Be Mainstreamed
            Because He Continues To Make Progress ..................... 49

        ii.  The IEP Is Deficient And Inappropriate Since The
            School District Did Not Provide Sufficient Time
            And Effort To Make The Existing IEP Work ............... 50

        iii.  The Evaluations Performed By The School District
            Are Not Reliable ............................................................ 53

iv.   The IEP Is Deficient And Inappropriate Since It Fails
To Consider Bringing Back A One-On-One So The
Child Can Remain Mainstreamed ................................. 56

v.   The School District Has Not Proffered <u>Any</u> Evidence
That M.D.S. Would Benefit From Being Segregated ... 56

CONCLUSION ................................................................................... 58

COMBINED CERTIFICATIONS ......................................................... 59

## JOINT APPENDIX (VOLUME I) (FILED WITH BRIEF)

Administrative Decision and Order ................................................ A1-A19

District Court's Order entered May 28, 2014 ......................................A20

Notice of Appeal ......................................................................... A21-A45

Order of the United States Court of Appeals for the Third Circuit dated
June 24, 2014 ...................................................................................A46

## ADDENDUM TO BRIEF PURSUANT TO FED.R.A.P. 28(f)

20 U.S.C. § 1412 ............................................................. Addendum 1-16

20 U.S.C. § 1414 ........................................................... Addendum 17-29

20 U.S.C. § 1415 ........................................................... Addendum 30-44

20 U.S.C. § 1232(g) ...................................................... Addendum 45-60

5 U.S.C. § 705 ............................................................... Addendum 61-62

34 C.F.R. § 300.518 ..........................................................Addendum 63

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*A.W. v. Jersey City Public Schools*,
    486 F.3d 791 (3d Cir. 2007) (en banc) ............................................................48

*Antoine M. v. Chester Upland School District*,
    420 F.Supp.2d 396 (E.D.Pa. 2006) ....................................................................31

*Bd. of Educ. v. Rowley*,
    458 U.S. 176 (1982) ............................................................................................47

*Brown v. Board of Education*,
    347 U.S. 483 (1954) ............................................................................................47

*Elrod v. Burns*,
    427 U.S. 347 (1976) ......................................................................................33, 41

*Hall v. Florida*,
    134 S. Ct. 1986 (May 27, 2014) ....................................................................33, 45

*Jenn-Ching Luo v. Baldwin Union Free School District*,
    2011 WL 941263 (E.D.N.Y, 2011) ....................................................................48

*LE v. Ramsey Board of Education*,
    435 F.3d 384 (3d Cir. 2006) ..............................................................................31

*M.H. v. New York City Dept. of Educ.*,
    712 F.Supp.2d 125 (S.D.N.Y.), *aff'd*, 685 F.3d 217 (2d Cir. 2010) .................45

*Miller v. Mitchell*,
    598 F.3d 139 (3d Cir. 2010) ........................................................................42, 46

*Montanye v. Wissahickon School District*,
    399 F. Supp. 2d 615 (E.D. Pa. 2005), *aff'd*, 218 Fed. Appx. 126 (3d Cir.
    2007) ..................................................................................................................52

*Moore v. Hamilton Southeastern School District*,
    2013 WL 4607228 (S.D. Indiana, August 29, 2013)..........................................48

*Oberti by Oberti v. Bd. of Educ. of Borough of Clemonton Sch. Dist.*,
    995 F.2d 1204 (3d Cir. 1993) ...........................................................47

*Ridley School District v. M.R.*,
    680 F.3d 260 (3d Cir. 2012) ............................................................35

*Schaffer v. Weast*,
    546 U.S. 49 (2005).....................................................................34, 35

*Scripps-Howard Radio, Inc. v. FCC*,
    316 U.S. 4 (1942).............................................................................2

*Stahura-Uhl v. Iroquois Central School District*,
    836 F.Supp.2d 132 (W.D.N.Y. 2011)..............................................48

STATE CASES

*Aronson v. Lewis*,
    473 A. 2d 806 (Del. 1984) ..............................................................35

FEDERAL STATUTES

5 U.S.C. § 705 .......................................................................................2

20 U.S.C. § 1401 *et seq.*..........................................................1, 26, 33

20 U.S.C. § 1412 (a)(5)........................................................................47

20 U.S.C. §1414 ............................................................................41, 42

20 U.S.C. § 1415 ..................................................................................38

20 U.S.C. § 1415 (i)(2)(C)...................................................................31

20 U.S.C. § 1232g ("FERPA") ............................................................38

28 U.S.C. § 1292(a)(1)...........................................................................2

28 U.S.C. § 1331 ....................................................................................1

29 U.S.C. § 701 *et seq.*........................................................1, 26, 27, 41

42 U.S.C. § 1983 ...........................................................................passim

**STATE STATUTES**

65 P.S. § 67.101 ................................................................................3, 28

18 Pa. C.S. § 4904.................................................................................29

**RULES**

Local Appellate Rules 8.1, 8.2 and 18.1 ...................................................2

Federal Rules of Appellate Procedure 8 and 18 .......................................2

PA. R. C.P. 1915.13 ...............................................................................6

**REGULATIONS**

34 C.F.R § 300.518 ..............................................................................32

**CONSTITUTIONAL PROVISIONS**

First Amendment of the United States Constitution..............................27, 33, 41, 46

Fourteenth Amendment of the United States Constitution....................42, 43, 46, 47

# JURISDICTIONAL STATEMENT

This appeal arises from the decision of the Department of Education – Special Education Hearing Officer dated April 23, 2014, ODR Case # 14523-1314KE (McElligott, Jake, Special Education Hearing Officer) (hereinafter the "Administrative Decision and Order").  (A1-19)

On May 13, 2014, Appellant timely filed with the district court: (1) a Complaint appealing the Administrative Decision and Order; (2) an Ex Parte Application for Order to Show Cause Re: Entry of Stay Pending Appeal, Preliminary Injunction and Temporary Restraining Order; (3) Memorandum of Law in Support Thereof; (4) a Proposed Order; and (5) Appellant's Declaration with Exhibits.  (A160-398)  The district court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 since the claims asserted arise under The Individuals with Disabilities Education Improvement Act ("IDEIA"), 20 U.S.C. § 1401 *et seq.*, in particular, § 1415(i)(2) and the regulations promulgated thereunder, 34 C.F.R., Part 300; The Federal Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.*; 42 U.S.C. § 1983; and, the First and Fourteenth Amendments to the United States Constitution.

On May 21, 2014, the district court held a hearing.  (A399-528)  By Order entered May 28, 2014, the district court denied Appellant's Application.  (A20)  No reasons were given.  On May 30, 2014, Appellant timely filed a Notice of

Appeal.  (A21-45)  On June 2, 2014, Appellant filed with this Court an Expedited

Application pursuant to Federal Rules of Appellate Procedure 8 and 18, Local

Appellate Rules 8.1, 8.2 and 18.1 and 5 U.S.C. § 705 to vacate the district court's

order entered May 28, 2014 and to Enter an Order Staying the Administrative

Decision and Order Pending Appeal.  (A529-700)

By Order filed June 24, 2014, this Court granted Appellant's motion for a

stay and directed the clerk to refer this case to a merits panel and list it before the

next available panel on an expedited basis.  (A46)

This Court has jurisdiction pursuant to Federal Rules of Appellate Procedure

8 and 18, Local Appellate Rules 8.1, 8.2 and 18.1, 5 U.S.C. § 705; and, 28 U.S.C.

§ 1292(a)(1).  This Court also has authority to grant the stay pursuant to its

"traditional equipment for the administration of justice."  *Scripps-Howard Radio,*

*Inc. v. FCC*, 316 U.S. 4, 9-10 (1942).

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.      Whether Appellant and the minor child will suffer irreparable harm if: (1) a stay pending appeal is not entered and the School District is permitted to conduct a Functional Behavioral Assessment of the minor child M.D.S.; and/or (2) M.D.S.' program/placement is changed from the regular classroom setting;

2.      Whether Appellant has demonstrated probable success on the merits.

## STATEMENT OF RELATED CASES

Appellant has served upon the Pennsylvania Department of Education and the Pennsbury School District requests pursuant to Pennsylvania's Right to Know Law, 65 P.S. § 67.101.  Appellant has appealed the decisions of the Pennsylvania Office of Open Records denying his requests to the Commonwealth Court of Pennsylvania (No. 967-CD-2014) and the Bucks County Court of Common Pleas (No. 2014-04164).

**STATEMENT OF THE CASE AND STATEMENT OF FACTS**

## I.    BACKGROUND

Appellant is an attorney duly licensed to practice law in the Commonwealth of Pennsylvania.  Appellant is also the father of the minor child M.D.S.  Appellant and Harriet A. Sheils ("Ms. Sheils") were married on September 17, 1988.  They separated in April 2004.  The Divorce Proceeding was commenced May 5, 2004.  The Divorce was decreed on August 7, 2007.  (A164)

Appellant and Ms. Sheils have three minor children: D.F.S., Jr. (born September 25, 2000); D.I.S. (born July 3, 2002); and M.D.S. (born July 3, 2002).  Appellant and Ms. Sheils share legal custody of the children.  Primary physical custody of the children is with Ms. Sheils.  (A164-65)

The minor child D.F.S., Jr. is a child with special needs.  (A165)

The minor child M.D.S. was born premature.  (A165)

On or about March 2007, the Council Rock School District, wherein Ms. Sheils and the children then resided, requested Appellant's consent to evaluate M.D.S. to determine whether he was eligible to receive a free appropriate public education and related services under the IDEIA in connection with his transition to kindergarten for the 2007-08 school year.  (A165; A1058-70)

Appellant consented to such an evaluation; and, M.D.S. was found to qualify to receive a free appropriate public education and related services under the IDEIA

as a student with speech and language impairment.  (A1069, *see also* A1072-90)
The evaluation performed by the Council Rock School District never suggested
that M.D.S. was autistic or on the autistic spectrum.

After the divorce between Appellant and Ms. Sheils was decreed on August
7, 2007, Ms. Sheils and the children moved into the Pennsbury School District
("the "School District").  (A165)

At M.D.S.' IEPs Appellant and Ms. Sheils both insisted that M.D.S. be
mainstreamed.  When M.D.S. initially started under an IEP, he received physical
therapy, occupational therapy, and speech therapy.  He also had a one-on-one aide.

M.D.S. made steady progress in school.  Under M.D.S.' IEP as of February
2012, he was deemed to no longer need a one-on-one aide or physical therapy.
Occupational therapy, at the recommendation of the School District, was reduced
to one session per month.  As of February 2012, M.D.S. was still receiving speech
therapy.  (A1092-1128; A1129-89)

In 2009, Ms. Sheils, without Appellant's knowledge or consent, had M.D.S.
examined by Dr. Mary Pipan, M.D., a developmental pediatrician of the Children's
Hospital of Philadelphia ("CHOP").  (A1036-37)  In her report, Dr. Pipan found
that M.D.S. has language delays (herein referred to as Pipan Report I).  (A1038-39;
A1042-45)  Nowhere in her report did Dr. Pipan suggest that M.D.S. was autistic
or on the autism spectrum.

In November, 2011, Appellant received another report from Dr. Pipan, dated November 21, 2011 regarding an examination of M.D.S. on November 21, 2011 (herein referred to as Pipan Report II).  (A1046-49)  This examination of M.D.S. was again done without Appellant's consent.  Furthermore, Dr. Pipan's report reflected misstatements purportedly made by Ms. Sheils about Appellant.

In her November 21, 2011 report, Dr. Pipan suggested that M.D.S. was autistic and recommended an ADOS test.

Following receipt of Dr. Pipan's report, Appellant received numerous letters from Ms. Sheils demanding that M.D.S. have an ADOS test.

On or about January 25, 2012, Ms. Sheils filed a Petition for Special Relief Pursuant to PA. R. C.P. 1915.13 with the Court of Common Pleas Bucks County, Family Division for an Order "requiring . . . Denis F. Sheils, to execute any and all authorizations required so as to authorize the administration of an ADOS, speech and language assessment and occupational therapy evaluation as more fully set forth and recommended in Dr. Pipan's Report dated January 6, 2012."  (A1294-1304)  This report dated January 6, 2012 is referred to herein as Pipan Report III. Pipan Report III is different from Pipan Report II, even though both reports purport to reflect Dr. Pipan's examination of [M.D.S.] on November 21, 2011.

Pipan Reports II and III were based upon an examination of M.D.S. on November 21, 2011, in Appellant's absence during which misstatements were

6

made to Dr. Pipan by Ms. Sheils about Appellant.  Pipan Report II and III reflected

Ms. Sheils' continuing campaign to cause estrangement between Appellant and the

children, including M.D.S.  *See* Pipan Report II ("Frustrated with school and with

visits with dad"); ("Fearful may cry when he spills something"); ("Mom thinks dad

threatens him with jail if he does something wrong.").

Nowhere is this campaign better illustrated than in the two reports of child

abuse leveled against Appellant, at the behest of Ms. Sheils, each of which were

deemed to be "unfounded."  *See* Hearing Officer-36[1], pp. 22-23 of 49; *see also*

(A167-76; A965-67).

*          *          *

**A.    The First Unfounded Report of Child Abuse**

> (1)    At an IEP meeting for D.F.S., Jr. on November 3, 2008,
>
> Appellant discovered that Ms. Sheils had obtained a written
>
> prescription to bolus feed D.F.S., Jr. from Kids-First Newtown
>
> that had never been provided to Appellant.  When the School
>
> District/Bucks County Intermediate Unit informed Appellant,
>
> over his objection, that it would side with Ms. Sheils and abide
>
> by this prescription for bolus feeding, Appellant filed, on

---

[1] Hearing Officer Exhibits not included in the Appendix shall hereinafter be referred to as "HO-___".

November 25, 2008, a disapproval of the IEP/NOREP and

demanded a due process hearing.  (A1329-69)

(2)    On November 13, 2008 at 10:00 a.m., Ms. Sheils and Appellant

met with Dr. Pipan, to discuss the results of D.F.S., Jr.'s ADOS

test.  At the meeting, Dr. Pipan stated that, in her opinion

D.F.S., Jr. was autistic.  At the meeting, Appellant stated that it

was his intention to get a second opinion.  This angered Ms.

Sheils, as well as comments Appellant made that Ms. Sheils

needed to get a job.  After Dr. Pipan left the room, Ms. Sheils

threatened Appellant.  (A167-68)

(3)    Soon thereafter, Appellant received a telephone call from the

City of Philadelphia's Department of Human Services

informing Appellant that a complaint had been filed against

Appellant for child abuse.  The social worker insisted upon

meeting Appellant at his apartment in the presence of the

children.  The document provided to Appellant by the social

worker stated that the report alleged that "children were hit in

head by Fat and child has bruise on knee."  (A168)

(4)    After the social worker left, the minor child D.I.S. informed

Appellant that he and his brothers had been photographed by

someone; and, this upset him very much.  He also informed Appellant that his mother told him to tell the people talking to him that "the bruises he gets is when he is at his da-da's house." (A168)

(5)    By letter dated December 2, 2008, and postmarked December 19, 2008, Appellant was informed by the City of Philadelphia's Department of Human Services that the "report of suspected child abuse" has been determined to be "unfounded."  (A169)

(6)    Ms. Sheils apparently relayed this report of alleged child abuse to the children's general pediatrician.  The November 18, 2008 entry by Dr. Julie Kardos, M.D. contained in Kids First-Newtown medical records states "… school just contacted social services because his brother reported to school guidance counselor that dad slaps them at his house for misbehaving." (A971)

(7)    With respect to Appellant's due process demand regarding D.F.S., Jr., the School District/Bucks County Intermediate Unit moved to dismiss.  (A1321-23)  In a decision dated January 28, 2009, the Pennsylvania Special Education Hearing Officer held that it did not have jurisdiction over the issue.  (A1324-28)

(8)    Subsequently, Appellant requested that the school guidance

counselor at the School District, Ms. Patricia Vommorow

(Gunerman), no longer have any involvement with the children,

including M.D.S.  On July 28, 2010, Appellant wrote to the

School District's attorney, Ms. Claudia Huot, Esquire, and

inquired whether the School District permits school guidance

counselors who make false reports of child abuse regarding

parents to continue to see the child.  (A985-86)  Appellant

never received a response.  At a later date, Appellant again

stated to the principal of the elementary school that M.D.S.

attended, Ms. Fran Nitkin, that he did not want Ms. Vommorow

to have any involvement with the children, including M.D.S.

Dr. Alison Smith Test. (A708-09)

**B.    The Second Unfounded Report of Child Abuse**

(1)    On September 22, 2009, Ms. Sheils filed a Petition to Modify

Custody with the Court of Common Pleas of Bucks County,

Family Division, seeking sole legal custody of the minor child,

D.F.S., Jr.  The basis for her request for sole legal custody was

that the parties' ongoing disputes had seriously compromised

"the minor child's health and education."  (A1271-81)

(2)    On or about November 6, 2009, Ms. Sheils filed another

Petition in the Court of Common Pleas of Bucks County,

Family Division, entitled "Petition for Notice of a Petition for

Mental Health Evaluation."  In her Petition, Ms. Sheils sought

to have a mental health evaluation performed upon Appellant.

In the Petition, Ms. Sheils alleged that a psychological

evaluation of Appellant "will show that father's

confrontational, oppositional, untrusting and accusatory

tendencies toward the child's medical providers have

undermined their ability to care for D.F.S., Jr. to the extent they

feel appropriate, caused unnecessary and unwarranted changes

in medical providers, and prohibited the child from receiving

the maximum level of services recommended by his care

provider."  (A170)

(3)    On December 3, 2009, Appellant took D.F.S., Jr. to the

Kennedy-Krieger Institute's Pediatric Feeding Disorders Clinic

to have D.F.S., Jr. weaned from a feeding tube.  (A171; A1283-

92)

(4)     The specialists and physicians at the Kennedy-Krieger Institute
        recommended that D.F.S., Jr. treatment occur at soon as
        possible.  (A171; A1283-92)

(5)     Prior to D.F.S., Jr. participating in the Kennedy Krieger
        Institute's Pediatric Feeding Disorders Clinic, the specialists
        and physician's at the Kennedy Krieger Institute required that
        initial medical tests be performed.  More specifically, the
        physicians recommended complete blood count ("CBC"), a
        comprehensive metabolic panel ("CMP"), an upper endoscopy
        and a radioallergsorbent test ("RAST").  (A171; A1283-92)

(6)     Appellant advised Ms. Sheils of the required testing.  (A171;
        A1289)

(7)     Ms. Sheils refused to give her consent to the required testing or
        to D.F.S., Jr.'s attendance at the Kennedy Krieger Institute's
        Pediatric Feeding Disorders Program.  (A171; A1289)

(8)     On January 29, 2010, Appellant received correspondence from
        the Kennedy-Krieger Institute, advising that D.F.S., Jr. would
        lose his position and possibility of attending the Feeding
        Program unless the Kennedy-Krieger Institute was provided
        with confirmation within one week of Appellant's receipt of the

correspondence that D.F.S., Jr. would be participating in the program and having the required testing performed.  (A171-72; A1292)

(9)    Appellant took steps to be granted more time with the Kennedy Krieger Institute's Feeding Disorders Program before the position was filled by another child.  (A172; A1290)

(10)   On Wednesday, February 3, 2010, Appellant had D.F.S., Jr., D.I.S. and M.D.S. over for their regularly scheduled overnight visit.  Appellant returned the children to Ms. Sheils the morning of Thursday, February 4, 2010.  (A172)

(11)   On Friday, February 5, 2010, Appellant picked up D.F.S., Jr., D.I.S. and M.D.S. from Ms. Sheils house at approximately 5:30 p.m., as is the normal time for their weekend visitation with Appellant.  Since a record breaking snowfall was predicted to hit Philadelphia that weekend, the children and Appellant immediately went food shopping once they arrived in Philadelphia.  As the children and Appellant were approaching the entrance to the high-rise building, Appellant received a telephone call from the front desk informing Appellant that a social worker from the City of Philadelphia, Department of

13

Human Services was there and that the social worker wanted to see Appellant.  (A172)

(12)    The social worker informed Appellant that the Child Line and Abuse Registry received a report that Appellant had physically abused his son M.D.S. by kicking him on the leg on the morning of Thursday, February 4, 2010.  Appellant denied kicking M.D.S. in the leg and voiced his suspicion that this second false report was being made by Ms. Sheils in retaliation for his efforts in opposing the motion to take  legal custody of D.F.S., Jr. from Appellant and for bringing D.F.S., Jr. to the Kennedy Krieger Institute to have him weaned off the feeding tube/bolus feeds.  Appellant also voiced his suspicion that this false report was also being made since Appellant had a girlfriend.  (A172-73)

(13)    By letter dated February 22, 2010, Appellant was informed by the Department of Human Services that the report of suspected child abuse "concerning [M.D.S.] was determined to be 'unfounded.'"  (A174)

(14)    By letters dated March 4, 2010, March 31, 2010, and May 10, 2010, Appellant wrote to the Child Line and Abuse Registry

14

requesting a copy of the report of child abuse. By letter date May 28, 2010, Appellant finally received a redacted copy of the report. Significantly, the report contains a statement clearly attributed to M.D.S., even though the attribution is redacted. It states "[redacted] states father kicked him on the leg and then changed his story and stated that he fell while playing." (A977-80)

(15)  Suspecting that it was the physicians at Kids-First, at the behest of Ms. Sheils, that made the false report of child abuse, Appellant drove to Kids First and completed a form seeking the release of the medical records of D.F.S., Jr., D.I.S. and M.D.S. (A174)

(16)  The medical records produced by Kids-First established that Dr. Kardos made the false report at the behest of Ms. Sheils.[2] (A973-75)

(17)  On March 2, 2010, Appellant's attorney filed an Emergency Petition for Special Relief in Custody Regarding Medical

_____

[2] Another entry from the medical records of Kids-First Newtown that reflects Ms. Sheils' attempts to plant statements in M.D.S.' head is from Dr. Mary Walder, M.D. dated July 9, 2008. (A982-83)

Treatment for Minor Child, D.F.S., Jr. with the Court of

Common Pleas of Bucks County, Family Division.  (A1283-92)

The Petition requested the Court to issue an Order as follows:

- The minor child, [D.F.S., Jr.], is permitted to undergo

  blood count ("CBC"), a comprehensive metabolic panel

  ("CMP"), an upper endoscopy, a radioallergsorbent test

  ("RAST"), and any test required by the physicians and

  specialists at Kennedy Krieger Institute; and,

- The minor child, [D.F.S., Jr.] is permitted to attend at the

  Kennedy Krieger Institute's Pediatric Feeding Disorders

  Clinic-Bolus Removal Inpatient Program in August of

  2010 or such time that the Kennedy Krieger Institute

  shall be able to schedule such attendance.

(18)   At the Court hearing on March 16, 2010, Ms. Sheils entered

into a Stipulation that permitted Appellant to have D.F.S., Jr.

undergo the testing required and to have him attend the

Kennedy Krieger Institute's Feeding Disorders Program.

(A175)

(19)   On May 3, 2010, Appellant took D.F.S., Jr. to the Johns

Hopkins University School of Medicine for the required tests.

16

Significantly, the RAST test came back <u>negative</u> for allergies to egg whites, milk, wheat, peanut and soybean.  Accordingly, D.F.S., Jr. had been denied significant sources of nutrition.  (A176)

(20)    From September 28, 2010 to October 18, 2010, Appellant worked with D.F.S., Jr. and the Kennedy-Krieger Institute's Feeding Disorders Program to get D.F.S., Jr. off the G-Tube feeds and to be independent with respect to eating.  No restrictions were placed on D.F.S., Jr.'s diet.  During the time he was there, D.F.S., Jr. drank milk and was exposed to eggs.  He had no allergic reactions.  (A1370-77; A1379-80)

(21)    During the program, one noticeable change in D.F.S., Jr.'s behavior was observed – the Monday after he returned from the only weekend with Ms. Sheils.  That entry states as follows:

> On Monday, 10/11/10 a noticeable change in [D.F.S., Jr.'s] affect and behavior was observed. [D.F.S., Jr.'s] affect was dramatically different than previous Mondays that he participated in the program.  [D.F.S., Jr.] was less cooperative, appeared to be irresponsive to environment stimuli including others around him and non-attentive to both verbal and non-verbal requests.  On Tuesday, 10/12/10 this behavior was no longer observed and [D.F.S., Jr.'s] affect and behavior returned to previous levels.  Overall, [D.F.S., Jr.] was more compliant with demands and appeared to be more

17

engaged.  This reflected in mealtime data including meal duration, bite rate, and inappropriate refusal behavior.  (A1374)

(22)    The program was successful.  The feeding tube was removed on April 7, 2011, in keeping with the Kennedy-Krieger Institute's protocol to keep a feeding tube in place six (6) months' after completion of the program.

(23)    In total, Appellant spent at least nineteen thousand one hundred fifty seven dollars ($19,157) in legal fees to obtain orders to have D.F.S., Jr. receive the medical treatment he needed to have the feeding tube removed and to oppose the motion of Ms. Sheils to have legal custody of D.F.S., Jr. taken from him. (A176)

*          *          *

On or about February 9, 2012, Appellant filed his opposition to Ms. Sheils' Petition for an Order requiring Appellant to execute all authorizations for the administration of an ADOS, speech and language assessment and occupational therapy evaluation for M.D.S.  Appellant opposed the motion on the grounds, of among other things, that he did not want M.D.S. labeled and on the grounds that Dr. Pipan's reports were unreliable.  (A176-77)

The Family Court Judge made it clear that he was not going to compel Appellant to consent to the testing, including the ADOS test, at least without permitting Appellant an opportunity to obtain discovery.  With this, Ms. Sheils withdrew her Petition.  (A140; A845)

## II.    THE SCHOOL DISTRICT AND M.D.S.

Ms. Sheils then sought to accomplish with the School District what she could not accomplish with the divorce court.  Dr. Pipan had a conference call with school staff, including Ms. Vommorow, the school's guidance counselor.  This was done without Appellant's knowledge, consent or participation.  (A141; A1054-57)

Furthermore, the school guidance counselor continued to be involved with M.D.S., despite Appellant's demand that she not, including conducting a re-evaluation of him on or about April and May, 2013, and being involved in his IEP.  (A53; A91-136; A108-09; A875-91)

Also, upon information and belief, Ms. Sheils began employment with the School District and used this position to step-up her campaign against Appellant and the minor child M.D.S.

In April, 2013, the School District sought to perform an FBA, a Connors 3 and an Autism Spectrum Evaluation.  (A871; A1305-20)  Appellant requested an informal meeting.  *Id.*  At the meeting, with Dr. Peter Kurtzer and Ms. Fran Nitkin, it was agreed that an FBA, Connors 3 and Autism Spectrum Evaluation would not

19

be performed.  (A842; A873-74)  Despite this, the School District essentially

disregarded Appellant's wishes and essentially performed a behavioral assessment.

Appellant strenuously objected to this in a letter dated June 6, 2013 to the Dr.

Kurtzer.  (A140-41)

Moreover, the School District and Ms. Sheils, polluted the Re-evaluation

Report with selected quotations from the reports of Dr. Pipan.  (A875-911)

## III.   THE JUNE 2013 IEP

The minor child M.D.S. is presently being taught under the IEP that was

agreed upon in June 2013, with an agreed upon revision made on or about July,

2013.  (A50-90)  Pursuant to the June 2013 IEP, M.D.S. spends 94% of his time in

the regular classroom.  Ms. Laura Tittle, William Penn Middle School's Vice

Principal, was present at the IEP meeting. (A53)

Since M.D.S. entered Middle School in late August 2014, the School

District, at the behest of Ms. Sheils, has been conducting a campaign to "open" the

IEP put in place in June 2013 and is seeking to no longer mainstream him.  It is

also seeking the right to conduct an FBA.  The School District was already

anticipating a due process hearing and was merely creating a record to fit into a

decision it had already made.  (A96; A930-33; A936-37; A938-40)

## IV.   THE DECEMBER 2013 IEP AND APPELLANT'S DUE PROCESS DEMANDS

In December, 2013, the School District unveiled the IEP that had been

plotting for months.  (A91-136)

The IEP meeting was held on Friday, December 13, 2013.  At the meeting, it

became apparent that the School District no longer wanted the child mainstreamed

and that it was insisting upon an FBA.  The School District was not proposing any

additional therapies for the child, it sought merely to segregate him.  (A483-84)

On December 13, 2013, Appellant received an e-mail from Ms. Katie Cooper of

the Middle School stating that the Appellant provide her with his parental concerns

by Monday, December 16, 2013 so that it could be posted into the IEP.  (A913)

Appellant responded that the deadline was unrealistic and that if the IEP team were

open-minded and wanted to approach this matter in an informative and deliberative

manner, that Appellant be provided sufficient time to respond.  Given the Holiday

season and the fact that Appellant would have the children the majority of the time

during the Holiday season, Appellant proposed providing his comments no later

than January 15, 2014.  *Id.*  Ms. Cooper, and the School District, rejected his

proposal.

On December 13, 2013, the School District issued a Permission to

Reevaluate Form to perform an FBA upon M.D.S.  On December 17, 2013,

Appellant requested a due process hearing.  (A137-41)

21

On December 20, 2013, the School District issued a Notice of

Recommended Educational Placement pursuant to which M.D.S. would no longer

be mainstreamed.  On December 20, 2013, Appellant requested a due process

hearing.  (A145-54)

In his due process complaint, filed on December 20, 2013, Appellant

demanded the following relief:

a.  That the child continue to be mainstreamed.
b.  That the child **not** be placed in a Learning Support setting.
c.  That the father's express wishes be honored and that no functional behavior assessments be performed.
d.  That any assessments or mention of the child's behavior be stricken.
e.  That any mention of autism or autistic spectrum disorder be stricken.
f.  That the IEP eliminate behavior as a goal, objective or instruction and instead focus upon the core subjects of reading, writing, comprehension and mathematics.
g.  That exercises in abstract thinking continue as a goal, objective and instruction.
h.  That the "case manager" for the child be identified and an explanation be provided to the father as to when a "case manager" became involved, who authorized it, why the father was not previously notified, and that father be provided with the documents, notes and records of the "case manager."
i.  That the one-on-one speech therapist focus upon reading, writing and comprehension and forego any attempts to modify "behavior" or giving instructions regarding identifying or providing solutions to emergency situations.
j.  That a one-on-one aid be provided, if needed to continue the child to be mainstreamed.
k.  That the co-teaching model be eliminated since it is distracting to the child.
l.  That the child be given the exact same homework assignments as the other children in the classroom.

    m.    That chunking, social cartoons and a "positive behavior support plan" in the IEP be stricken.

    n.    That the father be provided with documents reflecting any conversations or meetings between any employee of the school or school district and Dr. Pipan concerning the child, including, but not limited to any documents pertaining to behavior, behavioral assessments, autism or autistic spectrum disorder.

    o.    That the father be provided with prior notice of any conversations or meetings between any employee of the school or the school district and Dr. Pipan, or any other physician or psychologist retained by the mother, concerning the child and that the father be permitted to participate in such conversations or meetings.

    p.    That an independent professional be retained, at the school district's expense, to monitor compliance with the foregoing.

    q.    That the school district conduct an investigation regarding the circumstances surrounding the female student telling other students that the child was autistic.

    r.    That other relief be granted as may be just and proper.  (A152-53)

## V.    THE "DUE PROCESS HEARING" AND ADMINISTRATIVE DECISION AND ORDER

A Due Process Hearing conference was held on March 3, 2014.  The Due Processing Hearing was held on March 6, 7, 10, 17 and 18, 2014.  Written closing arguments were submitted on April 9, 2014.  (A862-70; A1438-63)

On April 23, 2014, the Hearing Officer rendered his Decision.  (A1-19)  In his Decision, the Hearing Officer found in favor of Appellant in certain regards and in favor of the School District in other regards.

First, the Hearing Officer found in favor of the School District regarding an

FBA.  The Hearing Officer held that the FBA shall be performed in an educational

setting.  The Hearing Officer set forth the following regarding the FBA:

- On or before May 3, 2014, the District shall provide in writing to the student's father information (as set forth below) for three independent evaluators experienced in conducting of data-gathering for, and authorship of, FBAs who will make themselves available to conduct an independent FBA at District expense.

- The District's selection of the evaluators shall be based solely on the background and experience of the evaluators. Communications by the District with a potential evaluator shall not include any discussion of an evaluator's rate or fee, and, in selecting the independent evaluators, the District shall not give any consideration to its estimation of the cost of the independent FBA.

- The information provided to the student's father regarding the selected evaluators shall include the full curricula vitae for the evaluators. The student's father may review the evaluators' curriculum vitae but shall not contact any of the potential evaluators.

- The cost of the independent FBA shall be at the evaluator's rate or fee and shall be borne by the District at public expense.

- On or before May 13, 2013, the student's father shall contact the District's director of special education by email to inform the District of the evaluator selected by the father to conduct the independent FBA.

- If the student's father has not emailed a selection of one of the independent evaluators by May 13, 2014, the District shall select one of the three independent evaluators. Even if the District makes the selection of the independent evaluator, all

other aspects of this order related to the independent evaluator and/or the independent FBA shall be followed.

- The selected evaluator shall coordinate with the District on the scheduling of observations, but the number and nature of those observations shall be determined solely by the evaluator. Furthermore, the scope, details, findings and recommendations of the independent FBA shall be determined solely by the selected evaluator.

- After the independent evaluator has issued the independent FBA for the student, the student's IEP team shall meet to consider the findings of the assessment in light of the student's IEP and educational programming ("the FBA IEP meeting"). At the FBA IEP meeting, the IEP team shall invite and include the independent evaluator in the IEP team meeting (making scheduling accommodations for the participation of the evaluator as necessary), and the District shall bear any cost, or rate, for the appearance of the independent evaluator at the FBA IEP meeting.

- The terms of this order regarding the involvement of the independent evaluator shall cease after the independent evaluator has participated in the FBA IEP team meeting, although nothing in this order should be read to limit, or interfere with, the continued involvement of the independent evaluator as one party, or both parties, see(s) value in such continued involvement and might make arrangements therefor. (A16-18)

With respect to the Program & Placement, the Hearing Officer held as

follows:

As of the date of this decision, the least restrictive environment for the student to receive instruction, with appropriate modifications, adaptations, aids, services and supports required by the student, is a split-program where the student receives some instruction in a resource room setting and some in an inclusive regular education classroom, both classrooms to be at

the school the student would attend if not eligible for special education.

Instruction in reading and writing shall take place in a resource room setting. Instruction in mathematics shall take place in an inclusive regular education setting. Instruction and therapeutic techniques in speech and language shall take place where the student's IEP team determines this instruction would allow the student to gain meaningful education benefit from the instruction.  (A15)

Prior to the Hearing Officer rendering his Decision, the School District notified Appellant that it would change M.D.S. placement immediately, if that were the Hearing Officer's decision, despite the "stay-put rule" even though Appellant would appeal.  (A190-92)

On April 29, 2014, the Pennsbury School District e-mailed Appellant the curriculum vitae of three behavioral specialists.  (A437-38)  Pursuant to Decision and Order, Appellant was to inform the School District of the evaluator essentially picked by the School District no later than May 13, 2014.

## VI.    THE PROCEEDINGS BEFORE THE DISTRICT COURT AND THIS COURT

On May 13, 2014, Appellant filed with the district court: (1) a Complaint appealing the Decision and Order;[3] (2) an Ex Parte Application for Order to Show

---

[3]  The Complaint asserts the following causes of action:  Violation of the Individuals with Disabilities Education Improvement Act, 20 U.S.C. § 1401 *et seq.*, (Counts I and II); Violation of the Individuals with Disabilities Education Improvement Act and 42 U.S.C. § 1983, (Count III); Violation of the Federal

*footnote continued*

Cause Re: Entry of Stay Pending Appeal, Preliminary Injunction and Temporary

Restraining Order; (3) Memorandum of Law in Support Thereof; (4) a Proposed

Order; and (5) Appellant's Declaration with Exhibits.  (A160-398)  On May 20,

2014, the School District filed a response in opposition to Appellant's Application.

In its response, the School District stated that it had selected an evaluator and that

the "FBA is currently in progress."  (A540; A691-94)  On May 21, 2014, the

district court held a hearing.  (A399-528)  Without prior notice to Appellant, the

district court permitted the School District to present witnesses.  Appellant was not

given the opportunity to take discovery in the district court proceeding prior to this

hearing.  By Order entered May 28, 2014, the district court denied Appellant's

Application.  (A20)  No reasons were given.  On May 30, 2014, Appellant filed a

Notice of Appeal.  (A21-45)

On June 2, 2014, Appellant filed with this Court an Expedited Application to

Vacate the district court's order and to enter an Order staying the Administrative

Decision and Order pending appeal.  (A529-700)  By Order dated June 24, 2014,

this Court granted the motion for a stay and directed the clerk to refer this case to

---

Rehabilitation Act of 1973, 29 U.S.C. § 794 *et seq.*, (Count IV); Violation of the
Federal Rehabilitation Act of 1973 and 42 U.S.C. § 1983 (Count V); Violation of
the First Amendment of the United States Constitution and 42 U.S.C. § 1983
(Count VI); Violation of Due Process and 42 U.S.C. § 1983 (Count VII); Violation
of Equal Protection of the Law and 42 U.S.C. § 1983 (Count VIII); Conspiracy to
Violate 42 U.S.C. § 1983 (Count IX).  (A160-228)

the merits panel to be listed before the next available panel on an expedited basis.

(A46)

## VII.  APPELLANT'S REQUESTS UNDER PENNSYLVANIA'S RIGHT TO KNOW LAW PENDING IN THE STATE COURTS

On February 28, 2014, Appellant served upon the Pennsylvania Department

of Education and the School District requests pursuant to Pennsylvania's Right to

Know Law, 65 P.S. § 67.101.  (A192)  Appellant requested, among other things,

the number of reports of child abuse by school guidance counselors made against

those of the male gender, the curriculum vitae of the teachers and school guidance

counselors involved with M.D.S. and their home addresses.  The Pennsylvania

Department of Education and the School District denied Appellant's requests in

their entirety.  On April 22, 2014 and April 24, 2014, Appellant appealed.  In

support of its opposition to Appellant's appeals, the School District submitted

Affidavits of Cheryl A. Morett, Director of Special Education for the School

District.  (A192-93)  Ms. Morett's Affidavit submitted in connection with the

appeal regarding the Pennsbury School District states as follows:

> 1.  I have reviewed Denis F. Sheils' Right To Know (RTK) request of February 28, 2014, which attached to the instant response as Exhibit "A".
>
> 2.  As noted in his appeal, Mr. Sheils initiated a due process complaint against the Pennsbury School District on behalf of his minor son.

3.   During the course of that litigation, both myself and other district employees have been subject to unfounded and personal verbal attacks by Mr. Sheils.

4.   In Paragraph 28 of his RTK request, Mr. Sheils requests the home and mailing addresses of those individuals involved in the due process litigation initiated against the District.

5.   There is a concern for the safety and risk of harm to those employees mentioned in Paragraph 28 of the RTK request based on contentious nature of the litigation and Mr. Sheils behavior and demeanor toward District employees.

6.   The statements made in the foregoing correspondence to Appeals Officer J. Chadwick Schnee, Esquire, responding to the appeal of Denis F. Sheils to the Office of Open Records, Docket # AP 2014-0621 are true and correct to the best of my knowledge, information and belief.

7.   I make this statement under penalty of perjury as more fully set forth in 18 Pa. C.S. § 4904.

On May 19, 2014, the OOR, Appeals Officer J. Chadwick Schnee, Esquire,

(Docket No.: AP2014-0621) denied Appellant's request for documents.  However,

in its decision, the OOR ignored the Affidavit of Ms. Morett.

On May 27, 2014, the OOR, by Appeals Officer Audrey Buglione, Esquire,

again denied Appellant's request for documents (Docket No.: AP2014-0679).

However in so doing, it relied, at least in part, upon the Affidavit of Ms. Morett.

Appellant has appealed the decisions of the OOR to the Commonwealth

Court of Pennsylvania (No. 967-CD-2014) and the Bucks County Court of

Common Pleas (No. 2014-04164).

29

## VIII.  SUBSEQUENT EVENTS CONCERNING M.D.S.

On December 4, 2012, M.D.S. weighed 81 lbs., 2.1 oz. (A1473)  On March 20, 2013, he weighed 75 lbs., 6.4 oz. (A1477)  On February 4, 2014, M.D.S. weighed 74 lbs., 1.2 oz. (A1480)  On April 25, 2014, M.D.S. weighed 67 lbs., 7.4 oz. (A1486)  On or about June 14, 2014, Appellant received notice that Ms. Sheils requested a support conference to increase the amount of support to be paid by Appellant.  (A1505-06)  On June 23, 2014, M.D.S. weighed 64 lbs., 2.5 oz. (A1496)  The minor child M.D.S. was admitted to the hospital on July 2, 2014 for malnutrition and orthostatic hypotension.  (A1498-1504)  Although Appellant does not have primary physical custody of M.D.S., the physicians at Kids First-Newtown were contemplating reporting *Appellant* for child abuse.  (A1485-87)[4]

### STATEMENT OF SCOPE AND STANDARD OF REVIEW

The district court did not make any findings when it denied Appellant's motion to stay and to enter a preliminary injunction.  As such, this Court should exercise plenary review with respect to the legal standards to be applied.  Also, the Court should apply a modified version of <u>de novo</u> review and engage in an

---

[4] M.D.S. was released from the hospital on Saturday, June 12, 2014.  Ms. Sheils picked M.D.S. up from the hospital since it was her weekend.  Appellant had not seen or spoken with M.D.S. since the night of Friday, July 11, 2014.  On Tuesday, July 15, 2014, Appellate received a text message from Ms. Sheils.  It is self-explanatory.  (A1507-09)

independent review of the record.  *See LE v. Ramsey Board of Education*, 435 F.3d 384, 389 (3d Cir. 2006).  Also, under the IDEIA, a reviewing federal court "shall hear additional evidence at the request of a party."  20 U.S.C. § 1415 (i)(2)(C); *see also Antoine M. v. Chester Upland School District*, 420 F.Supp.2d 396 (E.D.Pa. 2006).[5]

## SUMMARY OF ARGUMENT

The district court's order denying Appellant's Application should be vacated and the Administrative Decision and Order should be stayed pending final disposition of this matter.  If such an order is not entered, Appellant and the minor child will suffer irreparable harm.  An FBA should <u>not</u> be conducted and M.D.S. should remain in the regular classroom setting for all subjects.  The stay is further warranted since Appellant should be provided the opportunity to conduct discovery and supplement the record.  Regardless, even upon the existing record Appellant has demonstrated probable success on the merits.

---

[5] In conjunction with Appellant's Application with the district court, Appellant filed a Complaint and a Declaration with exhibits, that included the written closing argument dated April 9, 2014 that Appellant submitted to the Hearing Officer that marshalled the evidence.  In addition, the district court received additional testimony at the May 21, 2014 hearing.  (A399-528)  At the hearing, Appellant requested that all exhibits Appellant listed and/or identified in the Due Process Hearing be admitted, including the exhibits the Hearing Officer excluded; and, the Hearing Officer exhibits.  (A494-96)

## ARGUMENT

## I.    THE "STAY-PUT RULE" REQUIRES ENTRY OF THE STAY

The "stay-put rule" set forth in 34 C.F.R § 300.518 requires entry of the

requested stay, at least with respect to the minor child's program/placement

pending final disposition of the appeal.  The School District in taking the position

that since the child's mother wants M.D.S.' program/placement changed, the "stay-

put rule" is overridden.  (A190-92)  The School District's reading of 34 C.F.R §

300.518 is erroneous.  The regulation expressly provides that the "stay-put rule" is

only overridden if the Hearing Officer and the parents (plural) agree to a new

placement.  The School District's position also violates the custody order that

places legal custody in both parents jointly.  To change M.D.S.'

program/placement pending any appeal, without Appellant's consent is a violation

by the School District of Appellant's parental rights and liberty interest in the

child.

## II.    THE STATUS QUO SHOULD BE PRESERVED PENDING CONCLUSION OF THE REVIEW PROCEEDINGS TO AVOID IRREPARABLE HARM

The Application should also be granted to maintain the status quo pending

conclusion of the review proceedings to avoid irreparable injury.  The

Administrative Decision and Order should be stayed in its entirety since if such an

order were not entered, Appellant and the minor child will suffer irreparable harm

since:

- Up until this Court entered a stay, the School District was proceeding with the FBA. The FBA should not be performed against Appellant's consent, at least until this matter is finally resolved.[6]

- An FBA will subject M.D.S. to results that will be in his education records and, in light of recent changes to the DSM-V, as explained in the recent decision of the United States Supreme Court in *Hall v. Florida*, 134 S. Ct. 1986 (May 27, 2014), subject to the minor child to the possibility of being labeled "intellectually disabled";

- An FBA performed according to the Administrative Decision and Order violates Appellant's and M.D.S.' rights to have Appellant act as an advocate for his son in violation of the IDEIA, 20 U.S.C. § 1401 *et seq.* and the First Amendment of the United States Constitution since:

  A. Appellant is enjoined from contacting and discussing the matter with the evaluator prior to any evaluation being done and does not guaranty that Appellant will be able to speak with the evaluator even after the evaluation is completed (*see Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("Loss of First Amendment freedoms, for even minimal periods of times, unquestionably constitutes irreparable harm");

  B. Leaves it solely to the School District to propose evaluators to perform the FBA and limits the choice to Appellant to pick one of the three evaluators;[7]

---

[6] The School District has represented to this Court that there is no interaction with the child when conducting the FBA, even though Ms. Morett testified that there may be. (A460) If there is any interaction that is additional reason for entering a stay. (A535)

[7] Since Appellant did not select one of the evaluators proposed by the School District by the date set by the Hearing Officer, and instead filed an Application

*footnote continued*

- The School District has stated that the "stay-put" rule does not apply to this matter and that it intends to change the minor child's placement, once the steps in the Administrative Decision and Order are completed. This will cause irreparable harm to the minor child by denying him the benefits mainstreaming provides. (A190-92)

## III.   APPELLANT ESTABLISHED THAT HE WILL LIKELY SUCCEED ON THE MERITS

### A.    The "Due Process Hearing" Did Not Provide "Due Process"

Throughout the "due process" hearing, including the written closing, Appellant objected to how the process proceeded. It is likely that the Administrative Decision and Order will be reversed on appeal.

Among the objections made, include the following:

### 1.    Burden of Proof

The Hearing Officer, relying upon *Schaffer v. Weast*, 546 U.S. 49 (2005), placed the burden of persuasion upon Appellant since Appellant was challenging the proposed IEP. (A962) This is a misreading of *Schaffer v. Weast*, and the Hearing Officer erred in placing the burden of persuasion upon Appellant. Since

---

with the district court, the School District has already selected an evaluator. (A535)

the School District is seeking to radically change the existing IEP dated June,

2013, the burden of persuasion should rest upon the School District.[8]

### 2.    The IEP Team Is Biased, Conflicted And Not Disinterested

Even assuming *arguendo*, that the burden of persuasion rests with Appellant,

the burden shifts since the IEP is biased, conflicted and/or not disinterested.  *See,*

*e.g.*, *Aronson v. Lewis*, 473 A. 2d 806 (Del. 1984) (business judgment of board of

directors rebutted when board not independent or disinterested).  In this case, the

Hearing Officer erred in not permitting Appellant to challenge whether the IEP

was independent or disinterested.  Appellant was not permitted to delve into issues

of bias.  (A863)  Nor was Appellant permitted even to discover whether Ms. Sheils

was or had been employed by the School District.  (A829-30)[9]

---

[8]  In *Ridley School District v. M.R.*, 680 F.3d 260, 270 (3d Cir. 2012) (Fisher, Circuit Judge), this Court held that it is "the party challenging the administrative decision [that] bears the burden before the district court as to each claim challenged."  It is respectfully submitted that this position is also contrary to *Schaffer*.  As *Schaffer* noted the burden "should be assigned to the [party] who…seeks to change the present state of affairs."  546 U.S. at 56.  Since it is the School District that seeks to radically change the present state of affairs, the burden of persuasion at the administrative level should have been placed upon the School District.  To hold that the party upon whom the burden was erroneously placed at the administrative level has the additional burden to also challenge the administrative decision, only compounds the error.

[9]  Ms. Sheils is, or at least was, an employee of the School District.  An e-mail Ms. Sheils sent to The Hearing Officer in January, 2014 suggests that this is the case. HO-5.  The refusal of Ms. Sheils to testify whether she is or was employed by the School District, and the denials of the School District employees of knowledge

*footnote continued*

35

### 3.    The Scope Of The Issues Heard And Relief Permitted Were Improperly Limited

The scope of the issues heard by the Hearing Officer and the relief permitted were improperly limited. The scope of the hearing should have encompassed all the issues raised and the relief sought in the due process complaints.

For example, in his ruling dated February 21, 2014, the Hearing Officer stated that he would only permit witnesses to testify who had information about M.D.S. in the education environment.  (A989)  He also generally limited the hearing to the time period beginning when M.D.S. started in Middle School, except with respect to the Reevaluation Reports.  (A863)  Indeed, when he ordered an FBA to be conducted, he limited it to observations regarding M.D.S. in the educational environment, even though at least one witness testified that FBA's also involve observations in the home setting to try to pinpoint the source of any purported off-task behaviors.  (A248; A393-98)  Given the Hearing Officer's decision, Appellant was not permitted to discover or present witnesses, testimony documents and evidence that is highly relevant, including the change in M.D.S.'

---

whether Ms. Sheils is or was employed by the School District, draws into question the credibility of the school district employees.  *See* Harriet A. Sheils Test. (A829-30); *see also* Katie Cooper Test. (A716-17); Cheryl Morett Test., Volume II (A754).  It is also relevant to the question regarding the independence of the IEP team, which Appellant was not permitted to explore.

"progress" after Dr. Pipan became involved.  HO-36, 24 of 49; *see also* A1091-1128.

Furthermore, Appellant sought to have all references to autism deleted from M.D.S.' school records.  (A152)  The Hearing Officer never entertained this request.

### 4.    Appellant Was Denied The Opportunity To Subpoena And Examine Important Witnesses

Appellant was denied the opportunity to examine important witnesses, including, but not limited to: Dr. Peter Kurtzer, Ms. Laura Tittle, Ms. Patricia Vommorow, Dr. Julie Kardos, Ms. Laura Kozak, Ms. Barbara Statura and Ms. Claudia Huot, Esquire.  HO-36; HO-37; (A862; A963-88; A992-94)  The involvement of Dr. Kurtzer, Ms. Tittle, Ms. Vommorow, Dr. Julie Kardos and Claudia Huot, Esquire are discussed above.  In particular, Appellant requested the opportunity to explore with Dr. Kardos what is being said to her and M.D.S. by Ms. Sheils and whether Ms. Sheils was positively enforcing M.D.S. purported "inappropriate behaviors" and whether she was interfering with M.D.S.' "intellectual, emotion and social development."  Ms. Kozak and Ms. Stachura are with the Penndel Mental Health Center.  They have had personal contact with Ms. Sheils and the children, including M.D.S.  Ms. Kozak issued a Progress Note dated February 23, 2013 regarding Ms. Sheils.  (A969)  In her report, Ms. Kozak refers to Ms. Sheils' "persistent pattern of overprotection."  Although the report refers to

37

her "overprotectiveness" of the child D.F.S., Jr., such "overprotectiveness" was

noted to "interfere[] with D.F.S., Jr.'s intellectual, emotional and social

development."  Appellant requested the opportunity to explore with Ms. Kozak and

Ms. Stachura their observations of Ms. Sheils, what is being said to M.D.S. by his

mother and whether she is interfering with his "intellectual, emotional and social

development."  The Hearing Officer denied Appellant's request.  (A989)

### 5. Appellant Was Denied Access To Important And Relevant Documents

Appellant was denied access to important and relevant documents, the

curriculum vitae of the witnesses and those of the IEP team, including test

protocols and progress reports.[10]

The School District has taken the position that the only documents its needs

to produce under the Family Educational Rights and Privacy Act of 1974, 20

U.S.C. § 1232g ("FERPA") are "education records." HO-14, HO-15, HO-16, HO-

17.  However, 20 U.S.C. § 1415, which applies to due process proceedings is not

so limited.  It permits review by parents of "all records relating to such child."  In

any event, even if FERPA were to apply, the School District's reading of the

---

[10]  The Hearing Officer requested witnesses to provide education and employment
background at the beginning of their testimony.  However, this is an inadequate
substitute for not receiving complete curricula vitae of the witnesses before the
hearings started.

exceptions to "education records" is erroneous and should be rejected. It is non-sensical to interpret a statute intended to protect the privacy of the school records of students to deny those students and parents access to those records.

The Hearing Officer also erred in denying Appellant personal access to test protocols, ruling that only an expert retained by Appellant could have access to them. To the extent that test protocols are confidential and proprietary, Appellant offered to enter into a reasonable confidentiality stipulation. Despite this, the School District still objected and the Hearing Officer erroneously adopted the School District's position. HO-32.

### 6.    The School District Did Not Produce Relevant Documents

The School District did not produce relevant documents, even those within the scope of the Hearing Officer's relevant time period. For example, important e-mails were not produced, including an e-mail from Ms. Sheils to Ms. Katie Cooper in September, 2013. Katie Cooper Test. (A715a-715f).[11]

---

[11] During her testimony, Ms. Cooper was asked whether Ms. Sheils ever expressed concerns about money. Ms. Cooper testified that Ms. Sheils never expressed such concerns. *See* Cooper Testimony. (A244) This testimony is contradicted by the e-mail Ms. Sheils sent to Ms. Cooper on October 16, 2013. (A929) Appellant should also be provided with the September, 2013 e-mail, which has never been produced.

**7.    Unreasonable Time Limits Were Placed Regarding Examination of Witnesses**

The Hearing Officer also placed unreasonable time limits upon regarding the examination of witnesses.  (A1020-21)

**8.    Documents Were Admitted That Should Not Have Been Admitted And Documents Were Excluded That Should Have Been Admitted**

Documents were admitted into evidence that should not have been, even according to the criteria set by the Hearing Officer, including the 2013 Re-Evaluation Report that is littered with selected quotes from the Reports of Dr. Pipan.  (A875-911)  Furthermore, documents were excluded or not admitted that should have been admitted.  *See* A995-1012; A1018-19; A1022-1381.

**9.    Witnesses Were Permitted To Refuse To Answer Relevant Questions**

The Hearing Officer erred by permitting witnesses to refuse to answer relevant questions, including permitting Ms. Sheils to decline to testify whether she is, or ever was, employed by the School District.  (A829-30)

**10.    Insufficient Time Was Provided To Obtain Necessary Documents And To Retain An Expert To Review And Write A Report**

Insufficient time was provided to obtain necessary documents and to retain an expert to review and write a report.  (A862)  Much of the time, Appellant was attempting to obtain relevant documents from the School District, which has made

it an art not to produce relevant documents, at least up until the last minute before

the hearing. *See* HO-14. HO-16, HO-21, HO-25, HO-30. Also, as mentioned

above, relevant documents and e-mails were still never produced.

**B.    Even Upon The Record As It Currently Exists, Appellant Has Shown That He Will Likely Succeed On The Merits**

Even upon the record as its exists, Appellant has shown that he will likely

succeed on the merits. The salient facts that show that Appellant will likely

succeed on the merits are as follows:

- Under the IDEIA, parental consent to an evaluation or re-evaluation is required. *See* 20 U.S.C. §1414. The School District has not obtained Appellant's consent to an FBA. Appellant has stated that he does not consent, and to the extent he has given any prior consent, it is revoked;

- The School District has not offered a school psychologist that was a member of the December 2013 IEP Team that recommended that an FBA be conducted;

- The Administrative Decision and Order exceeds the Hearing Officer's authority and violates Appellant's rights and M.D.S.' rights as Appellant being an advocate for his son in violation of the IDEIA and the First Amendment of the United States Constitution. *See Elrod*, 427 U.S. at 373. Appellant has been unlawfully enjoined to contact and discuss the matter with the evaluator prior to any evaluation being done and does not guaranty that Appellant will be able to speak with the evaluator even after the evaluation is completed. It also improperly leaves it solely to the School District to propose the evaluator to perform the FBA.

- The Decision and Order violates M.D.S.' rights under § 504 of the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*;

- The Decision and Order violates the fundamental liberty interests that Appellant has in the care, custody and control of M.D.S. protected by the Fourteenth Amendment of the United States Constitution and 42 U.S.C. § 1983. *See, e.g., Miller v. Mitchell*, 598 F.3d 139, 150 (3d Cir. 2010);

- The Decision and Order violates Appellant's rights and M.D.S.' rights under the Due Process Clause of the Fourteenth Amendment of the United States Constitution and 42 U.S.C. § 1983; and

- The Decision and Order violates Appellant's rights and M.D.S.' under the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and 42 U.S.C. § 1983.

### 1.    A Functional Behavioral Assessment Cannot Be Performed

The IDEIA and the federal regulations promulgated therewith, appoints parents as advocates for minor children.  Under the IDEIA, parental consent to an evaluation or re-evaluation is required.  *See* 20 U.S.C. § 1414.  The School District has not obtained Appellant's consent to an FBA.  Appellant has stated that he does not consent, and to the extent Appellant has given any prior consent, he revokes such consent.  Denis F. Sheils Test. (A841)  As a legal matter, that should end the matter.  In any event, Appellant's rationale for refusing consent has been provided and it should be respected.

First, in April, 2013, this issue previously arose.  Not only did the School District seek to perform an FBA, it also sought to perform a Connors 3 and Autism Spectrum Evaluation.  (A871; A1305-20)  Appellant requested an informal meeting.  *Id.*  At the informal meeting, it was agreed that an FBA, Connors 3 and

42

Autism Spectrum Evaluation would not be performed.  Denis F. Sheils Test.

(A842; *see also* A873-74).  Despite this, the School District intentionally

disregarded Appellant's wishes, and essentially performed a behavioral

assessment.  Appellant strenuously objected to this is his letter to Dr. Kurtzer dated

June 6, 2013.  (A140-41)

Second, Ms. Sheils previously moved the Court of Common Pleas, Bucks

County, Family Division to compel Appellant to consent to an ADOS test, a

speech and language assessment and occupational therapy evaluation for M.D.S.

The Family Court would not compel Appellant to consent to such a test and Ms.

Sheils withdrew her motion.  Denis F. Sheils Test. (A845)  Despite this, she went

on a campaign to have the School District join her and Dr. Pipan to have M.D.S.

diagnosed as autistic, despite Appellant's objections and the statements made by

the Family Court Judge.  (A1056-57)  Indeed, the Re-evaluation Report (A875-

911) is polluted with selected quotations from the reports of Dr. Pipan, in

conscious and intentional disregard of Appellant's parental rights and the liberty

interests of M.D.S. and Appellant guaranteed by the Fourteenth Amendment of the

United States Constitution.

Third, If the School District is claiming that it seeks only an FBA now, what

stops it from seeking a Connors 3 or an Autism Spectrum Evaluation later?  The

School District has no place diagnosing children, particularly in conscious disregard of a parent's wishes.

Fourth, the School District has engaged in a pattern and practice of disregarding Appellant's wishes and to what had been agreed upon.  Appellant had objected to Ms. Vommorow having any involvement with M.D.S.  Despite this, Ms. Vommorow was involved in the 2013 Re-evaluation and M.D.S.' June, 2013 IEP.  Dr. Alison Smith Test. (A708-09; A53; A875-911)  Also, in blatant and conscious disregard of Appellant's decision, and in breach of the agreement it previously reached (*see* A918; A922-27), the School District has, since M.D.S. started Middle School, gone out and re-evaluated M.D.S., not only without Appellant's consent, without notification to Appellant, but also in violation of the June, 2013 IEP.  It has taken M.D.S. out of class to perform these evaluations (*see* Katie Cooper Test. (A726), it has riddled his school record with evaluations that are not even standardized and has subjectively found results that are meant to bolster its pre-judged "case" that M.D.S. should be segregated and no longer mainstreamed.  (A930-33; A936-37; A938-40)

Fifth, Appellant has repeatedly stated that Appellant does not want his child labeled.  Denis F. Sheils Test. (A843)  It leads to segregation and discrimination. Furthermore, the psychologists that have seemed to have hijacked our educational system no longer concentrate on the fundamentals of reading, writing or arithmetic.

Instead, they parrot the purported importance of "behavior" and how "behavioral issues interfere with learning."  Perhaps the teachers should be looking into the question of what they can do to make their classes interesting so that a student wants to learn.

Sixth, the DSM-V that was recently issued seeks to use not only IQ scores but also behavior to determine who is "intellectually disabled."  *See Hall v. Florida*, 134 S. Ct. 1986 (May 27, 2014).  Appellant does not know where this is going but Appellant does not want any tests performed that may adversely affect his son in the future, when, in his opinion, such tests are subjective, inaccurate and subject to bias.  Denis F. Sheils Test. (A842-42; *see also* A472-73)

Seventh, an FBA is not needed since, even by their own testimony, the teachers have acknowledged that, nudging M.D.S. has been effective in getting him back on task.  *See* Kimberly Shultz Test. (A803, 805, 807); Erin Federsel Test. (A739-40); Raymond Walter Test. (A814-15); *see also* M.*H. v. New York City Dept. of Educ.*, 712 F.Supp.2d 125 (S.D.N.Y.) (FBA not needed when there are other means to address a student's purported problematic behaviors), *aff'd*, 685 F.3d 217 (2d Cir. 2010).

Eighth, the School District has not even offered a school psychologist that was part of the December 2013 IEP that has stated that M.D.S. should have an

FBA.  (A476-77)  The failure to proffer such a witness is, in any event, fatal to the

School District's position.

Finally, the Decision and Order exceeds the Hearing Officer's authority and

violates Appellant's rights and M.D.S.' rights as Appellant being an advocate for

his son in violation of the IDEIA, the First Amendment of the United States

Constitution, the Due Process Clause and the Equal Protection Clause of the

Fourteenth Amendment to the United States Constitution.  *See, e.g., Miller*, 598

F.3d at 150.

### 2.    M.D.S. Should Continue To Be Mainstreamed

M.D.S. should continue to be mainstreamed and not segregated from the

regular education classroom.

- M.D.S. has progressed; and Appellant believes that progress has been due to M.D.S. being mainstreamed.

- Appellant is convinced that a child learns best from his peers, including those considered to be more academically advanced.

- The Administrative Decision and Order did not consider bringing back a one-on-one so the child can remain mainstreamed, even assuming that the School District's concerns have any merit.

- The School District has not proferred any evidence that M.D.S. would benefit from being segregated.  The Hearing Officer directed during the conference call held on Monday, March 3, 2014, that he wanted to hear from the teacher that would be involved in the proposed new environment, to testify "this is what we do in the classroom" and "this is what we will be doing and how it is different from what has been happening."  *See* March 3, 2014 Conference Call Transcript (A701-03)  Contrary to the Hearing Officer's directions, the School District

46

did not proffer a witness who would be M.D.S.' teacher in the new environment.  (A484-87)

Appellant has never disputed that M.D.S. can be regarded as a child with a speech and language impairment.  Despite this, he has always been mainstreamed.  This is consistent with a core principle of the IDEIA that even children that are regarded as having a disability does not necessitate that the child be segregated from the regular education classroom.  The IDEIA requires that the students with disabilities be educated in the "least restrictive environment" appropriate for the student.  20 U.S.C. § 1412 (a)(5) ("[R]emoval of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily."); *see also Bd. of Educ. v. Rowley*, 458 U.S. 176, 188-89 (1982); *Oberti by Oberti v. Bd. of Educ. of Borough of Clemonton Sch. Dist.*, 995 F.2d 1204, 1213-14 (3d Cir. 1993) (holding the IDEA "sets forth a 'strong congressional preference' for integrating children with disabilities in regular classrooms") (internal citations omitted).

Furthermore, there is a Fourteenth Amendment constitutional dimension that mandates mainstreaming.  Basic human dignity requires nothing less.  As the United States Supreme Court recognized in the seminal case *Brown v. Board of Education*, 347 U.S. 483, 494 (1954), albeit in the context of racial segregation in schools, that a segregated school does not provide equal educational opportunities:

> Such considerations apply with added force to
> children in grade and high schools.  To separate
> them from others of similar age and qualifications
> solely because of their race generates a feeling of
> inferiority as to their status that may affect their
> hearts and minds in a way unlikely ever to be
> undone.
>
> *            *            *
>
> A sense of inferiority affects the motivation of a
> child to learn.

This rationale is just as applicable to those students regarded as disabled.

Self-esteem, one would think, is just as important, if not even more important, a

factor in seeing that a child regarded as having a disability is not segregated from

the rest of the class.[12]

---

[12]  In *A.W. v. Jersey City Public Schools*, 486 F.3d 791 (3d Cir. 2007) (en banc)
this Court held that a § 1983 action was not available to a student to receive
compensatory damages to remedy alleged violations of IDEA-created rights and
violations of the Rehabilitation Act.  *A.W.* is at odds with the decisions in other
Circuits, notably the Seventh and, apparently the Second.  *See, e.g., Moore v.
Hamilton Southeastern School District*, 2013 WL 4607228 (S.D. Indiana, August
29, 2013); *Stahura-Uhl v. Iroquois Central School District*, 836 F.Supp.2d 132,
144-46 (W.D.N.Y. 2011); *Jenn-Ching Luo v. Baldwin Union Free School District*,
2011 WL 941263 (E.D.N.Y, 2011).  In any event, Appellant and M.D.S. have
properly asserted claims under the IDEIA and the Rehabilitation Act since they
seek relief afforded under these statutes.  Moreover, Appellant and M.D.S. have
properly asserted constitutional violations outside the scope of the IDEIA thus
entitling them to seek compensatory damages and other relief under § 1983.

### i.    M.D.S. Should Continue To Be Mainstreamed Because He Continues To Make Progress

Appellant has felt that M.D.S.' progress has been due to him being mainstreamed.  Denis F. Sheils Test. (A840)  Appellant is convinced that a child learns best from his peers, including those considered to be more academically advanced.  Denis F. Sheils Test. (A846)

M.D.S. should continue to be mainstreamed since he continues to show progress.  (A914-16; A941-42)  Kimberly Shultz Test. (A799-800); Paul Meehan Test. (A749-50); Christine Leonard Test. (A774-75; A783-84); Cheryl Morett Test. (A760)  Despite the purported "evaluations" the School District has proffered (which are of questionable reliability since they were performed after the school district decided to "open" the June 2013 IEP and no longer mainstream him), the undeniable fact is that M.D.S. is still progressing.  The Hearing Officer, at least with respect to mathematics, found as much.

M.D.S. is not a distraction in the classroom.  No witness has testified that M.D.S. has been removed from the classroom for being disruptive.  To the extent any witness has testified that M.D.S.' behavior is at times off-task, none of the behaviors cited have risen to the level that can be considered disruptive or which could justify him being no longer mainstreamed.  In fact, they are behaviors often exhibited by regular classroom students and even the teachers themselves.  *See* Raymond Walter Test. (A812-13); Alison Smith Test. (A712); Erin Federsel Test.

49

(A738); Kimberly Shultz Test. (A805-06)  In any event, a simple nudge is enough

to redirect M.D.S. from any purported off-task behavior he may exhibit.  *See*

Kimberly Shultz Test. (A802, 805, 807); Erin Federsel Test. (A739-40); Raymond

Walter Test. (A814-15)  Certainly, there is nothing in the record that justifies

segregating M.D.S. from the regular education classroom.

In any event, the purported "off task" behaviors to which school employees

have testified to are undermined by the October 1, 2013 observation.  Mr. Paul

Meehan, the school principal, who observed M.D.S. in science class with Ms.

Sheils and Appellant testified that: he did not see M.D.S. cry; he did not see or hear

him sing; he does not recall him doodling; he did not see him laughing

uncontrollably; and, he could not say that M.D.S. was talking to himself.  In a

small group setting, Mr. Meehan saw M.D.S. interacting with the other children; in

fact, he was smiling with the other students.  In the larger class setting, M.D.S.,

after a prompt, even answered a question posed to him by the science teacher.  Paul

Meehan Test. (A744-48)

> **ii.    The IEP Is Deficient And Inappropriate Since The
> School District Did Not Provide Sufficient Time And
> Effort To Make The Existing IEP Work**

The proposed IEP (A91-130) is deficient and inappropriate since the School

District did not provide sufficient time and effort to make the existing IEP work.

Almost as soon as M.D.S. began Middle School, it was decided to "open" the IEP

and the School District has been single-minded in its goal to no longer mainstream

M.D.S.  *See* Cheryl Morett Test. (A756-57); *see also* (A930-33; A936-37; A938-

40; A91-136).  In furtherance of this effort, unnecessary evaluations were

performed that took the child out of his regular classroom and unnecessary

observations were made that have shaken the child's confidence.  *See* Katie Cooper

Test. (A726)

The co-teaching model has been used to distract the child.  The co-teacher,

Ms. Cooper, has distracted M.D.S. from focusing upon problems that are not even

being taught by the regular classroom teacher.  *See* Lesley Gordon Hirsh Test.

(A794-95); Kimberly Shultz Test. (A801)

The co-teacher has also been modifying the child's homework assignments

such that he does substantially <u>less</u> homework than the other children.  Indeed,

numerous homework problems have been eliminated that need to be tackled in

order for the child to perform adequately upon the tests and exams that are given to

the class.  *See* Kimberly Shultz Test. (A804)  Frustration is the key to education.

Reducing the amount of work because the child exhibits or expresses frustration

positively reinforces such behavior to avoid even more work and squelches the

desire to learn.

The speech pathologist, Ms. Christine Leonard, with all due respect, has not

been providing M.D.S. with the appropriate services he requires.  Instead of first

determining a baseline, she started M.D.S. in the Hear Builder Program from

square one. Christine Leonard Test. (A772-73) M.D.S. has made progress; but, it

was not until January, 2014 that anything the speech pathologist was teaching

dovetailed with what M.D.S. was doing in class. Christine Leonard Test. (A778-

79, 784). *See* A942 ("Matthew is making steady progress while using these

strategies at this time.") The speech pathologist, who put off meeting with

Appellant for a month and a half, is also wasting time by improperly focusing upon

the identification and solutions of emergency situations instead of focusing upon

reading, reading comprehension and writing. Christine Leonard Test. (A785-87)

This is especially improper when neither parent has ever expressed any concern

about the child identifying and reacting to an emergency situation. Christine

Leonard Test. (A777) Prior IEPs have indicated that the child knows fully well

what 911 means; and, there is <u>nothing</u> in the existing IEP that mentions the child

identifying and providing solutions to emergency situations. *See Montanye v.

Wissahickon School District*, 399 F. Supp. 2d 615 (E.D. Pa. 2005), *aff'd*, 218 Fed.

Appx. 126 (3d Cir. 2007) (Special education teacher violated the IDEA by taking

special education student to a psychologist even though student's IEP did not

include psychological services, where teacher failed to obtain parent's written

consent to modify the IEP to include psychological service). M.D.S. has also been

placed at a disadvantage since his regular Language Arts teacher, Erin Federsel,

was out on maternity leave and did not meet M.D.S. until October 1, 2013.  Erin

Federsel Test. (A735)

### iii. The Evaluations Performed By The School District Are Not Reliable

The evaluations performed by the School District are unreliable.

The Re-evaluation Report (A875-911) is unreliable.  It was not performed

by an independent, third party.  Alison Smith Test. (A710-11)  Also, contrary to

what had been agreed upon, it is riddled with essentially behavioral assessments

and is littered with selected quotes from reports by Dr. Pipan.  An evaluation was

also performed by Ms. Vommorow, who Appellant had previously requested have

no involvement with M.D.S.  Dr. Alison Smith Test. (A708-09)  For these reasons

alone, the 2013 Re-evaluation Report is unreliable and should be stricken or

disregarded.  In any event, even in light of the 2013 Re-evaluation Report, the

School District agreed that M.D.S. should be continued to be mainstreamed as per

the June, 2013 IEP.  (A50-90)

The "purported" evaluations of M.D.S. performed since M.D.S. began

Middle School are particularly unreliable and should be stricken or disregarded.

First, they were performed without Appellant's knowledge or consent.  Denis F.

Sheils Test. (A855)

Second, they were performed after the School District had already

determined to "open" the June, 2013 IEP and to no longer have M.D.S.

mainstreamed.  In fact, the School District was already anticipating a due process hearing and was merely creating a record to fit into a decision it had already made. (A930-33; A936-37; A938-40)  Any evaluations performed in this context are unreliable.

Third, the tests performed are not standardized, they are "informal"; and, in the case of the "off-task" tallies, are merely an *ad hoc* creation being misleadingly passed off as some type of scientific assessment.  *See* Jeanette Sicilia Test. (A822)

Fourth, the purported assessments are extremely subjective, with the results being whatever the tester wants them to be.  As even Ms. Jeanette Sicilia acknowledged during her testimony, there is "not necessarily one right answer, one wrong answer."  Jeanette Sicilia Test. (A822)  Even more troubling, is that Ms. Sicilia made gratuitous observations about M.D.S.' purported behaviors even though such observations are <u>not</u> a component of the test.  Jeanette Sicilia Test. (A824-25)

Fifth, the evaluations of the test givers are also suspect.  Ms. Sicilia, who never appeared at the IEP meeting, only recently started as a reading specialist at the Middle School in August, 2013.  Sicilia Test. (A819) She has never had experience or been taught to administer the QRI-5.  Sicilia Test. (A823)

More disturbing is the previously unidentified paraprofessional who purportedly tallied the purported "off-task" behaviors during no less than 23

observations set forth in the purported assessment whose origins seem to have simply come out of the mind of Katherine Cooper.  *See* Cheryl Morett Test. (A759); Katie Cooper Test. (A722-25; A727)

In addition to the reading assessments performed by Ms. Sicilia, the reading assessments performed by Ms. Cooper are also suspect.  With the exception of one test, which was performed by Erin Federsel, the rest were performed by Ms. Cooper, a friend of Ms. Sicilia who Ms. Cooper had requested perform the informal reading inventories.  Jeanette Sicilia Test. (A820-21)  Ms. Cooper appears be to the driving force behind no longer having M.D.S. mainstreamed.  *See* Cheryl Morett Test. (756-57); Raymond Walter Test. (A811)  If that were the case, one person alone should not be permitted to essentially make such a decision.  In any event, Ms. Cooper's testing results are extremely suspect when compared in the light of the results obtained by Ms. Federsel when M.D.S. got all the answers correct.  *See* Erin Federsel Test. (A736; A737)

Finally, these purported assessments are unreliable since they were not performed by an independent third party.  Katie Cooper Test. (A718-19); Cheryl Morett Test. (A768)  The School District has been fully aware of Appellant's concerns about testing.  At the very least, putting aside the issue of the necessity of obtaining parental consent, the School District should retain an independent third

party to perform any assessment, especially when it is seeking to make a radical change by segregating M.D.S. and no longer mainstreaming him.

### iv. The IEP Is Deficient And Inappropriate Since It Fails To Consider Bringing Back A One-On-One So The Child Can Remain Mainstreamed

Many years ago, M.D.S. had a one-on-one and the School District eliminated it since it said it was no longer required. The IEP is deficient and inappropriate since it fails to consider bringing back a one-on-one so the child can remain mainstreamed, even assuming the School District's concerns have any merit. This possibility was raised with Ms. Morett; but, she rejected it. *See* Cheryl Morett Test. (A762) The Hearing Officer committed reversible error in not even addressing this possibility in the Administrative Decision and Order.

### v. The School District Has Not Proffered <u>Any</u> Evidence That M.D.S. Would Benefit From Being Segregated

During the conference call held on Monday, March 3, 2014, the Hearing Officer made it abundantly clear that he wanted to hear from the teacher that would be involved in the new environment, to testify "this is what we do in my classroom" and "this is what we will be doing and how it is different from what has been happening." (A701-03)

The School District has failed to proffer <u>any</u> evidence in this regard.

No testimony has been offered from the teacher who would be assigned to M.D.S. and can say "this is what we will be doing." (A484-87)

At most, Ms. Morett, who has never personally evaluated M.D.S. and who apparently has never even met or spoken with his (A443), has mentioned a number of possible programs that could be put in place, but, hardly anything concrete. *See* Cheryl Morett Test. (A484-87; A762-67)  And, Ms. Cooper testified in generalities but hardly came close to addressing what would be done in the classroom and how it is different from what has been happening. *See* Katie Cooper Test. (A729-30)

In any event, the testimony that has been elicited only reveals that segregating M.D.S. will do him a disservice, not assist him.

For example, assuming M.D.S. has social skill issues, at least half of the time he will be in a class interacting with other children who have IEPs.  It is disingenuous to assert that M.D.S. is better off learning social skills in a class consisting solely of children with IEPs as opposed to a regular education classroom.  The other half of the time, it appears that M.D.S. will be in front of a computer doing repeated tasks (purportedly because of "retention" issues).  With all due respect, this sounds like the route of how <u>not</u> to progress and to insure failure.  Furthermore, the argument the School District is making makes no sense considered in light of the fact that it has been reducing or eliminating homework.  Homework is repetitious and is important to master tasks and to go on to other topics. *See* Christine Leonard Test. (A776)  It is senseless to eliminate homework, only to replace it later with repeated routine tasks.

This non-sensical position only can make wonder:  Is the desire to segregate

M.D.S. really for the benefit of M.D.S. or is it for the benefit of the teachers?

## CONCLUSION

For the reasons set forth above, Appellant's Appeal to vacate the Order of

the district court and to stay the Administrative Decision and Order pending final

disposition of this matter should be granted.  Appellant should be provided the

opportunity to conduct discovery, and to supplement the record.  Furthermore, an

FBA should <u>not</u> be conducted and the minor child should remain in the regular

classroom setting for all subjects.

Dated: July 24, 2014                   Respectfully submitted,


                                       */s/ Denis F. Sheils*
                                       Denis F. Sheils
                                       Attorney I.D. No. 48888
                                       The Philadelphian
                                       2401 Pennsylvania Avenue
                                       Apartment No. 3A1
                                       Philadelphia, Pennsylvania 19130
                                       Telephone: (267) 467-8331

                                       *Pro Se and on Behalf of M.D.S., a minor*
                                       *child*

## COMBINED CERTIFICATIONS

I hereby certify as follows:

1)      I am a member in good standing of the bar of the Third Circuit.

2)      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,851 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

3)      This brief complies with the typeface requirements of Fed. R App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2003 with 14-point Times New Roman.

4)      The text of the electronic version of this brief is identical to the text in the paper copy.

5)      A virus detection program has been run on the file and no virus was detected.  The virus detection program used is Symantec Endpoint Protection version 11.0.2010.25.

6)      I have this day, July 24, 2014, served the foregoing brief and the appendix upon counsel for defendants through the ECF filing system and First Class Mail.


Dated: July 24, 2014                    */s/ Denis F. Sheils*
                                        Denis F. Sheils

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 14-2883

_____

DENIS F. SHEILS, on Behalf of Himself And
On Behalf of M.D.S., A Minor Child,
Appellant

v.

PENNSBURY SCHOOL DISTRICT,
Appellee

_____

On Appeal from the United States District Court
for the District of Pennsylvania, No. 2:14-cv-027376

_____

**JOINT APPENDIX**
**VOLUME 1 OF 3 (Pages A1 through A46) (Filed with Appellants' Brief)**

Denis F. Sheils
The Philadelphian
2401 Pennsylvania Avenue
Unit #3A1
Philadelphia, Pennsylvania 19130
(215) 238-1700 (Work)
(267) 467-8331 (Cell)
Email:  dsheils@kohnswift.com

Pro se and on behalf of M.D.S.,
a minor child

Pennsylvania
# Special Education Hearing Officer

## DECISION

Child's Name:  [M.D.S.]

Date of Birth:  July 3, 2002

Dates of Hearing:

March 6, 2014
March 7, 2014
March 10, 2014
March 17, 2014
March 18, 2014

CLOSED HEARING

ODR Case # 14526-1314KE

| Parties to the Hearing: | Representative: |
|---|---|
| Mr. Denis Sheils<br>2401 Pennsylvania Avenue<br>Unit 3A1<br>Philadelphia, PA  19130 | Pro Se |
| Pennsbury School District<br>134 Yardley Avenue<br>P.O. Box 338<br>Fallsington, PA  19058 | Thomas Warner, Esquire<br>Sweet Stevens Katz & Williams<br>331 E. Butler Avenue<br>New Britain, PA  18901 |
| Date Record Closed: | April 9, 2014 |
| Date of Decision: | April 23, 2014 |
| Hearing Officer: | Jake McElligott, Esquire |

A1

## INTRODUCTION AND PROCEDURAL HISTORY

[M.D.S]          ("student") is an 11-year old student residing in the Pennsbury School District ("District") who has been identified as a student with a disability under the Individuals with Disabilities in Education Improvement Act of 2004 ("IDEA")[1]. The student has been identified under the terms of IDEA as a student with specific learning disabilities and a speech and language impairment.

In December 2013, the District sought to change the student's placement in order to deliver specially designed instruction for reading and mathematics in a resource room environment instead of an inclusive, co-taught classroom. The District also sought permission to perform a functional behavior assessment ("FBA") as the result of certain in-school behaviors exhibited by the student.

The student's mother did not oppose the proposed change in placement or the request for a FBA. The student's father, however, took exception to both proposals by the District.

For the reasons set forth below, I find in favor of the father in certain regards and in favor of the District in other regards. The order will also contain certain explicit directives to the student's individualized education plan ("IEP") team.

---

[1] It is this hearing officer's preference to cite to the implementing regulation of the IDEIA at 34 C.F.R. §§300.1-300.818.

A2

## ISSUES

Is the program/placement proposed by the District appropriate for the student?

Should the District be allowed to perform a FBA?

## FINDINGS OF FACT

1. The 2012-2013 school year was the student's 5th grade year at the District. Given the structure of District schools, the student's 6th grade year in 2013-2014 would necessitate a move to a middle school.

2. In May 2013, the student was re-evaluated (Joint Exhibit ["J"]-1, J-2, J-3, J-4, J-5, J-6, J-7, J-13).

3. The May 2013 re-evaluation report ("RR") identified the student with specific learning disabilities in the areas of reading comprehension, math problem-solving, and listening comprehension. (J-13).

4. Given needs in auditory comprehension, pragmatic language, semantics, and syntax skills, the student was also identified as a student with a speech and language impairment. (J-13).

5. The May 2013 RR noted, from teacher input, that the student had difficulty attending to task, social/emotional difficulties in school settings, socially inappropriate behaviors (singing the alphabet

song, immature expressions), and exhibited noise-making, talking out loudly to self, and inappropriately laughing out loud. (J-13).

6. The evaluator who authored the May 2013 RR observed the student in a classroom setting and reported off-task behaviors in that setting, including many behaviors (such as inattention and laughter) similar to those reported by the student's teachers. (J-13).

7. In June 2013, the student's IEP was revised. Over the course of June-September 2013, the student's IEP was revised by the student's IEP team for implementation at the middle school in the 2013-2014 school year. (Parent's Exhibit ["P"]-134).

8. The June 2013 IEP indicated that communication needs were a special consideration for the student. In the same portion of the IEP, however, there was no indication that the student exhibited behaviors that impeded the student's learning or the learning of others. (P-134 at page 6).

9. The June 2013 IEP indicated transition to middle school might present challenges for the student, with a view toward potential changes in how the student's program/placement might unfold. At that point in the IEP and later, in a recitation of parental concerns, the student's father explicitly disagreed with notions that a movement out of the regular education would benefit the student. (J-19; P-134 at pages 8-11).

A4

10.      The June 2013 IEP included eight goals: three speech and language goals, a math concepts/applications goal, two reading goals, and a written expression goal, and an occupational therapy goal. (P-134 at pages 17-30).

11.      The June 2013 IEP included specially designed instruction in addition to related services in speech/language therapy and occupational therapy. (P-134 at page 32-34).

12.      The student qualified for extended school year ("ESY") services in the summer of 2013. Data from the ESY program in the June 2013 IEP indicated that the student exhibited limited progress in reading. Progress on mathematics probes was reported at 90% accuracy. (P-134 at page 36).

13.      In the June 2013 IEP, in a discussion of the student's participation in the regular education curriculum, the IEP team agreed in July that the student would be in co-taught inclusion classes for all academic subjects. (P-134 at page 38).

14.      Under the terms of the June 2013 IEP, the student spent 94% of the school day in regular education. (P-134 at page 40).

15.      The student began middle school under the terms of the June 2013 IEP (with its various revisions) in the 2013-2014 school year. (P-134).

16.      The student participated in co-taught inclusion classes for all academic instruction, with a special education teacher

providing direct support to the student and to other students in the regular education classroom who required specially designed instruction. (Notes of Testimony ["NT"] at 192-405).

17.     In October 2013, given concerns of the special education teacher and the student's language arts teacher about the student's progress, a District reading specialist administered two informal reading inventories. (P-194).

18.     On the Qualitative Reading Inventory-5, in word recognition, the student was independent at the 4th grade level, instructional at the "upper middle school" level, and frustrational at the "high school" level. In oral reading, the student showed consistency, although as the student progressed from pre-primer passages through 4th grade passages, the student's accuracy percentages declined. The student's comprehension beyond the pre-primer level, however, was markedly low. (P-194).

19.     On the Developmental Reading Assessment-2 ("DRA"), the student was an engaged reader, although the student required intervention. Oral reading was a relative strength, but the student continued to struggle with comprehension. (P-194).

20.     The evaluator's summary was: "(The student's) oral reading is stronger than...comprehension. The DRA also suggests that (the student) is comprehending text below...current grade level." (P-194 at page 6).

21.     At times during the informal evaluations, the student exhibited behaviors consistent with the inattentive and exclamatory behaviors (laughter, non sequiturs, seemingly off-hand and self-directed remarks) that had been reported throughout various observations and input. (P-194).

22.     In October 2013, the student's parents, the building principal, and the District's then-director of special education observed the student in class. Thereafter, a group including these individuals in addition to the special education teacher and regular education teacher who were teaching the class, met to discuss the student's needs, including the observation. (NT at 564-565).

23.     In November 2013, the District sought to revise the student's IEP, inviting both parents to an IEP meeting in December 2013. (J-20, J-21).

24.     In December 2013, the student's IEP team met to discuss revisions to the student's IEP. (J-22).

25.     The December 2013 IEP indicated, in the special considerations section, that a permission-to-evaluate the student would be issued to parents to seek a FBA of the student's behaviors in the school setting. (J-22).

26.     The informal reading inventory results from October 2013 were included in the IEP. (J-22 at pages 6-10).

27.    The December 2013 IEP included curriculum-based assessments from mathematics class. The student had intermittent success with certain aspects of computation. The student had intermittent success with certain aspects of mathematic concepts. (J-22 at pages 11-12).

28.    The December 2013 IEP contained observations from the speech and language therapist indicating that the student was not consistent with safety information (when to summon emergency responders, and which particular responders might respond to certain situations). (J-22 at 14-16).

29.    The December 2013 IEP contained parental concerns, shared just prior to or at the IEP meeting in mid-December. The student's mother was, in general, in agreement with the District's views of the student's needs and recommendations. The student's father continued to hold the view (shared throughout this record) that the focus of the student's education should be academic instruction in regular education environments. (J-22 at page 17).

30.    The December 2013 IEP included twelve goals: five speech and language goals, two mathematics goals, two reading goals, a writing goal, a task attention/refocusing goal, and a listening comprehension goal. (J-22 at pages 24-35).

31.    The December 2013 IEP included specially designed instruction in addition to related services in speech/language

8                                                          A8

therapy. A new element of specially designed

instruction/modification was a positive behavior support plan, to

be developed following the FBA. (J-22 at page 36-40).

32.    The December 2013 IEP recommended that the student

receive instruction in a resource room setting for reading,

mathematics and writing (45 minutes in each area daily).

Additionally, the student would receive four 30-minute sessions

weekly. (J-22 at page 43).

33.    Under the terms of the December 2013 IEP, the student

would spend 53% of the school day in regular education. (J-22 at

page 45).

34.    The student's mother approved the District's recommended

education placement and program as reflected in the December

2013 IEP. The student's father did not approve the

recommendation, and requested a due process hearing. (J-27, J-

28).

35.    In December 2013, the rejection by the student's father of

the District's recommendation, and a subsequent complaint,

brought forward the disagreement and claims that led to these

proceedings. (J-28; Hearing Officer Exhibit -1).

36.    Work product of the student in reading and general

academics supports the conclusion that the student's reading and

writing needs to be addressed in a more intensive environment. (P-191).

37.     Work product of the student in mathematics, while modified, supports the conclusion that the student made progress in mathematics in the co-taught inclusive classroom that was conceptually in line with the curriculum. (P-190, P-192).

38.     Documentation of the student's speech and language instruction and therapy supports the conclusion that the proposed programming for the student in speech and language is appropriate. (P-193).

39.     In January 2014, through the end of the 2nd marking period, the student's grades were as follows:

|  | 1st Marking Period | 2nd Marking Period |
|---|---|---|
| Language Arts | D | D |
| Mathematics | F | C |
| Art |  | C |
| Voice | B |  |
| Science | D | C |
| Social Studies | C | C |
| Physical Education | A | A |

(P-165).

40.     The testimony of the student's language arts teacher and special education teacher, and the reading specialist, was all

credible and was accorded heavy weight regarding the student's need for reading and writing instruction in the resource room setting. (NT at 192-405, 414-529, 1260-1365).

41.     The testimony of the student's math teacher and special education teacher was both credible and was accorded some weight regarding the student's needs in mathematics. The overall weight of the record regarding instruction of the student in mathematics, however, supports a conclusion that mathematics instruction in a co-taught inclusive classroom is the appropriate environment for such instruction. (NT at 192-405, 1066-1164).

42.     The testimony of all the student's teachers was credible and was accorded some weight regarding the student's behaviors in the school setting. While no one who worked directly with the student testified that the student was, in any way, disruptive or difficult to redirect, the consistency of the testimony indicates that the student's behavior in the school environment requires a FBA. (NT at 192-405, 414-529, 725-852, 965-1045, 1066-1259).

43.     The student's parents, while pointedly disagreeing about what the student's program, testified credibly and with authentic emotion about the care and concern each has for their child. The testimony of each, in its own way, was accorded heavy weight. (NT at 1402-1441).

## DISCUSSION AND CONCLUSION OF LAW

FAPE in the LRE

To assure that an eligible child receives a free appropriate public education ("FAPE"),[2] an IEP must be "reasonably calculated to yield meaningful educational...benefit and student or child progress."[3] "Meaningful benefit" means that a student's program affords the student the opportunity for "significant learning",[4] not simply *de minimis* or minimal education progress.[5]

Moreover, both federal and Pennsylvania law require that the placement of a student with a disability be in the LRE, considering the full range of supplemental aids and services that would allow a student to receive instruction and make progress in the LRE.[6] Pursuant to the mandate of 34 C.F.R. §300.114(a)(2):

> "Each (school district) must ensure that to the maximum
> extent appropriate, children with disabilities...are educated
> with children who are nondisabled, and...separate
> schooling...occurs only if the nature or severity of the
> disability is such that education in regular classes with the

---

[2] 34 C.F.R. §300.17.
[3] Board of Education v. Rowley, 458 U.S. 176, 102 S.Ct. 3034 (1982).
[4] Ridgewood Board of Education v. N.E., 172 F.3d 238 (3rd Cir. 1999).
[5] M.C. v. Central Regional School District, 81 F.3d 389 (3rd Cir. 1996).
[6] 34 C.F.R. §§300.114-120; 22 PA Code §14.145; Oberti v. Board of Education, 995 F.2d 1204 (3d Cir. 1993).

A12

use of supplementary aids and services cannot be achieved satisfactorily."

Additionally, to comply with LRE mandates, the school district must ensure that "unless the IEP of a child with a disability requires some other arrangement, the child is educated in the school that he or she would attend if nondisabled."[7]

Pennsylvania special education regulations mirror this emphasis on LRE. Where a student "can, with the full range of supplementary aids and services, make meaningful education progress on the goals in...the IEP", a school district cannot require separate schooling for a student.[8] Similarly, "(a) student may not be removed from...(a) placement in a regular education classroom solely because of the nature or severity of the student's disability, or solely because educating the student in the regular education classroom would necessitate additional cost or for administrative convenience."[9]

In this case, the record clearly supports two findings. One, the student's language arts instruction (reading and writing) needs to be intensively structured and delivered in a resource room setting. Two, the student's behaviors in school is marked and complex enough to necessitate a FBA. The third finding—that the student's mathematics instruction can and should be delivered in a co-taught inclusive regular

---

[7]  34 C.F.R. §300.116(c).

[8] 22 PA Code §14.145(3).

[9] 22 PA Code §14.145(4).

A13

education class—has support in the record; it is less definitive than the prior two findings, but, on balance, the it is the LRE for such instruction.

Accordingly, the LRE for this student for academic instruction in reading and writing is a resource room environment; for academic instruction in mathematics, the LRE is a co-taught inclusive regular education classroom with appropriate supplemental aids and services. A FBA shall be performed to assess the student's behavior in educational environments.

## **ORDER**

In accord with the findings of fact and conclusions of law as set forth above, on this record, the December 2013 IEP is reasonably calculated to yield meaningful education benefit. There are certain elements of the IEP, however, which shall be revised in accord with the terms of this order as set forth below.

*Program & Placement.* As of the date of this decision, the least restrictive environment for the student to receive instruction, with appropriate modifications, adaptations, aids, services and supports required by the student, is a split-program where the student receives some instruction in a resource room setting and some in an inclusive regular education classroom, both classrooms to be at the school the student would attend if not eligible for special education.

Instruction in reading and writing shall take place in a resource room setting. Instruction in mathematics shall take place in an inclusive regular education setting. Instruction and therapeutic techniques in speech and language shall take place where the student's IEP team determines this instruction would allow the student to gain meaningful education benefit from the instruction.

The student's December 2013 IEP shall be revised to reflect the placement changes as outlined in this order.

As set forth below, however, the student shall undergo a FBA in the educational setting. Because the FBA should take place in settings,

and with programming, that is not entirely new to the student, the implementation of the December 2013 IEP under the terms of this order shall not take place until the conclusion of "the FBA IEP meeting" set forth in the next section of this order.

*Independent Functional Behavior Assessment.* Finding that a FBA is necessary for future considerations of the student's IEP team, and pursuant to the authority granted in 34 C.F.R. §300.502(d), it is ordered that:

- On or before May 3, 2014, the District shall provide in writing to the student's father information (as set forth below) for three independent evaluators experienced in the conducting of data-gathering for, and authorship of, FBAs who will make themselves available to conduct an independent FBA at District expense.

- The District's selection of the evaluators shall be based solely on the background and experience of the evaluators. Communications by the District with a potential evaluator shall not include any discussion of an evaluator's rate or fee, and, in selecting the independent evaluators, the District shall not give any consideration to its estimation of the cost of the independent FBA.

- The information provided to the student's father regarding the selected evaluators shall include the full curricula vitae

for the evaluators. The student's father may review the evaluators' curriculum vitae but shall not contact any of the potential evaluators.

- The cost of the independent FBA shall be at the evaluator's rate or fee and shall be borne by the District at public expense.

- On or before May 13, 2013, the student's father shall contact the District's director of special education by email to inform the District of the evaluator selected by the father to conduct the independent FBA.

- If the student's father has not emailed a selection of one of the independent evaluators by May 13, 2014, the District shall select one of the three independent evaluators. Even if the District makes the selection of the independent evaluator, all other aspects of this order related to the independent evaluator and/or the independent FBA shall be followed.

- The selected evaluator shall coordinate with the District on the scheduling of observations, but the number and nature of those observations shall be determined solely by the evaluator. Furthermore, the scope, details, findings and recommendations of the independent FBA shall be determined solely by the selected evaluator.

A17

- After the independent evaluator has issued the independent FBA for the student, the student's IEP team shall meet to consider the findings of the assessment in light of the student's IEP and educational programming ("the FBA IEP meeting"). At the FBA IEP meeting, the IEP team shall invite and include the independent evaluator in the IEP team meeting (making scheduling accommodations for the participation of the evaluator as necessary), and the District shall bear any cost, or rate, for the appearance of the independent evaluator at the FBA IEP meeting.

- The terms of this order regarding the involvement of the independent evaluator shall cease after the independent evaluator has participated in the FBA IEP team meeting, although nothing in this order should be read to limit, or interfere with, the continued involvement of the independent evaluator as one party, or both parties, see(s) value in such continued involvement and might make arrangements therefor.

*Agreements Otherwise by the IEP Team.* Nothing in this order should be read to limit or interfere with the ability of the IEP team, by agreement of both parents and the District, to alter the explicit directives of this order related to the student's IEP. Nothing in this order should be read to limit or interfere with the ability of the IEP team, by agreement of

the both parents and the District, to make additions or deletions to the student's IEP.

Any claim not specifically addressed in this decision and order is denied.


*s/Jake McElligott, Esquire*

Jake McElligott, Esquire
Special Education Hearing Officer

April 23, 2014

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **DENIS F. SHEILS, ON BEHALF OF HIMSELF AND ON BEHALF OF M.D.S., A MINOR CHILD** | : : : : | |
| | : | **CIVIL ACTION** |
| **Plaintiff,** | : : | **NO. 14-2736** |
| **v.** | : : : | |
| **PENNSBURY SCHOOL DISTRICT,** | : : | |
| **Defendant.** | : : | |

**ORDER**

     **AND NOW**, this _____ day of May, 2014, upon consideration of Plaintiff's Application for Order to Show Cause Re: Entry of Stay Pending Appeal, Preliminary Injunction and Temporary Restraining Order (Doc. 2 ), Defendant's Response in Opposition thereto (Doc. 7), and the hearing on the matter held on May 21, 2014, **IT IS HEREBY ORDERED AND DECREED** that Plaintiff's Application is **DENIED**.

                                         **BY THE COURT:**

                                         **/s/ Petrese B. Tucker**

                                         **_____**

                                         **Hon. Petrese B. Tucker, C. J.**

A20

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DENIS F. SHEILS, On Behalf Of Himself And** | : | |
| **On Behalf Of M.D.S., A Minor Child** | : | |
| **The Philadelphian** | : | |
| **2401 Pennsylvania Avenue, Apartment No. 3A1** | : | |
| **Philadelphia, Pennsylvania 19130** | : | |
| | : | |
| **Plaintiff,** | : | **Docket No. 2:14-cv-02736-PBT** |
| **v.** | : | **(The Honorable Petrese B. Tucker)** |
| | : | |
| **PENNSBURY SCHOOL DISTRICT** | : | |
| **134 Yardley Avenue** | : | |
| **Fallsington, Pennsylvania 19058** | : | |
| | : | |
| **Defendant.** | : | |

## <u>NOTICE OF APPEAL</u>

Notice is hereby given that Denis F. Sheils, on behalf of himself and on behalf of M.D.S.,

a minor child, plaintiff in the above named case, hereby appeals to the United States Court of

Appeals for the Third Circuit from an Order entered in this action May 27, 2014 denying

Plaintiff's Application for Order to Show Cause Re: Entry of Stay Pending Appeal, Preliminary

Injunction and Temporary Restraining Order (Document No. 9) regarding the Decision and

Order of the Department of Education – Special Education Hearing Office in the Matter

Concerning the minor child M.D.S. dated April 23, 2014 (ODR Case # 14523-1314 KE).  A true

and correct copy of the Order entered May 27, 2014 is attached hereto as Exhibit "A."  A true

121437

and correct copy of the Decision and Order of the Department of Education dated April 23, 2014

is attached hereto as Exhibit "B."

Dated: May 30, 2014                           Respectfully submitted,


                                             _/s/ Denis F. Sheils_____
                                             Denis F. Sheils
                                             Attorney I.D. No. 48888
                                             The Philadelphian
                                             2401 Pennsylvania Avenue
                                             Apartment No. 3A1
                                             Philadelphia, Pennsylvania 19130
                                             Telephone: (267) 467-8331

                                             _Pro Se and on Behalf of M.D.S., a minor child_

# Exhibit A

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

DENIS F. SHEILS, ON BEHALF OF     :
HIMSELF AND ON BEHALF OF M.D.S., A    :
MINOR CHILD     :
    :     CIVIL ACTION
     Plaintiff,     :
    :     NO. 14-2736
    v.     :
    :
    :
PENNSBURY SCHOOL DISTRICT,     :
    :
     Defendant.     :
    :

## ORDER

     **AND NOW**, this _____ day of May, 2014, upon consideration of Plaintiff's Application for

Order to Show Cause Re: Entry of Stay Pending Appeal, Preliminary Injunction and Temporary

Restraining Order (Doc. 2 ), Defendant's Response in Opposition thereto (Doc. 7), and the hearing on the

matter held on May 21, 2014, **IT IS HEREBY ORDERED AND DECREED** that Plaintiff's

Application is **DENIED**.

                        **BY THE COURT:**

                        **/s/ Petrese B. Tucker**
                        _____
                        **Hon. Petrese B. Tucker, C. J.**

A24

# Exhibit B

Pennsylvania
# Special Education Hearing Officer

DECISION

Child's Name:  [M.D.S.]

Date of Birth:  July 3, 2002

Dates of Hearing:

March 6, 2014
March 7, 2014
March 10, 2014
March 17, 2014
March 18, 2014

CLOSED HEARING

ODR Case # 14526-1314KE

| Parties to the Hearing: | Representative: |
|---|---|
| Mr. Denis Sheils<br>2401 Pennsylvania Avenue<br>Unit 3A1<br>Philadelphia, PA  19130 | Pro Se |
| Pennsbury School District<br>134 Yardley Avenue<br>P.O. Box 338<br>Fallsington, PA  19058 | Thomas Warner, Esquire<br>Sweet Stevens Katz & Williams<br>331 E. Butler Avenue<br>New Britain, PA  18901 |
| Date Record Closed: | April 9, 2014 |
| Date of Decision: | April 23, 2014 |
| Hearing Officer: | Jake McElligott, Esquire |

## INTRODUCTION AND PROCEDURAL HISTORY

[M.D.S]  ("student") is an 11-year old student residing in the Pennsbury School District ("District") who has been identified as a student with a disability under the Individuals with Disabilities in Education Improvement Act of 2004 ("IDEA")[1]. The student has been identified under the terms of IDEA as a student with specific learning disabilities and a speech and language impairment.

In December 2013, the District sought to change the student's placement in order to deliver specially designed instruction for reading and mathematics in a resource room environment instead of an inclusive, co-taught classroom. The District also sought permission to perform a functional behavior assessment ("FBA") as the result of certain in-school behaviors exhibited by the student.

The student's mother did not oppose the proposed change in placement or the request for a FBA. The student's father, however, took exception to both proposals by the District.

For the reasons set forth below, I find in favor of the father in certain regards and in favor of the District in other regards. The order will also contain certain explicit directives to the student's individualized education plan ("IEP") team.

---

[1] It is this hearing officer's preference to cite to the implementing regulation of the IDEIA at 34 C.F.R. §§300.1-300.818.

2

A27

## ISSUES

Is the program/placement proposed by the District appropriate for the student?

Should the District be allowed to perform a FBA?

## FINDINGS OF FACT

1. The 2012-2013 school year was the student's 5th grade year at the District. Given the structure of District schools, the student's 6th grade year in 2013-2014 would necessitate a move to a middle school.

2. In May 2013, the student was re-evaluated (Joint Exhibit ["J"]-1, J-2, J-3, J-4, J-5, J-6, J-7, J-13).

3. The May 2013 re-evaluation report ("RR") identified the student with specific learning disabilities in the areas of reading comprehension, math problem-solving, and listening comprehension. (J-13).

4. Given needs in auditory comprehension, pragmatic language, semantics, and syntax skills, the student was also identified as a student with a speech and language impairment. (J-13).

5. The May 2013 RR noted, from teacher input, that the student had difficulty attending to task, social/emotional difficulties in school settings, socially inappropriate behaviors (singing the alphabet

3

A28

song, immature expressions), and exhibited noise-making, talking out loudly to self, and inappropriately laughing out loud. (J-13).

6. The evaluator who authored the May 2013 RR observed the student in a classroom setting and reported off-task behaviors in that setting, including many behaviors (such as inattention and laughter) similar to those reported by the student's teachers. (J-13).

7. In June 2013, the student's IEP was revised. Over the course of June-September 2013, the student's IEP was revised by the student's IEP team for implementation at the middle school in the 2013-2014 school year. (Parent's Exhibit ["P"]-134).

8. The June 2013 IEP indicated that communication needs were a special consideration for the student. In the same portion of the IEP, however, there was no indication that the student exhibited behaviors that impeded the student's learning or the learning of others. (P-134 at page 6).

9. The June 2013 IEP indicated transition to middle school might present challenges for the student, with a view toward potential changes in how the student's program/placement might unfold. At that point in the IEP and later, in a recitation of parental concerns, the student's father explicitly disagreed with notions that a movement out of the regular education would benefit the student. (J-19; P-134 at pages 8-11).

A29

10.     The June 2013 IEP included eight goals: three speech and language goals, a math concepts/applications goal, two reading goals, and a written expression goal, and an occupational therapy goal. (P-134 at pages 17-30).

11.     The June 2013 IEP included specially designed instruction in addition to related services in speech/language therapy and occupational therapy. (P-134 at page 32-34).

12.     The student qualified for extended school year ("ESY") services in the summer of 2013. Data from the ESY program in the June 2013 IEP indicated that the student exhibited limited progress in reading. Progress on mathematics probes was reported at 90% accuracy. (P-134 at page 36).

13.     In the June 2013 IEP, in a discussion of the student's participation in the regular education curriculum, the IEP team agreed in July that the student would be in co-taught inclusion classes for all academic subjects. (P-134 at page 38).

14.     Under the terms of the June 2013 IEP, the student spent 94% of the school day in regular education. (P-134 at page 40).

15.     The student began middle school under the terms of the June 2013 IEP (with its various revisions) in the 2013-2014 school year. (P-134).

16.     The student participated in co-taught inclusion classes for all academic instruction, with a special education teacher

A30

providing direct support to the student and to other students in the regular education classroom who required specially designed instruction. (Notes of Testimony ["NT"] at 192-405).

17.     In October 2013, given concerns of the special education teacher and the student's language arts teacher about the student's progress, a District reading specialist administered two informal reading inventories. (P-194).

18.     On the Qualitative Reading Inventory-5, in word recognition, the student was independent at the 4th grade level, instructional at the "upper middle school" level, and frustrational at the "high school" level. In oral reading, the student showed consistency, although as the student progressed from pre-primer passages through 4th grade passages, the student's accuracy percentages declined. The student's comprehension beyond the pre-primer level, however, was markedly low. (P-194).

19.     On the Developmental Reading Assessment-2 ("DRA"), the student was an engaged reader, although the student required intervention. Oral reading was a relative strength, but the student continued to struggle with comprehension. (P-194).

20.     The evaluator's summary was: "(The student's) oral reading is stronger than...comprehension. The DRA also suggests that (the student) is comprehending text below...current grade level." (P-194 at page 6).

A31

21.       At times during the informal evaluations, the student exhibited behaviors consistent with the inattentive and exclamatory behaviors (laughter, non sequiturs, seemingly off-hand and self-directed remarks) that had been reported throughout various observations and input. (P-194).

22.       In October 2013, the student's parents, the building principal, and the District's then-director of special education observed the student in class. Thereafter, a group including these individuals in addition to the special education teacher and regular education teacher who were teaching the class, met to discuss the student's needs, including the observation. (NT at 564-565).

23.       In November 2013, the District sought to revise the student's IEP, inviting both parents to an IEP meeting in December 2013. (J-20, J-21).

24.       In December 2013, the student's IEP team met to discuss revisions to the student's IEP. (J-22).

25.       The December 2013 IEP indicated, in the special considerations section, that a permission-to-evaluate the student would be issued to parents to seek a FBA of the student's behaviors in the school setting. (J-22).

26.       The informal reading inventory results from October 2013 were included in the IEP. (J-22 at pages 6-10).

27.     The December 2013 IEP included curriculum-based assessments from mathematics class. The student had intermittent success with certain aspects of computation. The student had intermittent success with certain aspects of mathematic concepts. (J-22 at pages 11-12).

28.     The December 2013 IEP contained observations from the speech and language therapist indicating that the student was not consistent with safety information (when to summon emergency responders, and which particular responders might respond to certain situations). (J-22 at 14-16).

29.     The December 2013 IEP contained parental concerns, shared just prior to or at the IEP meeting in mid-December. The student's mother was, in general, in agreement with the District's views of the student's needs and recommendations. The student's father continued to hold the view (shared throughout this record) that the focus of the student's education should be academic instruction in regular education environments. (J-22 at page 17).

30.     The December 2013 IEP included twelve goals: five speech and language goals, two mathematics goals, two reading goals, a writing goal, a task attention/refocusing goal, and a listening comprehension goal. (J-22 at pages 24-35).

31.     The December 2013 IEP included specially designed instruction in addition to related services in speech/language

8

A33

therapy. A new element of specially designed instruction/modification was a positive behavior support plan, to be developed following the FBA. (J-22 at page 36-40).

32.     The December 2013 IEP recommended that the student receive instruction in a resource room setting for reading, mathematics and writing (45 minutes in each area daily). Additionally, the student would receive four 30-minute sessions weekly. (J-22 at page 43).

33.     Under the terms of the December 2013 IEP, the student would spend 53% of the school day in regular education. (J-22 at page 45).

34.     The student's mother approved the District's recommended education placement and program as reflected in the December 2013 IEP. The student's father did not approve the recommendation, and requested a due process hearing. (J-27, J-28).

35.     In December 2013, the rejection by the student's father of the District's recommendation, and a subsequent complaint, brought forward the disagreement and claims that led to these proceedings. (J-28; Hearing Officer Exhibit -1).

36.     Work product of the student in reading and general academics supports the conclusion that the student's reading and

A34

writing needs to be addressed in a more intensive environment. (P-191).

37.     Work product of the student in mathematics, while modified, supports the conclusion that the student made progress in mathematics in the co-taught inclusive classroom that was conceptually in line with the curriculum. (P-190, P-192).

38.     Documentation of the student's speech and language instruction and therapy supports the conclusion that the proposed programming for the student in speech and language is appropriate. (P-193).

39.     In January 2014, through the end of the 2nd marking period, the student's grades were as follows:

|  | 1st Marking Period | 2nd Marking Period |
|---|---|---|
| Language Arts | D | D |
| Mathematics | F | C |
| Art |  | C |
| Voice | B |  |
| Science | D | C |
| Social Studies | C | C |
| Physical Education | A | A |

(P-165).

40.     The testimony of the student's language arts teacher and special education teacher, and the reading specialist, was all

credible and was accorded heavy weight regarding the student's need for reading and writing instruction in the resource room setting. (NT at 192-405, 414-529, 1260-1365).

41.     The testimony of the student's math teacher and special education teacher was both credible and was accorded some weight regarding the student's needs in mathematics. The overall weight of the record regarding instruction of the student in mathematics, however, supports a conclusion that mathematics instruction in a co-taught inclusive classroom is the appropriate environment for such instruction. (NT at 192-405, 1066-1164).

42.     The testimony of all the student's teachers was credible and was accorded some weight regarding the student's behaviors in the school setting. While no one who worked directly with the student testified that the student was, in any way, disruptive or difficult to redirect, the consistency of the testimony indicates that the student's behavior in the school environment requires a FBA. (NT at 192-405, 414-529, 725-852, 965-1045, 1066-1259).

43.     The student's parents, while pointedly disagreeing about what the student's program, testified credibly and with authentic emotion about the care and concern each has for their child. The testimony of each, in its own way, was accorded heavy weight. (NT at 1402-1441).

## DISCUSSION AND CONCLUSION OF LAW

FAPE in the LRE

To assure that an eligible child receives a free appropriate public education ("FAPE"),[2] an IEP must be "reasonably calculated to yield meaningful educational...benefit and student or child progress."[3] "Meaningful benefit" means that a student's program affords the student the opportunity for "significant learning",[4] not simply *de minimis* or minimal education progress.[5]

Moreover, both federal and Pennsylvania law require that the placement of a student with a disability be in the LRE, considering the full range of supplemental aids and services that would allow a student to receive instruction and make progress in the LRE.[6] Pursuant to the mandate of 34 C.F.R. §300.114(a)(2):

> "Each (school district) must ensure that to the maximum extent appropriate, children with disabilities...are educated with children who are nondisabled, and...separate schooling...occurs only if the nature or severity of the disability is such that education in regular classes with the

---

[2] 34 C.F.R. §300.17.

[3] Board of Education v. Rowley, 458 U.S. 176, 102 S.Ct. 3034 (1982).

[4] Ridgewood Board of Education v. N.E., 172 F.3d 238 (3rd Cir. 1999).

[5] M.C. v. Central Regional School District, 81 F.3d 389 (3rd Cir. 1996).

[6] 34 C.F.R. §§300.114-120; 22 PA Code §14.145; Oberti v. Board of Education, 995 F.2d 1204 (3d Cir. 1993).

A37

use of supplementary aids and services cannot be achieved satisfactorily."

Additionally, to comply with LRE mandates, the school district must ensure that "unless the IEP of a child with a disability requires some other arrangement, the child is educated in the school that he or she would attend if nondisabled."[7]

Pennsylvania special education regulations mirror this emphasis on LRE. Where a student "can, with the full range of supplementary aids and services, make meaningful education progress on the goals in...the IEP", a school district cannot require separate schooling for a student.[8] Similarly, "(a) student may not be removed from...(a) placement in a regular education classroom solely because of the nature or severity of the student's disability, or solely because educating the student in the regular education classroom would necessitate additional cost or for administrative convenience."[9]

In this case, the record clearly supports two findings. One, the student's language arts instruction (reading and writing) needs to be intensively structured and delivered in a resource room setting. Two, the student's behaviors in school is marked and complex enough to necessitate a FBA. The third finding—that the student's mathematics instruction can and should be delivered in a co-taught inclusive regular

---

[7]  34 C.F.R. §300.116(c).
[8] 22 PA Code §14.145(3).
[9] 22 PA Code §14.145(4).

education class—has support in the record; it is less definitive than the prior two findings, but, on balance, the it is the LRE for such instruction.

Accordingly, the LRE for this student for academic instruction in reading and writing is a resource room environment; for academic instruction in mathematics, the LRE is a co-taught inclusive regular education classroom with appropriate supplemental aids and services. A FBA shall be performed to assess the student's behavior in educational environments.

## ORDER

In accord with the findings of fact and conclusions of law as set forth above, on this record, the December 2013 IEP is reasonably calculated to yield meaningful education benefit. There are certain elements of the IEP, however, which shall be revised in accord with the terms of this order as set forth below.

*Program & Placement.* As of the date of this decision, the least restrictive environment for the student to receive instruction, with appropriate modifications, adaptations, aids, services and supports required by the student, is a split-program where the student receives some instruction in a resource room setting and some in an inclusive regular education classroom, both classrooms to be at the school the student would attend if not eligible for special education.

Instruction in reading and writing shall take place in a resource room setting. Instruction in mathematics shall take place in an inclusive regular education setting. Instruction and therapeutic techniques in speech and language shall take place where the student's IEP team determines this instruction would allow the student to gain meaningful education benefit from the instruction.

The student's December 2013 IEP shall be revised to reflect the placement changes as outlined in this order.

As set forth below, however, the student shall undergo a FBA in the educational setting. Because the FBA should take place in settings,

A40

and with programming, that is not entirely new to the student, the implementation of the December 2013 IEP under the terms of this order shall not take place until the conclusion of "the FBA IEP meeting" set forth in the next section of this order.

*Independent Functional Behavior Assessment.* Finding that a FBA is necessary for future considerations of the student's IEP team, and pursuant to the authority granted in 34 C.F.R. §300.502(d), it is ordered that:

- On or before May 3, 2014, the District shall provide in writing to the student's father information (as set forth below) for three independent evaluators experienced in the conducting of data-gathering for, and authorship of, FBAs who will make themselves available to conduct an independent FBA at District expense.

- The District's selection of the evaluators shall be based solely on the background and experience of the evaluators. Communications by the District with a potential evaluator shall not include any discussion of an evaluator's rate or fee, and, in selecting the independent evaluators, the District shall not give any consideration to its estimation of the cost of the independent FBA.

- The information provided to the student's father regarding the selected evaluators shall include the full curricula vitae

for the evaluators. The student's father may review the evaluators' curriculum vitae but shall not contact any of the potential evaluators.

- The cost of the independent FBA shall be at the evaluator's rate or fee and shall be borne by the District at public expense.

- On or before May 13, 2013, the student's father shall contact the District's director of special education by email to inform the District of the evaluator selected by the father to conduct the independent FBA.

- If the student's father has not emailed a selection of one of the independent evaluators by May 13, 2014, the District shall select one of the three independent evaluators. Even if the District makes the selection of the independent evaluator, all other aspects of this order related to the independent evaluator and/or the independent FBA shall be followed.

- The selected evaluator shall coordinate with the District on the scheduling of observations, but the number and nature of those observations shall be determined solely by the evaluator. Furthermore, the scope, details, findings and recommendations of the independent FBA shall be determined solely by the selected evaluator.

A42

- After the independent evaluator has issued the independent FBA for the student, the student's IEP team shall meet to consider the findings of the assessment in light of the student's IEP and educational programming ("the FBA IEP meeting"). At the FBA IEP meeting, the IEP team shall invite and include the independent evaluator in the IEP team meeting (making scheduling accommodations for the participation of the evaluator as necessary), and the District shall bear any cost, or rate, for the appearance of the independent evaluator at the FBA IEP meeting.

- The terms of this order regarding the involvement of the independent evaluator shall cease after the independent evaluator has participated in the FBA IEP team meeting, although nothing in this order should be read to limit, or interfere with, the continued involvement of the independent evaluator as one party, or both parties, see(s) value in such continued involvement and might make arrangements therefor.

*Agreements Otherwise by the IEP Team.* Nothing in this order should be read to limit or interfere with the ability of the IEP team, by agreement of both parents and the District, to alter the explicit directives of this order related to the student's IEP. Nothing in this order should be read to limit or interfere with the ability of the IEP team, by agreement of

the both parents and the District, to make additions or deletions to the student's IEP.

Any claim not specifically addressed in this decision and order is denied.

*s/Jake McElligott, Esquire*

Jake McElligott, Esquire
Special Education Hearing Officer

April 23, 2014

## CERTIFICATE OF SERVICE

I, Denis F. Sheils, hereby certify that on May 30, 2014, the foregoing Notice of Appeal

was served by first class mail upon the following:

> Thomas C. Warner, Esquire
> Sweet, Stevens, Katz & Williams, LLP
> 331 East Butler Avenue
> New Britain, PA 18901

> */s/ Denis F. Sheils*
> Denis F. Sheils

121437

A45

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

June 6, 2014
BCO-088-E

No. 14-2883

DENIS F. SHEILS,
ON BEHALF OF HIMSELF AND ON
BEHALF OF M.D.S., A MINOR CHILD,

Appellant

v.

PENNSBURY SCHOOL DISTRICT

(E.D. Pa. No. 2-14-cv-027376)

Present:  AMBRO and CHAGARES, Circuit Judges

    1. Motion by Appellant for Expedited Application for Stay of Order Pursuant to Federal Rules of Appellate Procedure 8 and 18, Local Appellate Rules 8.1, 8.2 and 18.1 and 5 U.S.C. Section 705;

    2. Supplemental Exhibit to Appellant's Expedited Application;

    3. Response by Appellee in opposition.

Respectfully,
Clerk/tmm

_____ORDER_____

The foregoing motion for a stay of order is hereby granted.  The clerk is hereby directed to refer this case to a merits panel and the case shall be listed before the next available panel on an expedited basis.

By the Court,

s/ Michael A. Chagares
Circuit Judge

Dated: June 24, 2014
tmm/cc: Denis F. Sheils, Esq.
Jonathan P. Riba, Esq.

A46

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 14-2883
_____

DENIS F. SHEILS, on Behalf of Himself And
On Behalf of M.D.S., A Minor Child,
Appellant

v.

PENNSBURY SCHOOL DISTRICT,
Appellee
_____

On Appeal from the United States District Court
for the District of Pennsylvania, No. 2:14-cv-027376
_____

**ADDENDUM TO APPELLANTS' BRIEF PURSUANT TO F.R.APP.P. 28(f)**

Denis F. Sheils
The Philadelphian
2401 Pennsylvania Avenue
Unit #3A1
Philadelphia, Pennsylvania 19130
(215) 238-1700 (Work)
(267) 467-8331 (Cell)
Email:  dsheils@kohnswift.com

Pro se and on behalf of M.D.S.,
a minor child

# CONTENTS OF ADDENDUM

**Page**

20 U.S.C. § 1412 ............................................................ Addendum 1 - 16

20 U.S.C. § 1414 ............................................................ Addendum 17 - 29

20 U.S.C. § 1415 ............................................................ Addendum 30 - 44

20 U.S.C. § 1232(g) ....................................................... Addendum 45 - 60

5 U.S.C. § 705 ............................................................... Addendum 61 - 62

34 C.F.R. § 300.518 ....................................................... Addendum 63

NB: *This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

## TITLE 20 - EDUCATION
### CHAPTER 33 - EDUCATION OF INDIVIDUALS WITH DISABILITIES
#### SUBCHAPTER II - ASSISTANCE FOR EDUCATION OF ALL CHILDREN WITH DISABILITIES

### § 1412. State eligibility

**(a)  In general**

A State is eligible for assistance under this subchapter for a fiscal year if the State submits a plan that provides assurances to the Secretary that the State has in effect policies and procedures to ensure that the State meets each of the following conditions:

**(1)  Free appropriate public education**

**(A)  In general**

A free appropriate public education is available to all children with disabilities residing in the State between the ages of 3 and 21, inclusive, including children with disabilities who have been suspended or expelled from school.

**(B)  Limitation**

The obligation to make a free appropriate public education available to all children with disabilities does not apply with respect to children—

**(i)**  aged 3 through 5 and 18 through 21 in a State to the extent that its application to those children would be inconsistent with State law or practice, or the order of any court, respecting the provision of public education to children in those age ranges; and

**(ii)**  aged 18 through 21 to the extent that State law does not require that special education and related services under this subchapter be provided to children with disabilities who, in the educational placement prior to their incarceration in an adult correctional facility—

**(I)**  were not actually identified as being a child with a disability under section 1401 of this title; or

**(II)**  did not have an individualized education program under this subchapter.

**(C)  State flexibility**

A State that provides early intervention services in accordance with subchapter III to a child who is eligible for services under section 1419 of this title, is not required to provide such child with a free appropriate public education.

**(2)  Full educational opportunity goal**

The State has established a goal of providing full educational opportunity to all children with disabilities and a detailed timetable for accomplishing that goal.

**(3)  Child find**

**(A)  In general**

All children with disabilities residing in the State, including children with disabilities who are homeless children or are wards of the State and children with disabilities attending private schools, regardless of the severity of their disabilities, and who are in need of special education and related services, are identified, located, and evaluated and a practical method is developed and implemented to determine which children with disabilities are currently receiving needed special education and related services.

**(B)  Construction**

Nothing in this chapter requires that children be classified by their disability so long as each child who has a disability listed in section 1401 of this title and who, by reason of that

Addendum 1

*NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

disability, needs special education and related services is regarded as a child with a disability under this subchapter.

**(4) Individualized education program**

An individualized education program, or an individualized family service plan that meets the requirements of section 1436 (d) of this title, is developed, reviewed, and revised for each child with a disability in accordance with section 1414 (d) of this title.

**(5) Least restrictive environment**

**(A) In general**

To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

**(B) Additional requirement**

**(i) In general**

A State funding mechanism shall not result in placements that violate the requirements of subparagraph (A), and a State shall not use a funding mechanism by which the State distributes funds on the basis of the type of setting in which a child is served that will result in the failure to provide a child with a disability a free appropriate public education according to the unique needs of the child as described in the child's IEP.

**(ii) Assurance**

If the State does not have policies and procedures to ensure compliance with clause (i), the State shall provide the Secretary an assurance that the State will revise the funding mechanism as soon as feasible to ensure that such mechanism does not result in such placements.

**(6) Procedural safeguards**

**(A) In general**

Children with disabilities and their parents are afforded the procedural safeguards required by section 1415 of this title.

**(B) Additional procedural safeguards**

Procedures to ensure that testing and evaluation materials and procedures utilized for the purposes of evaluation and placement of children with disabilities for services under this chapter will be selected and administered so as not to be racially or culturally discriminatory. Such materials or procedures shall be provided and administered in the child's native language or mode of communication, unless it clearly is not feasible to do so, and no single procedure shall be the sole criterion for determining an appropriate educational program for a child.

**(7) Evaluation**

Children with disabilities are evaluated in accordance with subsections (a) through (c) of section 1414 of this title.

**(8) Confidentiality**

Agencies in the State comply with section 1417 (c) of this title (relating to the confidentiality of records and information).

**(9) Transition from subchapter III to preschool programs**

Children participating in early intervention programs assisted under subchapter III, and who will participate in preschool programs assisted under this subchapter, experience a smooth and effective

NB: *This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

transition to those preschool programs in a manner consistent with section 1437 (a)(9) of this title. By the third birthday of such a child, an individualized education program or, if consistent with sections 1414 (d)(2)(B) and 1436 (d) of this title, an individualized family service plan, has been developed and is being implemented for the child. The local educational agency will participate in transition planning conferences arranged by the designated lead agency under section 1435 (a)(10) of this title.

**(10) Children in private schools**

**(A) Children enrolled in private schools by their parents**

**(i)** In general

To the extent consistent with the number and location of children with disabilities in the State who are enrolled by their parents in private elementary schools and secondary schools in the school district served by a local educational agency, provision is made for the participation of those children in the program assisted or carried out under this subchapter by providing for such children special education and related services in accordance with the following requirements, unless the Secretary has arranged for services to those children under subsection (f):

**(I)** Amounts to be expended for the provision of those services (including direct services to parentally placed private school children) by the local educational agency shall be equal to a proportionate amount of Federal funds made available under this subchapter.

**(II)** In calculating the proportionate amount of Federal funds, the local educational agency, after timely and meaningful consultation with representatives of private schools as described in clause (iii), shall conduct a thorough and complete child find process to determine the number of parentally placed children with disabilities attending private schools located in the local educational agency.

**(III)** Such services to parentally placed private school children with disabilities may be provided to the children on the premises of private, including religious, schools, to the extent consistent with law.

**(IV)** State and local funds may supplement and in no case shall supplant the proportionate amount of Federal funds required to be expended under this subparagraph.

**(V)** Each local educational agency shall maintain in its records and provide to the State educational agency the number of children evaluated under this subparagraph, the number of children determined to be children with disabilities under this paragraph, and the number of children served under this paragraph.

**(ii)** Child find requirement

**(I)** In general

The requirements of paragraph (3) (relating to child find) shall apply with respect to children with disabilities in the State who are enrolled in private, including religious, elementary schools and secondary schools.

**(II)** Equitable participation

The child find process shall be designed to ensure the equitable participation of parentally placed private school children with disabilities and an accurate count of such children.

**(III)** Activities

In carrying out this clause, the local educational agency, or where applicable, the State educational agency, shall undertake activities similar to those activities undertaken for the agency's public school children.

*NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

**(IV)** Cost

The cost of carrying out this clause, including individual evaluations, may not be considered in determining whether a local educational agency has met its obligations under clause (i).

**(V)** Completion period

Such child find process shall be completed in a time period comparable to that for other students attending public schools in the local educational agency.

**(iii)** Consultation

To ensure timely and meaningful consultation, a local educational agency, or where appropriate, a State educational agency, shall consult with private school representatives and representatives of parents of parentally placed private school children with disabilities during the design and development of special education and related services for the children, including regarding—

**(I)** the child find process and how parentally placed private school children suspected of having a disability can participate equitably, including how parents, teachers, and private school officials will be informed of the process;

**(II)** the determination of the proportionate amount of Federal funds available to serve parentally placed private school children with disabilities under this subparagraph, including the determination of how the amount was calculated;

**(III)** the consultation process among the local educational agency, private school officials, and representatives of parents of parentally placed private school children with disabilities, including how such process will operate throughout the school year to ensure that parentally placed private school children with disabilities identified through the child find process can meaningfully participate in special education and related services;

**(IV)** how, where, and by whom special education and related services will be provided for parentally placed private school children with disabilities, including a discussion of types of services, including direct services and alternate service delivery mechanisms, how such services will be apportioned if funds are insufficient to serve all children, and how and when these decisions will be made; and

**(V)** how, if the local educational agency disagrees with the views of the private school officials on the provision of services or the types of services, whether provided directly or through a contract, the local educational agency shall provide to the private school officials a written explanation of the reasons why the local educational agency chose not to provide services directly or through a contract.

**(iv)** Written affirmation

When timely and meaningful consultation as required by clause (iii) has occurred, the local educational agency shall obtain a written affirmation signed by the representatives of participating private schools, and if such representatives do not provide such affirmation within a reasonable period of time, the local educational agency shall forward the documentation of the consultation process to the State educational agency.

**(v)** Compliance

**(I)** In general

A private school official shall have the right to submit a complaint to the State educational agency that the local educational agency did not engage in consultation that was meaningful and timely, or did not give due consideration to the views of the private school official.

**(II)** Procedure

*NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

If the private school official wishes to submit a complaint, the official shall provide the basis of the noncompliance with this subparagraph by the local educational agency to the State educational agency, and the local educational agency shall forward the appropriate documentation to the State educational agency. If the private school official is dissatisfied with the decision of the State educational agency, such official may submit a complaint to the Secretary by providing the basis of the noncompliance with this subparagraph by the local educational agency to the Secretary, and the State educational agency shall forward the appropriate documentation to the Secretary.

**(vi)**  Provision of equitable services

**(I)**  Directly or through contracts

The provision of services pursuant to this subparagraph shall be provided—

**(aa)**  by employees of a public agency; or

**(bb)**  through contract by the public agency with an individual, association, agency, organization, or other entity.

**(II)**  Secular, neutral, nonideological

Special education and related services provided to parentally placed private school children with disabilities, including materials and equipment, shall be secular, neutral, and nonideological.

**(vii)**  Public control of funds

The control of funds used to provide special education and related services under this subparagraph, and title to materials, equipment, and property purchased with those funds, shall be in a public agency for the uses and purposes provided in this chapter, and a public agency shall administer the funds and property.

**(B)  Children placed in, or referred to, private schools by public agencies**

**(i)**  In general

Children with disabilities in private schools and facilities are provided special education and related services, in accordance with an individualized education program, at no cost to their parents, if such children are placed in, or referred to, such schools or facilities by the State or appropriate local educational agency as the means of carrying out the requirements of this subchapter or any other applicable law requiring the provision of special education and related services to all children with disabilities within such State.

**(ii)**  Standards

In all cases described in clause (i), the State educational agency shall determine whether such schools and facilities meet standards that apply to State educational agencies and local educational agencies and that children so served have all the rights the children would have if served by such agencies.

**(C)  Payment for education of children enrolled in private schools without consent of or referral by the public agency**

**(i)**  In general

Subject to subparagraph (A), this subchapter does not require a local educational agency to pay for the cost of education, including special education and related services, of a child with a disability at a private school or facility if that agency made a free appropriate public education available to the child and the parents elected to place the child in such private school or facility.

**(ii)**  Reimbursement for private school placement

NB: *This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

If the parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private elementary school or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment.

**(iii)** Limitation on reimbursement

The cost of reimbursement described in clause (ii) may be reduced or denied—

    **(I)** if—

        **(aa)** at the most recent IEP meeting that the parents attended prior to removal of the child from the public school, the parents did not inform the IEP Team that they were rejecting the placement proposed by the public agency to provide a free appropriate public education to their child, including stating their concerns and their intent to enroll their child in a private school at public expense; or

        **(bb)** 10 business days (including any holidays that occur on a business day) prior to the removal of the child from the public school, the parents did not give written notice to the public agency of the information described in item (aa);

    **(II)** if, prior to the parents' removal of the child from the public school, the public agency informed the parents, through the notice requirements described in section 1415 (b)(3) of this title, of its intent to evaluate the child (including a statement of the purpose of the evaluation that was appropriate and reasonable), but the parents did not make the child available for such evaluation; or

    **(III)** upon a judicial finding of unreasonableness with respect to actions taken by the parents.

**(iv)** Exception

Notwithstanding the notice requirement in clause (iii)(I), the cost of reimbursement—

    **(I)** shall not be reduced or denied for failure to provide such notice if—

        **(aa)** the school prevented the parent from providing such notice;

        **(bb)** the parents had not received notice, pursuant to section 1415 of this title, of the notice requirement in clause (iii)(I); or

        **(cc)** compliance with clause (iii)(I) would likely result in physical harm to the child; and

    **(II)** may, in the discretion of a court or a hearing officer, not be reduced or denied for failure to provide such notice if—

        **(aa)** the parent is illiterate or cannot write in English; or

        **(bb)** compliance with clause (iii)(I) would likely result in serious emotional harm to the child.

**(11)  State educational agency responsible for general supervision**

  **(A)  In general**

The State educational agency is responsible for ensuring that—

    **(i)** the requirements of this subchapter are met;

    **(ii)** all educational programs for children with disabilities in the State, including all such programs administered by any other State agency or local agency—

        **(I)** are under the general supervision of individuals in the State who are responsible for educational programs for children with disabilities; and

        **(II)** meet the educational standards of the State educational agency; and

*20 USC 1412*

NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).

**(iii)** in carrying out this subchapter with respect to homeless children, the requirements of subtitle B of title VII of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11431 et seq.) are met.

**(B) Limitation**

Subparagraph (A) shall not limit the responsibility of agencies in the State other than the State educational agency to provide, or pay for some or all of the costs of, a free appropriate public education for any child with a disability in the State.

**(C) Exception**

Notwithstanding subparagraphs (A) and (B), the Governor (or another individual pursuant to State law), consistent with State law, may assign to any public agency in the State the responsibility of ensuring that the requirements of this subchapter are met with respect to children with disabilities who are convicted as adults under State law and incarcerated in adult prisons.

**(12) Obligations related to and methods of ensuring services**

**(A) Establishing responsibility for services**

The Chief Executive Officer of a State or designee of the officer shall ensure that an interagency agreement or other mechanism for interagency coordination is in effect between each public agency described in subparagraph (B) and the State educational agency, in order to ensure that all services described in subparagraph (B)(i) that are needed to ensure a free appropriate public education are provided, including the provision of such services during the pendency of any dispute under clause (iii). Such agreement or mechanism shall include the following:

**(i)** Agency financial responsibility

An identification of, or a method for defining, the financial responsibility of each agency for providing services described in subparagraph (B)(i) to ensure a free appropriate public education to children with disabilities, provided that the financial responsibility of each public agency described in subparagraph (B), including the State medicaid agency and other public insurers of children with disabilities, shall precede the financial responsibility of the local educational agency (or the State agency responsible for developing the child's IEP).

**(ii)** Conditions and terms of reimbursement

The conditions, terms, and procedures under which a local educational agency shall be reimbursed by other agencies.

**(iii)** Interagency disputes

Procedures for resolving interagency disputes (including procedures under which local educational agencies may initiate proceedings) under the agreement or other mechanism to secure reimbursement from other agencies or otherwise implement the provisions of the agreement or mechanism.

**(iv)** Coordination of services procedures

Policies and procedures for agencies to determine and identify the interagency coordination responsibilities of each agency to promote the coordination and timely and appropriate delivery of services described in subparagraph (B)(i).

**(B) Obligation of public agency**

**(i)** In general

If any public agency other than an educational agency is otherwise obligated under Federal or State law, or assigned responsibility under State policy pursuant to

*NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

subparagraph (A), to provide or pay for any services that are also considered special education or related services (such as, but not limited to, services described in section 1401 (1) relating to assistive technology devices, 1401(2) relating to assistive technology services, 1401(26) relating to related services, 1401(33) relating to supplementary aids and services, and 1401(34) of this title relating to transition services) that are necessary for ensuring a free appropriate public education to children with disabilities within the State, such public agency shall fulfill that obligation or responsibility, either directly or through contract or other arrangement pursuant to subparagraph (A) or an agreement pursuant to subparagraph (C).

**(ii)**  Reimbursement for services by public agency

If a public agency other than an educational agency fails to provide or pay for the special education and related services described in clause (i), the local educational agency (or State agency responsible for developing the child's IEP) shall provide or pay for such services to the child. Such local educational agency or State agency is authorized to claim reimbursement for the services from the public agency that failed to provide or pay for such services and such public agency shall reimburse the local educational agency or State agency pursuant to the terms of the interagency agreement or other mechanism described in subparagraph (A)(i) according to the procedures established in such agreement pursuant to subparagraph (A)(ii).

**(C)  Special rule**

The requirements of subparagraph (A) may be met through—

   **(i)**  State statute or regulation;

   **(ii)**  signed agreements between respective agency officials that clearly identify the responsibilities of each agency relating to the provision of services; or

   **(iii)**  other appropriate written methods as determined by the Chief Executive Officer of the State or designee of the officer and approved by the Secretary.

**(13)  Procedural requirements relating to local educational agency eligibility**

The State educational agency will not make a final determination that a local educational agency is not eligible for assistance under this subchapter without first affording that agency reasonable notice and an opportunity for a hearing.

**(14)  Personnel qualifications**

   **(A)  In general**

The State educational agency has established and maintains qualifications to ensure that personnel necessary to carry out this subchapter are appropriately and adequately prepared and trained, including that those personnel have the content knowledge and skills to serve children with disabilities.

   **(B)  Related services personnel and paraprofessionals**

The qualifications under subparagraph (A) include qualifications for related services personnel and paraprofessionals that—

   **(i)**  are consistent with any State-approved or State-recognized certification, licensing, registration, or other comparable requirements that apply to the professional discipline in which those personnel are providing special education or related services;

   **(ii)**  ensure that related services personnel who deliver services in their discipline or profession meet the requirements of clause (i) and have not had certification or licensure requirements waived on an emergency, temporary, or provisional basis; and

   **(iii)**  allow paraprofessionals and assistants who are appropriately trained and supervised, in accordance with State law, regulation, or written policy, in meeting the requirements

of this subchapter to be used to assist in the provision of special education and related services under this subchapter to children with disabilities.

**(C)  Qualifications for special education teachers**

The qualifications described in subparagraph (A) shall ensure that each person employed as a special education teacher in the State who teaches elementary school, middle school, or secondary school is highly qualified by the deadline established in section 6319 (a)(2) of this title.

**(D)  Policy**

In implementing this section, a State shall adopt a policy that includes a requirement that local educational agencies in the State take measurable steps to recruit, hire, train, and retain highly qualified personnel to provide special education and related services under this subchapter to children with disabilities.

**(E)  Rule of construction**

Notwithstanding any other individual right of action that a parent or student may maintain under this subchapter, nothing in this paragraph shall be construed to create a right of action on behalf of an individual student for the failure of a particular State educational agency or local educational agency staff person to be highly qualified, or to prevent a parent from filing a complaint about staff qualifications with the State educational agency as provided for under this subchapter.

**(15)  Performance goals and indicators**

The State—

**(A)**  has established goals for the performance of children with disabilities in the State that—

**(i)**  promote the purposes of this chapter, as stated in section 1400 (d) of this title;

**(ii)**  are the same as the State's definition of adequate yearly progress, including the State's objectives for progress by children with disabilities, under section 6311 (b)(2)(C) of this title;

**(iii)**  address graduation rates and dropout rates, as well as such other factors as the State may determine; and

**(iv)**  are consistent, to the extent appropriate, with any other goals and standards for children established by the State;

**(B)**  has established performance indicators the State will use to assess progress toward achieving the goals described in subparagraph (A), including measurable annual objectives for progress by children with disabilities under section 6311 (b)(2)(C)(v)(II)(cc) of this title; and

**(C)**  will annually report to the Secretary and the public on the progress of the State, and of children with disabilities in the State, toward meeting the goals established under subparagraph (A), which may include elements of the reports required under section 6311 (h) of this title.

**(16)  Participation in assessments**

**(A)  In general**

All children with disabilities are included in all general State and districtwide assessment programs, including assessments described under section 6311 of this title, with appropriate accommodations and alternate assessments where necessary and as indicated in their respective individualized education programs.

**(B)  Accommodation guidelines**

The State (or, in the case of a districtwide assessment, the local educational agency) has developed guidelines for the provision of appropriate accommodations.

**(C)  Alternate assessments**

**(i)**  In general

The State (or, in the case of a districtwide assessment, the local educational agency) has developed and implemented guidelines for the participation of children with disabilities in alternate assessments for those children who cannot participate in regular assessments under subparagraph (A) with accommodations as indicated in their respective individualized education programs.

**(ii)**  Requirements for alternate assessments

The guidelines under clause (i) shall provide for alternate assessments that—

**(I)**  are aligned with the State's challenging academic content standards and challenging student academic achievement standards; and

**(II)**  if the State has adopted alternate academic achievement standards permitted under the regulations promulgated to carry out section 6311 (b)(1) of this title, measure the achievement of children with disabilities against those standards.

**(iii)**  Conduct of alternate assessments

The State conducts the alternate assessments described in this subparagraph.

**(D)  Reports**

The State educational agency (or, in the case of a districtwide assessment, the local educational agency) makes available to the public, and reports to the public with the same frequency and in the same detail as it reports on the assessment of nondisabled children, the following:

**(i)**  The number of children with disabilities participating in regular assessments, and the number of those children who were provided accommodations in order to participate in those assessments.

**(ii)**  The number of children with disabilities participating in alternate assessments described in subparagraph (C)(ii)(I).

**(iii)**  The number of children with disabilities participating in alternate assessments described in subparagraph (C)(ii)(II).

**(iv)**  The performance of children with disabilities on regular assessments and on alternate assessments (if the number of children with disabilities participating in those assessments is sufficient to yield statistically reliable information and reporting that information will not reveal personally identifiable information about an individual student), compared with the achievement of all children, including children with disabilities, on those assessments.

**(E)  Universal design**

The State educational agency (or, in the case of a districtwide assessment, the local educational agency) shall, to the extent feasible, use universal design principles in developing and administering any assessments under this paragraph.

**(17)  Supplementation of State, local, and other Federal funds**

**(A)  Expenditures**

Funds paid to a State under this subchapter will be expended in accordance with all the provisions of this subchapter.

**(B)  Prohibition against commingling**

Funds paid to a State under this subchapter will not be commingled with State funds.

**(C)  Prohibition against supplantation and conditions for waiver by Secretary**

Except as provided in section 1413 of this title, funds paid to a State under this subchapter will be used to supplement the level of Federal, State, and local funds (including funds that are not under the direct control of State or local educational agencies) expended for special education and related services provided to children with disabilities under this subchapter and in no

NB: *This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

case to supplant such Federal, State, and local funds, except that, where the State provides clear and convincing evidence that all children with disabilities have available to them a free appropriate public education, the Secretary may waive, in whole or in part, the requirements of this subparagraph if the Secretary concurs with the evidence provided by the State.

**(18)  Maintenance of State financial support**

**(A)  In general**

The State does not reduce the amount of State financial support for special education and related services for children with disabilities, or otherwise made available because of the excess costs of educating those children, below the amount of that support for the preceding fiscal year.

**(B)  Reduction of funds for failure to maintain support**

The Secretary shall reduce the allocation of funds under section 1411 of this title for any fiscal year following the fiscal year in which the State fails to comply with the requirement of subparagraph (A) by the same amount by which the State fails to meet the requirement.

**(C)  Waivers for exceptional or uncontrollable circumstances**

The Secretary may waive the requirement of subparagraph (A) for a State, for 1 fiscal year at a time, if the Secretary determines that—

**(i)**  granting a waiver would be equitable due to exceptional or uncontrollable circumstances such as a natural disaster or a precipitous and unforeseen decline in the financial resources of the State; or

**(ii)**  the State meets the standard in paragraph (17)(C) for a waiver of the requirement to supplement, and not to supplant, funds received under this subchapter.

**(D)  Subsequent years**

If, for any year, a State fails to meet the requirement of subparagraph (A), including any year for which the State is granted a waiver under subparagraph (C), the financial support required of the State in future years under subparagraph (A) shall be the amount that would have been required in the absence of that failure and not the reduced level of the State's support.

**(19)  Public participation**

Prior to the adoption of any policies and procedures needed to comply with this section (including any amendments to such policies and procedures), the State ensures that there are public hearings, adequate notice of the hearings, and an opportunity for comment available to the general public, including individuals with disabilities and parents of children with disabilities.

**(20)  Rule of construction**

In complying with paragraphs (17) and (18), a State may not use funds paid to it under this subchapter to satisfy State-law mandated funding obligations to local educational agencies, including funding based on student attendance or enrollment, or inflation.

**(21)  State advisory panel**

**(A)  In general**

The State has established and maintains an advisory panel for the purpose of providing policy guidance with respect to special education and related services for children with disabilities in the State.

**(B)  Membership**

Such advisory panel shall consist of members appointed by the Governor, or any other official authorized under State law to make such appointments, be representative of the State population, and be composed of individuals involved in, or concerned with, the education of children with disabilities, including—

NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).

**(i)**  parents of children with disabilities (ages birth through 26);

**(ii)**  individuals with disabilities;

**(iii)**  teachers;

**(iv)**  representatives of institutions of higher education that prepare special education and related services personnel;

**(v)**  State and local education officials, including officials who carry out activities under subtitle B of title VII of the McKinney-Vento Homeless Assistance Act (42 U.S.C. 11431 et seq.);

**(vi)**  administrators of programs for children with disabilities;

**(vii)**  representatives of other State agencies involved in the financing or delivery of related services to children with disabilities;

**(viii)**  representatives of private schools and public charter schools;

**(ix)**  not less than 1 representative of a vocational, community, or business organization concerned with the provision of transition services to children with disabilities;

**(x)**  a representative from the State child welfare agency responsible for foster care; and

**(xi)**  representatives from the State juvenile and adult corrections agencies.

**(C)  Special rule**

A majority of the members of the panel shall be individuals with disabilities or parents of children with disabilities (ages birth through 26).

**(D)  Duties**

The advisory panel shall—

**(i)**  advise the State educational agency of unmet needs within the State in the education of children with disabilities;

**(ii)**  comment publicly on any rules or regulations proposed by the State regarding the education of children with disabilities;

**(iii)**  advise the State educational agency in developing evaluations and reporting on data to the Secretary under section 1418 of this title;

**(iv)**  advise the State educational agency in developing corrective action plans to address findings identified in Federal monitoring reports under this subchapter; and

**(v)**  advise the State educational agency in developing and implementing policies relating to the coordination of services for children with disabilities.

**(22)  Suspension and expulsion rates**

**(A)  In general**

The State educational agency examines data, including data disaggregated by race and ethnicity, to determine if significant discrepancies are occurring in the rate of long-term suspensions and expulsions of children with disabilities—

**(i)**  among local educational agencies in the State; or

**(ii)**  compared to such rates for nondisabled children within such agencies.

**(B)  Review and revision of policies**

If such discrepancies are occurring, the State educational agency reviews and, if appropriate, revises (or requires the affected State or local educational agency to revise) its policies, procedures, and practices relating to the development and implementation of IEPs, the use of positive behavioral interventions and supports, and procedural safeguards, to ensure that such policies, procedures, and practices comply with this chapter.

**(23)  Access to instructional materials**

**(A)  In general**

NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).

The State adopts the National Instructional Materials Accessibility Standard for the purposes of providing instructional materials to blind persons or other persons with print disabilities, in a timely manner after the publication of the National Instructional Materials Accessibility Standard in the Federal Register.

**(B)  Rights of State educational agency**

Nothing in this paragraph shall be construed to require any State educational agency to coordinate with the National Instructional Materials Access Center. If a State educational agency chooses not to coordinate with the National Instructional Materials Access Center, such agency shall provide an assurance to the Secretary that the agency will provide instructional materials to blind persons or other persons with print disabilities in a timely manner.

**(C)  Preparation and delivery of files**

If a State educational agency chooses to coordinate with the National Instructional Materials Access Center, not later than 2 years after December 3, 2004, the agency, as part of any print instructional materials adoption process, procurement contract, or other practice or instrument used for purchase of print instructional materials, shall enter into a written contract with the publisher of the print instructional materials to—

   **(i)**  require the publisher to prepare and, on or before delivery of the print instructional materials, provide to the National Instructional Materials Access Center electronic files containing the contents of the print instructional materials using the National Instructional Materials Accessibility Standard; or

   **(ii)**  purchase instructional materials from the publisher that are produced in, or may be rendered in, specialized formats.

**(D)  Assistive technology**

In carrying out this paragraph, the State educational agency, to the maximum extent possible, shall work collaboratively with the State agency responsible for assistive technology programs.

**(E)  Definitions**

In this paragraph:

   **(i)**  National Instructional Materials Access Center

   The term "National Instructional Materials Access Center" means the center established pursuant to section 1474 (e) of this title.

   **(ii)**  National Instructional Materials Accessibility Standard

   The term "National Instructional Materials Accessibility Standard" has the meaning given the term in section 1474 (e)(3)(A) of this title.

   **(iii)**  Specialized formats

   The term "specialized formats" has the meaning given the term in section 1474 (e)(3)(D) of this title.

**(24)  Overidentification and disproportionality**

The State has in effect, consistent with the purposes of this chapter and with section 1418 (d) of this title, policies and procedures designed to prevent the inappropriate overidentification or disproportionate representation by race and ethnicity of children as children with disabilities, including children with disabilities with a particular impairment described in section 1401 of this title.

**(25)  Prohibition on mandatory medication**

   **(A)  In general**

The State educational agency shall prohibit State and local educational agency personnel from requiring a child to obtain a prescription for a substance covered by the Controlled Substances Act (21 U.S.C. 801 et seq.) as a condition of attending school, receiving an evaluation under subsection (a) or (c) of section 1414 of this title, or receiving services under this chapter.

**(B)  Rule of construction**

Nothing in subparagraph (A) shall be construed to create a Federal prohibition against teachers and other school personnel consulting or sharing classroom-based observations with parents or guardians regarding a student's academic and functional performance, or behavior in the classroom or school, or regarding the need for evaluation for special education or related services under paragraph (3).

**(b)  State educational agency as provider of free appropriate public education or direct services**

If the State educational agency provides free appropriate public education to children with disabilities, or provides direct services to such children, such agency—

**(1)**  shall comply with any additional requirements of section 1413 (a) of this title, as if such agency were a local educational agency; and

**(2)**  may use amounts that are otherwise available to such agency under this subchapter to serve those children without regard to section 1413 (a)(2)(A)(i) of this title (relating to excess costs).

**(c)  Exception for prior State plans**

**(1)  In general**

If a State has on file with the Secretary policies and procedures that demonstrate that such State meets any requirement of subsection (a), including any policies and procedures filed under this subchapter as in effect before the effective date of the Individuals with Disabilities Education Improvement Act of 2004, the Secretary shall consider such State to have met such requirement for purposes of receiving a grant under this subchapter.

**(2)  Modifications made by State**

Subject to paragraph (3), an application submitted by a State in accordance with this section shall remain in effect until the State submits to the Secretary such modifications as the State determines necessary. This section shall apply to a modification to an application to the same extent and in the same manner as this section applies to the original plan.

**(3)  Modifications required by the Secretary**

If, after the effective date of the Individuals with Disabilities Education Improvement Act of 2004, the provisions of this chapter are amended (or the regulations developed to carry out this chapter are amended), there is a new interpretation of this chapter by a Federal court or a State's highest court, or there is an official finding of noncompliance with Federal law or regulations, then the Secretary may require a State to modify its application only to the extent necessary to ensure the State's compliance with this subchapter.

**(d)  Approval by the Secretary**

**(1)  In general**

If the Secretary determines that a State is eligible to receive a grant under this subchapter, the Secretary shall notify the State of that determination.

**(2)  Notice and hearing**

The Secretary shall not make a final determination that a State is not eligible to receive a grant under this subchapter until after providing the State—

**(A)**  with reasonable notice; and

**(B)**  with an opportunity for a hearing.

**(e)  Assistance under other Federal programs**

*20 USC 1412*

NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).

Nothing in this chapter permits a State to reduce medical and other assistance available, or to alter eligibility, under titles V and XIX of the Social Security Act [42 U.S.C. 701 et seq., 1396 et seq.] with respect to the provision of a free appropriate public education for children with disabilities in the State.

**(f)  By-pass for children in private schools**

**(1)  In general**

If, on December 2, 1983, a State educational agency was prohibited by law from providing for the equitable participation in special programs of children with disabilities enrolled in private elementary schools and secondary schools as required by subsection (a)(10)(A), or if the Secretary determines that a State educational agency, local educational agency, or other entity has substantially failed or is unwilling to provide for such equitable participation, then the Secretary shall, notwithstanding such provision of law, arrange for the provision of services to such children through arrangements that shall be subject to the requirements of such subsection.

**(2)  Payments**

**(A)  Determination of amounts**

If the Secretary arranges for services pursuant to this subsection, the Secretary, after consultation with the appropriate public and private school officials, shall pay to the provider of such services for a fiscal year an amount per child that does not exceed the amount determined by dividing—

**(i)**  the total amount received by the State under this subchapter for such fiscal year; by

**(ii)**  the number of children with disabilities served in the prior year, as reported to the Secretary by the State under section 1418 of this title.

**(B)  Withholding of certain amounts**

Pending final resolution of any investigation or complaint that may result in a determination under this subsection, the Secretary may withhold from the allocation of the affected State educational agency the amount the Secretary estimates will be necessary to pay the cost of services described in subparagraph (A).

**(C)  Period of payments**

The period under which payments are made under subparagraph (A) shall continue until the Secretary determines that there will no longer be any failure or inability on the part of the State educational agency to meet the requirements of subsection (a)(10)(A).

**(3)  Notice and hearing**

**(A)  In general**

The Secretary shall not take any final action under this subsection until the State educational agency affected by such action has had an opportunity, for not less than 45 days after receiving written notice thereof, to submit written objections and to appear before the Secretary or the Secretary's designee to show cause why such action should not be taken.

**(B)  Review of action**

If a State educational agency is dissatisfied with the Secretary's final action after a proceeding under subparagraph (A), such agency may, not later than 60 days after notice of such action, file with the United States court of appeals for the circuit in which such State is located a petition for review of that action. A copy of the petition shall be forthwith transmitted by the clerk of the court to the Secretary. The Secretary thereupon shall file in the court the record of the proceedings on which the Secretary based the Secretary's action, as provided in section 2112 of title 28.

**(C)  Review of findings of fact**

NB: *This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

The findings of fact by the Secretary, if supported by substantial evidence, shall be conclusive, but the court, for good cause shown, may remand the case to the Secretary to take further evidence, and the Secretary may thereupon make new or modified findings of fact and may modify the Secretary's previous action, and shall file in the court the record of the further proceedings. Such new or modified findings of fact shall likewise be conclusive if supported by substantial evidence.

**(D)  Jurisdiction of court of appeals; review by United States Supreme Court**

Upon the filing of a petition under subparagraph (B), the United States court of appeals shall have jurisdiction to affirm the action of the Secretary or to set it aside, in whole or in part. The judgment of the court shall be subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of title 28.

(Pub. L. 91–230, title VI, § 612, as added Pub. L. 108–446, title I, § 101, Dec. 3, 2004, 118 Stat. 2676.)

## References in Text

The McKinney-Vento Homeless Assistance Act, referred to in subsec. (a)(11)(A)(iii), (21)(B)(v), is Pub. L. 100–77, July 22, 1987, 101 Stat. 482, as amended. Subtitle B of title VII of the Act is classified generally to part B (§ 11431 et seq.) of subchapter VI of chapter 119 of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see Short Title note set out under section 11301 of Title 42 and Tables.

The Controlled Substances Act, referred to in subsec. (a)(25)(A), is title II of Pub. L. 91–513, Oct. 27, 1970, 84 Stat. 1242, as amended, which is classified principally to subchapter I (§ 801 et seq.) of chapter 13 of Title 21, Food and Drugs. For complete classification of this Act to the Code, see Short Title note set out under section 801 of Title 21 and Tables.

For the effective date of the Individuals with Disabilities Education Improvement Act of 2004, referred to in subsec. (c)(1), (3), see section 302(a), (b) of Pub. L. 108–446, set out as an Effective Date note under section 1400 of this title.

The Social Security Act, referred to in subsec. (e), is act Aug. 14, 1935, ch. 531, 49 Stat. 620, as amended. Titles V and XIX of the Act are classified generally to subchapters V (§ 701 et seq.) and XIX (§ 1396 et seq.), respectively, of chapter 7 of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see section 1305 of Title 42 and Tables.

## Prior Provisions

A prior section 1412, Pub. L. 91–230, title VI, § 612, as added Pub. L. 105–17, title I, § 101, June 4, 1997, 111 Stat. 60, related to State eligibility for assistance, prior to the general amendment of subchapters I to IV of this chapter by Pub. L. 108–446.

Another prior section 1412, Pub. L. 91–230, title VI, § 612, Apr. 13, 1970, 84 Stat. 178; Pub. L. 92–318, title IV, § 421(b)(1)(C), June 23, 1972, 86 Stat. 341; Pub. L. 93–380, title VI, §§ 614(b), (f)(1), 615 (a), title VIII, § 843(b), Aug. 21, 1974, 88 Stat. 581, 582, 611; Pub. L. 94–142, §§ 2(a)(4), (c), (d), 5 (a), Nov. 29, 1975, 89 Stat. 773, 774, 780; Pub. L. 98–199, § 3(b), Dec. 2, 1983, 97 Stat. 1358; Pub. L. 99–457, title II, § 203(a), Oct. 8, 1986, 100 Stat. 1158; Pub. L. 100–630, title I, § 102(b), Nov. 7, 1988, 102 Stat. 3291; Pub. L. 101–476, title IX, § 901(b)(33)–(46), (c), Oct. 30, 1990, 104 Stat. 1143, 1144, 1151; Pub. L. 102–119, § 25(a)(5), (b), Oct. 7, 1991, 105 Stat. 606, 607, related to eligibility requirements, prior to the general amendment of subchapters I to IV of this chapter by Pub. L. 105–17.

NB: *This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

# TITLE 20 - EDUCATION
## CHAPTER 33 - EDUCATION OF INDIVIDUALS WITH DISABILITIES
### SUBCHAPTER II - ASSISTANCE FOR EDUCATION OF ALL CHILDREN WITH DISABILITIES

## § 1414. Evaluations, eligibility determinations, individualized education programs, and educational placements

**(a) Evaluations, parental consent, and reevaluations**

  **(1) Initial evaluations**

    **(A) In general**

A State educational agency, other State agency, or local educational agency shall conduct a full and individual initial evaluation in accordance with this paragraph and subsection (b), before the initial provision of special education and related services to a child with a disability under this subchapter.

    **(B) Request for initial evaluation**

Consistent with subparagraph (D), either a parent of a child, or a State educational agency, other State agency, or local educational agency may initiate a request for an initial evaluation to determine if the child is a child with a disability.

    **(C) Procedures**

      **(i)** In general

Such initial evaluation shall consist of procedures—

        **(I)** to determine whether a child is a child with a disability (as defined in 1401 of this title) within 60 days of receiving parental consent for the evaluation, or, if the State establishes a timeframe within which the evaluation must be conducted, within such timeframe; and

        **(II)** to determine the educational needs of such child.

      **(ii)** Exception

The relevant timeframe in clause (i)(I) shall not apply to a local educational agency if—

        **(I)** a child enrolls in a school served by the local educational agency after the relevant timeframe in clause (i)(I) has begun and prior to a determination by the child's previous local educational agency as to whether the child is a child with a disability (as defined in section 1401 of this title), but only if the subsequent local educational agency is making sufficient progress to ensure a prompt completion of the evaluation, and the parent and subsequent local educational agency agree to a specific time when the evaluation will be completed; or

        **(II)** the parent of a child repeatedly fails or refuses to produce the child for the evaluation.

    **(D) Parental consent**

      **(i)** In general

        **(I)** Consent for initial evaluation

The agency proposing to conduct an initial evaluation to determine if the child qualifies as a child with a disability as defined in section 1401 of this title shall obtain informed consent from the parent of such child before conducting the evaluation. Parental consent for evaluation shall not be construed as consent for placement for receipt of special education and related services.

        **(II)** Consent for services

*NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

An agency that is responsible for making a free appropriate public education available to a child with a disability under this subchapter shall seek to obtain informed consent from the parent of such child before providing special education and related services to the child.

**(ii)** Absence of consent

**(I)** For initial evaluation

If the parent of such child does not provide consent for an initial evaluation under clause (i)(I), or the parent fails to respond to a request to provide the consent, the local educational agency may pursue the initial evaluation of the child by utilizing the procedures described in section 1415 of this title, except to the extent inconsistent with State law relating to such parental consent.

**(II)** For services

If the parent of such child refuses to consent to services under clause (i)(II), the local educational agency shall not provide special education and related services to the child by utilizing the procedures described in section 1415 of this title.

**(III)** Effect on agency obligations

If the parent of such child refuses to consent to the receipt of special education and related services, or the parent fails to respond to a request to provide such consent—

**(aa)** the local educational agency shall not be considered to be in violation of the requirement to make available a free appropriate public education to the child for the failure to provide such child with the special education and related services for which the local educational agency requests such consent; and

**(bb)** the local educational agency shall not be required to convene an IEP meeting or develop an IEP under this section for the child for the special education and related services for which the local educational agency requests such consent.

**(iii)** Consent for wards of the State

**(I)** In general

If the child is a ward of the State and is not residing with the child's parent, the agency shall make reasonable efforts to obtain the informed consent from the parent (as defined in section 1401 of this title) of the child for an initial evaluation to determine whether the child is a child with a disability.

**(II)** Exception

The agency shall not be required to obtain informed consent from the parent of a child for an initial evaluation to determine whether the child is a child with a disability if—

**(aa)** despite reasonable efforts to do so, the agency cannot discover the whereabouts of the parent of the child;

**(bb)** the rights of the parents of the child have been terminated in accordance with State law; or

**(cc)** the rights of the parent to make educational decisions have been subrogated by a judge in accordance with State law and consent for an initial evaluation has been given by an individual appointed by the judge to represent the child.

**(E)** Rule of construction

The screening of a student by a teacher or specialist to determine appropriate instructional strategies for curriculum implementation shall not be considered to be an evaluation for eligibility for special education and related services.

**(2)** **Reevaluations**

NB: *This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

**(A)  In general**

A local educational agency shall ensure that a reevaluation of each child with a disability is conducted in accordance with subsections (b) and (c)—

> **(i)**  if the local educational agency determines that the educational or related services needs, including improved academic achievement and functional performance, of the child warrant a reevaluation; or

> **(ii)**  if the child's parents or teacher requests a reevaluation.

**(B)  Limitation**

A reevaluation conducted under subparagraph (A) shall occur—

> **(i)**  not more frequently than once a year, unless the parent and the local educational agency agree otherwise; and

> **(ii)**  at least once every 3 years, unless the parent and the local educational agency agree that a reevaluation is unnecessary.

**(b)  Evaluation procedures**

**(1)  Notice**

The local educational agency shall provide notice to the parents of a child with a disability, in accordance with subsections (b)(3), (b)(4), and (c) of section 1415 of this title, that describes any evaluation procedures such agency proposes to conduct.

**(2)  Conduct of evaluation**

In conducting the evaluation, the local educational agency shall—

**(A)**  use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information, including information provided by the parent, that may assist in determining—

> **(i)**  whether the child is a child with a disability; and

> **(ii)**  the content of the child's individualized education program, including information related to enabling the child to be involved in and progress in the general education curriculum, or, for preschool children, to participate in appropriate activities;

**(B)**  not use any single measure or assessment as the sole criterion for determining whether a child is a child with a disability or determining an appropriate educational program for the child; and

**(C)**  use technically sound instruments that may assess the relative contribution of cognitive and behavioral factors, in addition to physical or developmental factors.

**(3)  Additional requirements**

Each local educational agency shall ensure that—

**(A)**  assessments and other evaluation materials used to assess a child under this section—

> **(i)**  are selected and administered so as not to be discriminatory on a racial or cultural basis;

> **(ii)**  are provided and administered in the language and form most likely to yield accurate information on what the child knows and can do academically, developmentally, and functionally, unless it is not feasible to so provide or administer;

> **(iii)**  are used for purposes for which the assessments or measures are valid and reliable;

> **(iv)**  are administered by trained and knowledgeable personnel; and

> **(v)**  are administered in accordance with any instructions provided by the producer of such assessments;

**(B)**  the child is assessed in all areas of suspected disability;

**(C)** assessment tools and strategies that provide relevant information that directly assists persons in determining the educational needs of the child are provided; and

**(D)** assessments of children with disabilities who transfer from 1 school district to another school district in the same academic year are coordinated with such children's prior and subsequent schools, as necessary and as expeditiously as possible, to ensure prompt completion of full evaluations.

**(4)  Determination of eligibility and educational need**

Upon completion of the administration of assessments and other evaluation measures—

**(A)** the determination of whether the child is a child with a disability as defined in section 1401 (3) of this title and the educational needs of the child shall be made by a team of qualified professionals and the parent of the child in accordance with paragraph (5); and

**(B)** a copy of the evaluation report and the documentation of determination of eligibility shall be given to the parent.

**(5)  Special rule for eligibility determination**

In making a determination of eligibility under paragraph (4)(A), a child shall not be determined to be a child with a disability if the determinant factor for such determination is—

**(A)** lack of appropriate instruction in reading, including in the essential components of reading instruction (as defined in section 6368 (3) of this title);

**(B)** lack of instruction in math; or

**(C)** limited English proficiency.

**(6)  Specific learning disabilities**

**(A)  In general**

Notwithstanding section 1406 (b) of this title, when determining whether a child has a specific learning disability as defined in section 1401 of this title, a local educational agency shall not be required to take into consideration whether a child has a severe discrepancy between achievement and intellectual ability in oral expression, listening comprehension, written expression, basic reading skill, reading comprehension, mathematical calculation, or mathematical reasoning.

**(B)  Additional authority**

In determining whether a child has a specific learning disability, a local educational agency may use a process that determines if the child responds to scientific, research-based intervention as a part of the evaluation procedures described in paragraphs (2) and (3).

**(c)  Additional requirements for evaluation and reevaluations**

**(1)  Review of existing evaluation data**

As part of an initial evaluation (if appropriate) and as part of any reevaluation under this section, the IEP Team and other qualified professionals, as appropriate, shall—

**(A)** review existing evaluation data on the child, including—

**(i)** evaluations and information provided by the parents of the child;

**(ii)** current classroom-based, local, or State assessments, and classroom-based observations; and

**(iii)** observations by teachers and related services providers; and

**(B)** on the basis of that review, and input from the child's parents, identify what additional data, if any, are needed to determine—

**(i)** whether the child is a child with a disability as defined in section 1401 (3) of this title, and the educational needs of the child, or, in case of a reevaluation of a child, whether the child continues to have such a disability and such educational needs;

NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).

**(ii)**  the present levels of academic achievement and related developmental needs of the child;

**(iii)**  whether the child needs special education and related services, or in the case of a reevaluation of a child, whether the child continues to need special education and related services; and

**(iv)**  whether any additions or modifications to the special education and related services are needed to enable the child to meet the measurable annual goals set out in the individualized education program of the child and to participate, as appropriate, in the general education curriculum.

**(2)  Source of data**

The local educational agency shall administer such assessments and other evaluation measures as may be needed to produce the data identified by the IEP Team under paragraph (1)(B).

**(3)  Parental consent**

Each local educational agency shall obtain informed parental consent, in accordance with subsection (a)(1)(D), prior to conducting any reevaluation of a child with a disability, except that such informed parental consent need not be obtained if the local educational agency can demonstrate that it had taken reasonable measures to obtain such consent and the child's parent has failed to respond.

**(4)  Requirements if additional data are not needed**

If the IEP Team and other qualified professionals, as appropriate, determine that no additional data are needed to determine whether the child continues to be a child with a disability and to determine the child's educational needs, the local educational agency—

**(A)**  shall notify the child's parents of—

**(i)**  that determination and the reasons for the determination; and

**(ii)**  the right of such parents to request an assessment to determine whether the child continues to be a child with a disability and to determine the child's educational needs; and

**(B)**  shall not be required to conduct such an assessment unless requested to by the child's parents.

**(5)  Evaluations before change in eligibility**

**(A)  In general**

Except as provided in subparagraph (B), a local educational agency shall evaluate a child with a disability in accordance with this section before determining that the child is no longer a child with a disability.

**(B)  Exception**

**(i)**  In general

The evaluation described in subparagraph (A) shall not be required before the termination of a child's eligibility under this subchapter due to graduation from secondary school with a regular diploma, or due to exceeding the age eligibility for a free appropriate public education under State law.

**(ii)**  Summary of performance

For a child whose eligibility under this subchapter terminates under circumstances described in clause (i), a local educational agency shall provide the child with a summary of the child's academic achievement and functional performance, which shall include recommendations on how to assist the child in meeting the child's postsecondary goals.

**(d)  Individualized education programs**

**(1)  Definitions**

NB: *This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

In this chapter:

**(A) Individualized education program**

**(i)** In general

The term "individualized education program" or "IEP" means a written statement for each child with a disability that is developed, reviewed, and revised in accordance with this section and that includes—

**(I)** a statement of the child's present levels of academic achievement and functional performance, including—

**(aa)** how the child's disability affects the child's involvement and progress in the general education curriculum;

**(bb)** for preschool children, as appropriate, how the disability affects the child's participation in appropriate activities; and

**(cc)** for children with disabilities who take alternate assessments aligned to alternate achievement standards, a description of benchmarks or short-term objectives;

**(II)** a statement of measurable annual goals, including academic and functional goals, designed to—

**(aa)** meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general education curriculum; and

**(bb)** meet each of the child's other educational needs that result from the child's disability;

**(III)** a description of how the child's progress toward meeting the annual goals described in subclause (II) will be measured and when periodic reports on the progress the child is making toward meeting the annual goals (such as through the use of quarterly or other periodic reports, concurrent with the issuance of report cards) will be provided;

**(IV)** a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child, and a statement of the program modifications or supports for school personnel that will be provided for the child—

**(aa)** to advance appropriately toward attaining the annual goals;

**(bb)** to be involved in and make progress in the general education curriculum in accordance with subclause (I) and to participate in extracurricular and other nonacademic activities; and

**(cc)** to be educated and participate with other children with disabilities and nondisabled children in the activities described in this subparagraph;

**(V)** an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class and in the activities described in subclause (IV)(cc);

**(VI)(aa)** a statement of any individual appropriate accommodations that are necessary to measure the academic achievement and functional performance of the child on State and districtwide assessments consistent with section 1412 (a)(16)(A) of this title; and

**(bb)** if the IEP Team determines that the child shall take an alternate assessment on a particular State or districtwide assessment of student achievement, a statement of why—

**(AA)** the child cannot participate in the regular assessment; and

NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).

**(BB)** the particular alternate assessment selected is appropriate for the child;

**(VII)** the projected date for the beginning of the services and modifications described in subclause (IV), and the anticipated frequency, location, and duration of those services and modifications; and

**(VIII)** beginning not later than the first IEP to be in effect when the child is 16, and updated annually thereafter—

**(aa)** appropriate measurable postsecondary goals based upon age appropriate transition assessments related to training, education, employment, and, where appropriate, independent living skills;

**(bb)** the transition services (including courses of study) needed to assist the child in reaching those goals; and

**(cc)** beginning not later than 1 year before the child reaches the age of majority under State law, a statement that the child has been informed of the child's rights under this chapter, if any, that will transfer to the child on reaching the age of majority under section 1415 (m) of this title.

**(ii)** Rule of construction

Nothing in this section shall be construed to require—

**(I)** that additional information be included in a child's IEP beyond what is explicitly required in this section; and

**(II)** the IEP Team to include information under 1 component of a child's IEP that is already contained under another component of such IEP.

**(B) Individualized education program team**

The term "individualized education program team" or "IEP Team" means a group of individuals composed of—

**(i)** the parents of a child with a disability;

**(ii)** not less than 1 regular education teacher of such child (if the child is, or may be, participating in the regular education environment);

**(iii)** not less than 1 special education teacher, or where appropriate, not less than 1 special education provider of such child;

**(iv)** a representative of the local educational agency who—

**(I)** is qualified to provide, or supervise the provision of, specially designed instruction to meet the unique needs of children with disabilities;

**(II)** is knowledgeable about the general education curriculum; and

**(III)** is knowledgeable about the availability of resources of the local educational agency;

**(v)** an individual who can interpret the instructional implications of evaluation results, who may be a member of the team described in clauses (ii) through (vi);

**(vi)** at the discretion of the parent or the agency, other individuals who have knowledge or special expertise regarding the child, including related services personnel as appropriate; and

**(vii)** whenever appropriate, the child with a disability.

**(C) IEP Team attendance**

**(i)** Attendance not necessary

A member of the IEP Team shall not be required to attend an IEP meeting, in whole or in part, if the parent of a child with a disability and the local educational agency agree that the attendance of such member is not necessary because the member's area of the curriculum or related services is not being modified or discussed in the meeting.

*NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

**(ii)** Excusal

A member of the IEP Team may be excused from attending an IEP meeting, in whole or in part, when the meeting involves a modification to or discussion of the member's area of the curriculum or related services, if—

**(I)** the parent and the local educational agency consent to the excusal; and

**(II)** the member submits, in writing to the parent and the IEP Team, input into the development of the IEP prior to the meeting.

**(iii)** Written agreement and consent required

A parent's agreement under clause (i) and consent under clause (ii) shall be in writing.

**(D) IEP Team transition**

In the case of a child who was previously served under subchapter III, an invitation to the initial IEP meeting shall, at the request of the parent, be sent to the subchapter III service coordinator or other representatives of the subchapter III system to assist with the smooth transition of services.

**(2) Requirement that program be in effect**

**(A) In general**

At the beginning of each school year, each local educational agency, State educational agency, or other State agency, as the case may be, shall have in effect, for each child with a disability in the agency's jurisdiction, an individualized education program, as defined in paragraph (1)(A).

**(B) Program for child aged 3 through 5**

In the case of a child with a disability aged 3 through 5 (or, at the discretion of the State educational agency, a 2-year-old child with a disability who will turn age 3 during the school year), the IEP Team shall consider the individualized family service plan that contains the material described in section 1436 of this title, and that is developed in accordance with this section, and the individualized family service plan may serve as the IEP of the child if using that plan as the IEP is—

**(i)** consistent with State policy; and

**(ii)** agreed to by the agency and the child's parents.

**(C) Program for children who transfer school districts**

**(i)** In general

**(I)** Transfer within the same State

In the case of a child with a disability who transfers school districts within the same academic year, who enrolls in a new school, and who had an IEP that was in effect in the same State, the local educational agency shall provide such child with a free appropriate public education, including services comparable to those described in the previously held IEP, in consultation with the parents until such time as the local educational agency adopts the previously held IEP or develops, adopts, and implements a new IEP that is consistent with Federal and State law.

**(II)** Transfer outside State

In the case of a child with a disability who transfers school districts within the same academic year, who enrolls in a new school, and who had an IEP that was in effect in another State, the local educational agency shall provide such child with a free appropriate public education, including services comparable to those described in the previously held IEP, in consultation with the parents until such time as the local educational agency conducts an evaluation pursuant to subsection (a)(1), if

NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).

determined to be necessary by such agency, and develops a new IEP, if appropriate, that is consistent with Federal and State law.

**(ii)**  Transmittal of records

To facilitate the transition for a child described in clause (i)—

**(I)**  the new school in which the child enrolls shall take reasonable steps to promptly obtain the child's records, including the IEP and supporting documents and any other records relating to the provision of special education or related services to the child, from the previous school in which the child was enrolled, pursuant to section 99.31(a)(2) of title 34, Code of Federal Regulations; and

**(II)**  the previous school in which the child was enrolled shall take reasonable steps to promptly respond to such request from the new school.

**(3)  Development of IEP**

**(A)  In general**

In developing each child's IEP, the IEP Team, subject to subparagraph (C), shall consider—

**(i)**  the strengths of the child;

**(ii)**  the concerns of the parents for enhancing the education of their child;

**(iii)**  the results of the initial evaluation or most recent evaluation of the child; and

**(iv)**  the academic, developmental, and functional needs of the child.

**(B)  Consideration of special factors**

The IEP Team shall—

**(i)**  in the case of a child whose behavior impedes the child's learning or that of others, consider the use of positive behavioral interventions and supports, and other strategies, to address that behavior;

**(ii)**  in the case of a child with limited English proficiency, consider the language needs of the child as such needs relate to the child's IEP;

**(iii)**  in the case of a child who is blind or visually impaired, provide for instruction in Braille and the use of Braille unless the IEP Team determines, after an evaluation of the child's reading and writing skills, needs, and appropriate reading and writing media (including an evaluation of the child's future needs for instruction in Braille or the use of Braille), that instruction in Braille or the use of Braille is not appropriate for the child;

**(iv)**  consider the communication needs of the child, and in the case of a child who is deaf or hard of hearing, consider the child's language and communication needs, opportunities for direct communications with peers and professional personnel in the child's language and communication mode, academic level, and full range of needs, including opportunities for direct instruction in the child's language and communication mode; and

**(v)**  consider whether the child needs assistive technology devices and services.

**(C)  Requirement with respect to regular education teacher**

A regular education teacher of the child, as a member of the IEP Team, shall, to the extent appropriate, participate in the development of the IEP of the child, including the determination of appropriate positive behavioral interventions and supports, and other strategies, and the determination of supplementary aids and services, program modifications, and support for school personnel consistent with paragraph (1)(A)(i)(IV).

**(D)  Agreement**

In making changes to a child's IEP after the annual IEP meeting for a school year, the parent of a child with a disability and the local educational agency may agree not to convene an

*NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

IEP meeting for the purposes of making such changes, and instead may develop a written document to amend or modify the child's current IEP.

**(E)  Consolidation of IEP Team meetings**

To the extent possible, the local educational agency shall encourage the consolidation of reevaluation meetings for the child and other IEP Team meetings for the child.

**(F)  Amendments**

Changes to the IEP may be made either by the entire IEP Team or, as provided in subparagraph (D), by amending the IEP rather than by redrafting the entire IEP. Upon request, a parent shall be provided with a revised copy of the IEP with the amendments incorporated.

**(4)  Review and revision of IEP**

**(A)  In general**

The local educational agency shall ensure that, subject to subparagraph (B), the IEP Team—

**(i)**  reviews the child's IEP periodically, but not less frequently than annually, to determine whether the annual goals for the child are being achieved; and

**(ii)**  revises the IEP as appropriate to address—

**(I)**  any lack of expected progress toward the annual goals and in the general education curriculum, where appropriate;

**(II)**  the results of any reevaluation conducted under this section;

**(III)**  information about the child provided to, or by, the parents, as described in subsection (c)(1)(B);

**(IV)**  the child's anticipated needs; or

**(V)**  other matters.

**(B)  Requirement with respect to regular education teacher**

A regular education teacher of the child, as a member of the IEP Team, shall, consistent with paragraph (1)(C), participate in the review and revision of the IEP of the child.

**(5)  Multi-year IEP demonstration**

**(A)  Pilot program**

**(i)**  Purpose

The purpose of this paragraph is to provide an opportunity for States to allow parents and local educational agencies the opportunity for long-term planning by offering the option of developing a comprehensive multi-year IEP, not to exceed 3 years, that is designed to coincide with the natural transition points for the child.

**(ii)**  Authorization

In order to carry out the purpose of this paragraph, the Secretary is authorized to approve not more than 15 proposals from States to carry out the activity described in clause (i).

**(iii)**  Proposal

**(I)**  In general

A State desiring to participate in the program under this paragraph shall submit a proposal to the Secretary at such time and in such manner as the Secretary may reasonably require.

**(II)**  Content

The proposal shall include—

**(aa)**  assurances that the development of a multi-year IEP under this paragraph is optional for parents;

*NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

**(bb)**   assurances that the parent is required to provide informed consent before a comprehensive multi-year IEP is developed;

**(cc)**   a list of required elements for each multi-year IEP, including—

**(AA)**   measurable goals pursuant to paragraph (1)(A)(i)(II), coinciding with natural transition points for the child, that will enable the child to be involved in and make progress in the general education curriculum and that will meet the child's other needs that result from the child's disability; and

**(BB)**   measurable annual goals for determining progress toward meeting the goals described in subitem (AA); and

**(dd)**   a description of the process for the review and revision of each multi-year IEP, including—

**(AA)**   a review by the IEP Team of the child's multi-year IEP at each of the child's natural transition points;

**(BB)**   in years other than a child's natural transition points, an annual review of the child's IEP to determine the child's current levels of progress and whether the annual goals for the child are being achieved, and a requirement to amend the IEP, as appropriate, to enable the child to continue to meet the measurable goals set out in the IEP;

**(CC)**   if the IEP Team determines on the basis of a review that the child is not making sufficient progress toward the goals described in the multi-year IEP, a requirement that the local educational agency shall ensure that the IEP Team carries out a more thorough review of the IEP in accordance with paragraph (4) within 30 calendar days; and

**(DD)**   at the request of the parent, a requirement that the IEP Team shall conduct a review of the child's multi-year IEP rather than or subsequent to an annual review.

**(B)   Report**

Beginning 2 years after December 3, 2004, the Secretary shall submit an annual report to the Committee on Education and the Workforce of the House of Representatives and the Committee on Health, Education, Labor, and Pensions of the Senate regarding the effectiveness of the program under this paragraph and any specific recommendations for broader implementation of such program, including—

**(i)**   reducing—

**(I)**   the paperwork burden on teachers, principals, administrators, and related service providers; and

**(II)**   noninstructional time spent by teachers in complying with this subchapter;

**(ii)**   enhancing longer-term educational planning;

**(iii)**   improving positive outcomes for children with disabilities;

**(iv)**   promoting collaboration between IEP Team members; and

**(v)**   ensuring satisfaction of family members.

**(C)   Definition**

In this paragraph, the term "natural transition points" means those periods that are close in time to the transition of a child with a disability from preschool to elementary grades, from elementary grades to middle or junior high school grades, from middle or junior high school grades to secondary school grades, and from secondary school grades to post-secondary activities, but in no case a period longer than 3 years.

**(6)   Failure to meet transition objectives**

If a participating agency, other than the local educational agency, fails to provide the transition services described in the IEP in accordance with paragraph (1)(A)(i)(VIII), the local educational

NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).

agency shall reconvene the IEP Team to identify alternative strategies to meet the transition objectives for the child set out in the IEP.

**(7) Children with disabilities in adult prisons**

**(A) In general**

The following requirements shall not apply to children with disabilities who are convicted as adults under State law and incarcerated in adult prisons:

**(i)** The requirements contained in section 1412 (a)(16) of this title and paragraph (1)(A)(i)(VI) (relating to participation of children with disabilities in general assessments).

**(ii)** The requirements of items (aa) and (bb) of paragraph (1)(A)(i)(VIII) (relating to transition planning and transition services), do not apply with respect to such children whose eligibility under this subchapter will end, because of such children's age, before such children will be released from prison.

**(B) Additional requirement**

If a child with a disability is convicted as an adult under State law and incarcerated in an adult prison, the child's IEP Team may modify the child's IEP or placement notwithstanding the requirements of sections [1] 1412(a)(5)(A) of this title and paragraph (1)(A) if the State has demonstrated a bona fide security or compelling penological interest that cannot otherwise be accommodated.

**(e) Educational placements**

Each local educational agency or State educational agency shall ensure that the parents of each child with a disability are members of any group that makes decisions on the educational placement of their child.

**(f) Alternative means of meeting participation**

When conducting IEP team [2] meetings and placement meetings pursuant to this section, section 1415 (e) of this title, and section 1415 (f)(1)(B) of this title, and carrying out administrative matters under section 1415 of this title (such as scheduling, exchange of witness lists, and status conferences), the parent of a child with a disability and a local educational agency may agree to use alternative means of meeting participation, such as video conferences and conference calls.

*Footnotes*

[1] So in original. Probably should be "section".

[2] So in original. Probably should be capitalized.

(Pub. L. 91–230, title VI, § 614, as added Pub. L. 108–446, title I, § 101, Dec. 3, 2004, 118 Stat. 2702.)

**Prior Provisions**

A prior section 1414, Pub. L. 91–230, title VI, § 614, as added Pub. L. 105–17, title I, § 101, June 4, 1997, 111 Stat. 81, related to evaluations, eligibility determinations, individualized education programs, and educational placements, prior to the general amendment of subchapters I to IV of this chapter by Pub. L. 108–446.

Another prior section 1414, Pub. L. 91–230, title VI, § 614, Apr. 13, 1970, 84 Stat. 181; Pub. L. 94–142, § 5(a), Nov. 29, 1975, 89 Stat. 784; Pub. L. 98–199, § 3(b), Dec. 2, 1983, 97 Stat. 1358; Pub. L. 100–630, title I, § 102(d), Nov. 7, 1988, 102 Stat. 3293; Pub. L. 101–476, title IX, § 901(b)(59)–(70), Oct. 30, 1990, 104 Stat. 1144, 1145; Pub. L. 102–119, §§ 6, 25 (b), Oct. 7, 1991, 105 Stat. 591, 607, related to requisite features of an application, approval of application by State educational agency, consolidated applications of local educational agencies, and provision of special education and related services directly to children with disabilities in areas not served by local educational agency, prior to the general amendment of subchapters I to IV of this chapter by Pub. L. 105–17.

A prior section 1414a, Pub. L. 91–230, title VI, § 614A, as added Pub. L. 103–382, title III, § 312, Oct. 20, 1994, 108 Stat. 3934, which related to treatment of State agencies that received funds for fiscal year 1994 under subpart 2 of part

***20 USC 1414***

*NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

D of chapter 1 of title I of the Elementary and Secondary Education Act of 1965 (as in existence on the day preceding Oct. 20, 1994), was omitted in the general amendment of subchapters I to IV of this chapter by Pub. L. 105–17.

Addendum 29

NB: *This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

**TITLE 20 - EDUCATION**
  **CHAPTER 33 - EDUCATION OF INDIVIDUALS WITH DISABILITIES**
    **SUBCHAPTER II - ASSISTANCE FOR EDUCATION OF ALL CHILDREN WITH DISABILITIES**

## § 1415. Procedural safeguards

  **(a) Establishment of procedures**

  Any State educational agency, State agency, or local educational agency that receives assistance under this subchapter shall establish and maintain procedures in accordance with this section to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a free appropriate public education by such agencies.

  **(b) Types of procedures**

  The procedures required by this section shall include the following:

  **(1)** An opportunity for the parents of a child with a disability to examine all records relating to such child and to participate in meetings with respect to the identification, evaluation, and educational placement of the child, and the provision of a free appropriate public education to such child, and to obtain an independent educational evaluation of the child.

  **(2)** **(A)** Procedures to protect the rights of the child whenever the parents of the child are not known, the agency cannot, after reasonable efforts, locate the parents, or the child is a ward of the State, including the assignment of an individual to act as a surrogate for the parents, which surrogate shall not be an employee of the State educational agency, the local educational agency, or any other agency that is involved in the education or care of the child. In the case of—

      **(i)** a child who is a ward of the State, such surrogate may alternatively be appointed by the judge overseeing the child's care provided that the surrogate meets the requirements of this paragraph; and

      **(ii)** an unaccompanied homeless youth as defined in section 11434a (6) of title 42, the local educational agency shall appoint a surrogate in accordance with this paragraph.

    **(B)** The State shall make reasonable efforts to ensure the assignment of a surrogate not more than 30 days after there is a determination by the agency that the child needs a surrogate.

  **(3)** Written prior notice to the parents of the child, in accordance with subsection (c)(1), whenever the local educational agency—

    **(A)** proposes to initiate or change; or

    **(B)** refuses to initiate or change,

  the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to the child.

  **(4)** Procedures designed to ensure that the notice required by paragraph (3) is in the native language of the parents, unless it clearly is not feasible to do so.

  **(5)** An opportunity for mediation, in accordance with subsection (e).

  **(6)** An opportunity for any party to present a complaint—

    **(A)** with respect to any matter relating to the identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child; and

    **(B)** which sets forth an alleged violation that occurred not more than 2 years before the date the parent or public agency knew or should have known about the alleged action that forms the basis of the complaint, or, if the State has an explicit time limitation for presenting such a complaint under this subchapter, in such time as the State law allows, except that

the exceptions to the timeline described in subsection (f)(3)(D) shall apply to the timeline described in this subparagraph.

**(7)** **(A)** Procedures that require either party, or the attorney representing a party, to provide due process complaint notice in accordance with subsection (c)(2) (which shall remain confidential)—

**(i)** to the other party, in the complaint filed under paragraph (6), and forward a copy of such notice to the State educational agency; and

**(ii)** that shall include—

**(I)** the name of the child, the address of the residence of the child (or available contact information in the case of a homeless child), and the name of the school the child is attending;

**(II)** in the case of a homeless child or youth (within the meaning of section 11434a (2) of title 42), available contact information for the child and the name of the school the child is attending;

**(III)** a description of the nature of the problem of the child relating to such proposed initiation or change, including facts relating to such problem; and

**(IV)** a proposed resolution of the problem to the extent known and available to the party at the time.

**(B)** A requirement that a party may not have a due process hearing until the party, or the attorney representing the party, files a notice that meets the requirements of subparagraph (A)(ii).

**(8)** Procedures that require the State educational agency to develop a model form to assist parents in filing a complaint and due process complaint notice in accordance with paragraphs (6) and (7), respectively.

**(c)** **Notification requirements**

**(1)** **Content of prior written notice**

The notice required by subsection (b)(3) shall include—

**(A)** a description of the action proposed or refused by the agency;

**(B)** an explanation of why the agency proposes or refuses to take the action and a description of each evaluation procedure, assessment, record, or report the agency used as a basis for the proposed or refused action;

**(C)** a statement that the parents of a child with a disability have protection under the procedural safeguards of this subchapter and, if this notice is not an initial referral for evaluation, the means by which a copy of a description of the procedural safeguards can be obtained;

**(D)** sources for parents to contact to obtain assistance in understanding the provisions of this subchapter;

**(E)** a description of other options considered by the IEP Team and the reason why those options were rejected; and

**(F)** a description of the factors that are relevant to the agency's proposal or refusal.

**(2)** **Due process complaint notice**

**(A)** **Complaint**

The due process complaint notice required under subsection (b)(7)(A) shall be deemed to be sufficient unless the party receiving the notice notifies the hearing officer and the other party in writing that the receiving party believes the notice has not met the requirements of subsection (b)(7)(A).

**(B)** **Response to complaint**

*NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

**(i)** Local educational agency response

**(I)** In general

If the local educational agency has not sent a prior written notice to the parent regarding the subject matter contained in the parent's due process complaint notice, such local educational agency shall, within 10 days of receiving the complaint, send to the parent a response that shall include—

**(aa)** an explanation of why the agency proposed or refused to take the action raised in the complaint;

**(bb)** a description of other options that the IEP Team considered and the reasons why those options were rejected;

**(cc)** a description of each evaluation procedure, assessment, record, or report the agency used as the basis for the proposed or refused action; and

**(dd)** a description of the factors that are relevant to the agency's proposal or refusal.

**(II)** Sufficiency

A response filed by a local educational agency pursuant to subclause (I) shall not be construed to preclude such local educational agency from asserting that the parent's due process complaint notice was insufficient where appropriate.

**(ii)** Other party response

Except as provided in clause (i), the non-complaining party shall, within 10 days of receiving the complaint, send to the complaint a response that specifically addresses the issues raised in the complaint.

**(C)  Timing**

The party providing a hearing officer notification under subparagraph (A) shall provide the notification within 15 days of receiving the complaint.

**(D)  Determination**

Within 5 days of receipt of the notification provided under subparagraph (C), the hearing officer shall make a determination on the face of the notice of whether the notification meets the requirements of subsection (b)(7)(A), and shall immediately notify the parties in writing of such determination.

**(E)  Amended complaint notice**

**(i)** In general

A party may amend its due process complaint notice only if—

**(I)** the other party consents in writing to such amendment and is given the opportunity to resolve the complaint through a meeting held pursuant to subsection (f)(1)(B); or

**(II)** the hearing officer grants permission, except that the hearing officer may only grant such permission at any time not later than 5 days before a due process hearing occurs.

**(ii)** Applicable timeline

The applicable timeline for a due process hearing under this subchapter shall recommence at the time the party files an amended notice, including the timeline under subsection (f)(1)(B).

**(d)  Procedural safeguards notice**

**(1)  In general**

**(A)  Copy to parents**

NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).

A copy of the procedural safeguards available to the parents of a child with a disability shall be given to the parents only 1 time a year, except that a copy also shall be given to the parents—

**(i)**  upon initial referral or parental request for evaluation;

**(ii)**  upon the first occurrence of the filing of a complaint under subsection (b)(6); and

**(iii)**  upon request by a parent.

**(B)  Internet website**

A local educational agency may place a current copy of the procedural safeguards notice on its Internet website if such website exists.

**(2)  Contents**

The procedural safeguards notice shall include a full explanation of the procedural safeguards, written in the native language of the parents (unless it clearly is not feasible to do so) and written in an easily understandable manner, available under this section and under regulations promulgated by the Secretary relating to—

**(A)**  independent educational evaluation;

**(B)**  prior written notice;

**(C)**  parental consent;

**(D)**  access to educational records;

**(E)**  the opportunity to present and resolve complaints, including—

**(i)**  the time period in which to make a complaint;

**(ii)**  the opportunity for the agency to resolve the complaint; and

**(iii)**  the availability of mediation;

**(F)**  the child's placement during pendency of due process proceedings;

**(G)**  procedures for students who are subject to placement in an interim alternative educational setting;

**(H)**  requirements for unilateral placement by parents of children in private schools at public expense;

**(I)**  due process hearings, including requirements for disclosure of evaluation results and recommendations;

**(J)**  State-level appeals (if applicable in that State);

**(K)**  civil actions, including the time period in which to file such actions; and

**(L)**  attorneys' fees.

**(e)  Mediation**

**(1)  In general**

Any State educational agency or local educational agency that receives assistance under this subchapter shall ensure that procedures are established and implemented to allow parties to disputes involving any matter, including matters arising prior to the filing of a complaint pursuant to subsection (b)(6), to resolve such disputes through a mediation process.

**(2)  Requirements**

Such procedures shall meet the following requirements:

**(A)**  The procedures shall ensure that the mediation process—

**(i)**  is voluntary on the part of the parties;

**(ii)**  is not used to deny or delay a parent's right to a due process hearing under subsection (f), or to deny any other rights afforded under this subchapter; and

**(iii)**  is conducted by a qualified and impartial mediator who is trained in effective mediation techniques.

NB: *This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

**(B) Opportunity to meet with a disinterested party.—** A local educational agency or a State agency may establish procedures to offer to parents and schools that choose not to use the mediation process, an opportunity to meet, at a time and location convenient to the parents, with a disinterested party who is under contract with—

**(i)** a parent training and information center or community parent resource center in the State established under section 1471 or 1472 of this title; or

**(ii)** an appropriate alternative dispute resolution entity,

to encourage the use, and explain the benefits, of the mediation process to the parents.

**(C) List of qualified mediators.—** The State shall maintain a list of individuals who are qualified mediators and knowledgeable in laws and regulations relating to the provision of special education and related services.

**(D) Costs.—** The State shall bear the cost of the mediation process, including the costs of meetings described in subparagraph (B).

**(E) Scheduling and location.—** Each session in the mediation process shall be scheduled in a timely manner and shall be held in a location that is convenient to the parties to the dispute.

**(F) Written agreement.—** In the case that a resolution is reached to resolve the complaint through the mediation process, the parties shall execute a legally binding agreement that sets forth such resolution and that—

**(i)** states that all discussions that occurred during the mediation process shall be confidential and may not be used as evidence in any subsequent due process hearing or civil proceeding;

**(ii)** is signed by both the parent and a representative of the agency who has the authority to bind such agency; and

**(iii)** is enforceable in any State court of competent jurisdiction or in a district court of the United States.

**(G) Mediation discussions.—** Discussions that occur during the mediation process shall be confidential and may not be used as evidence in any subsequent due process hearing or civil proceeding.

**(f) Impartial due process hearing**

**(1) In general**

**(A) Hearing**

Whenever a complaint has been received under subsection (b)(6) or (k), the parents or the local educational agency involved in such complaint shall have an opportunity for an impartial due process hearing, which shall be conducted by the State educational agency or by the local educational agency, as determined by State law or by the State educational agency.

**(B) Resolution session**

**(i)** Preliminary meeting

Prior to the opportunity for an impartial due process hearing under subparagraph (A), the local educational agency shall convene a meeting with the parents and the relevant member or members of the IEP Team who have specific knowledge of the facts identified in the complaint—

**(I)** within 15 days of receiving notice of the parents' complaint;

**(II)** which shall include a representative of the agency who has decisionmaking authority on behalf of such agency;

**(III)** which may not include an attorney of the local educational agency unless the parent is accompanied by an attorney; and

**(IV)** where the parents of the child discuss their complaint, and the facts that form the basis of the complaint, and the local educational agency is provided the opportunity to resolve the complaint,

unless the parents and the local educational agency agree in writing to waive such meeting, or agree to use the mediation process described in subsection (e).

**(ii)** Hearing

If the local educational agency has not resolved the complaint to the satisfaction of the parents within 30 days of the receipt of the complaint, the due process hearing may occur, and all of the applicable timelines for a due process hearing under this subchapter shall commence.

**(iii)** Written settlement agreement

In the case that a resolution is reached to resolve the complaint at a meeting described in clause (i), the parties shall execute a legally binding agreement that is—

**(I)** signed by both the parent and a representative of the agency who has the authority to bind such agency; and

**(II)** enforceable in any State court of competent jurisdiction or in a district court of the United States.

**(iv)** Review period

If the parties execute an agreement pursuant to clause (iii), a party may void such agreement within 3 business days of the agreement's execution.

**(2) Disclosure of evaluations and recommendations**

**(A) In general**

Not less than 5 business days prior to a hearing conducted pursuant to paragraph (1), each party shall disclose to all other parties all evaluations completed by that date, and recommendations based on the offering party's evaluations, that the party intends to use at the hearing.

**(B) Failure to disclose**

A hearing officer may bar any party that fails to comply with subparagraph (A) from introducing the relevant evaluation or recommendation at the hearing without the consent of the other party.

**(3) Limitations on hearing**

**(A) Person conducting hearing**

A hearing officer conducting a hearing pursuant to paragraph (1)(A) shall, at a minimum—

**(i)** not be—

**(I)** an employee of the State educational agency or the local educational agency involved in the education or care of the child; or

**(II)** a person having a personal or professional interest that conflicts with the person's objectivity in the hearing;

**(ii)** possess knowledge of, and the ability to understand, the provisions of this chapter, Federal and State regulations pertaining to this chapter, and legal interpretations of this chapter by Federal and State courts;

**(iii)** possess the knowledge and ability to conduct hearings in accordance with appropriate, standard legal practice; and

**(iv)** possess the knowledge and ability to render and write decisions in accordance with appropriate, standard legal practice.

**(B) Subject matter of hearing**

NB: *This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

The party requesting the due process hearing shall not be allowed to raise issues at the due process hearing that were not raised in the notice filed under subsection (b)(7), unless the other party agrees otherwise.

**(C)  Timeline for requesting hearing**

A parent or agency shall request an impartial due process hearing within 2 years of the date the parent or agency knew or should have known about the alleged action that forms the basis of the complaint, or, if the State has an explicit time limitation for requesting such a hearing under this subchapter, in such time as the State law allows.

**(D)  Exceptions to the timeline**

The timeline described in subparagraph (C) shall not apply to a parent if the parent was prevented from requesting the hearing due to—

**(i)**  specific misrepresentations by the local educational agency that it had resolved the problem forming the basis of the complaint; or

**(ii)**  the local educational agency's withholding of information from the parent that was required under this subchapter to be provided to the parent.

**(E)  Decision of hearing officer**

**(i)**  In general

Subject to clause (ii), a decision made by a hearing officer shall be made on substantive grounds based on a determination of whether the child received a free appropriate public education.

**(ii)**  Procedural issues

In matters alleging a procedural violation, a hearing officer may find that a child did not receive a free appropriate public education only if the procedural inadequacies—

**(I)**  impeded the child's right to a free appropriate public education;

**(II)**  significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a free appropriate public education to the parents' child; or

**(III)**  caused a deprivation of educational benefits.

**(iii)**  Rule of construction

Nothing in this subparagraph shall be construed to preclude a hearing officer from ordering a local educational agency to comply with procedural requirements under this section.

**(F)  Rule of construction**

Nothing in this paragraph shall be construed to affect the right of a parent to file a complaint with the State educational agency.

**(g)  Appeal**

**(1)  In general**

If the hearing required by subsection (f) is conducted by a local educational agency, any party aggrieved by the findings and decision rendered in such a hearing may appeal such findings and decision to the State educational agency.

**(2)  Impartial review and independent decision**

The State educational agency shall conduct an impartial review of the findings and decision appealed under paragraph (1). The officer conducting such review shall make an independent decision upon completion of such review.

**(h)  Safeguards**

Any party to a hearing conducted pursuant to subsection (f) or (k), or an appeal conducted pursuant to subsection (g), shall be accorded—

**(1)** the right to be accompanied and advised by counsel and by individuals with special knowledge or training with respect to the problems of children with disabilities;

**(2)** the right to present evidence and confront, cross-examine, and compel the attendance of witnesses;

**(3)** the right to a written, or, at the option of the parents, electronic verbatim record of such hearing; and

**(4)** the right to written, or, at the option of the parents, electronic findings of fact and decisions, which findings and decisions—

**(A)** shall be made available to the public consistent with the requirements of section 1417 (b) of this title (relating to the confidentiality of data, information, and records); and

**(B)** shall be transmitted to the advisory panel established pursuant to section 1412 (a)(21) of this title.

**(i) Administrative procedures**

**(1) In general**

**(A) Decision made in hearing**

A decision made in a hearing conducted pursuant to subsection (f) or (k) shall be final, except that any party involved in such hearing may appeal such decision under the provisions of subsection (g) and paragraph (2).

**(B) Decision made at appeal**

A decision made under subsection (g) shall be final, except that any party may bring an action under paragraph (2).

**(2) Right to bring civil action**

**(A) In general**

Any party aggrieved by the findings and decision made under subsection (f) or (k) who does not have the right to an appeal under subsection (g), and any party aggrieved by the findings and decision made under this subsection, shall have the right to bring a civil action with respect to the complaint presented pursuant to this section, which action may be brought in any State court of competent jurisdiction or in a district court of the United States, without regard to the amount in controversy.

**(B) Limitation**

The party bringing the action shall have 90 days from the date of the decision of the hearing officer to bring such an action, or, if the State has an explicit time limitation for bringing such action under this subchapter, in such time as the State law allows.

**(C) Additional requirements**

In any action brought under this paragraph, the court—

**(i)** shall receive the records of the administrative proceedings;

**(ii)** shall hear additional evidence at the request of a party; and

**(iii)** basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate.

**(3) Jurisdiction of district courts; attorneys' fees**

**(A) In general**

The district courts of the United States shall have jurisdiction of actions brought under this section without regard to the amount in controversy.

**(B) Award of attorneys' fees**

*NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

**(i)**  In general

In any action or proceeding brought under this section, the court, in its discretion, may award reasonable attorneys' fees as part of the costs—

> **(I)**  to a prevailing party who is the parent of a child with a disability;

> **(II)**  to a prevailing party who is a State educational agency or local educational agency against the attorney of a parent who files a complaint or subsequent cause of action that is frivolous, unreasonable, or without foundation, or against the attorney of a parent who continued to litigate after the litigation clearly became frivolous, unreasonable, or without foundation; or

> **(III)**  to a prevailing State educational agency or local educational agency against the attorney of a parent, or against the parent, if the parent's complaint or subsequent cause of action was presented for any improper purpose, such as to harass, to cause unnecessary delay, or to needlessly increase the cost of litigation.

**(ii)**  Rule of construction

Nothing in this subparagraph shall be construed to affect section 327 of the District of Columbia Appropriations Act, 2005.

**(C)**  **Determination of amount of attorneys' fees**

Fees awarded under this paragraph shall be based on rates prevailing in the community in which the action or proceeding arose for the kind and quality of services furnished. No bonus or multiplier may be used in calculating the fees awarded under this subsection.

**(D)**  **Prohibition of attorneys' fees and related costs for certain services**

**(i)**  In general

Attorneys' fees may not be awarded and related costs may not be reimbursed in any action or proceeding under this section for services performed subsequent to the time of a written offer of settlement to a parent if—

> **(I)**  the offer is made within the time prescribed by Rule 68 of the Federal Rules of Civil Procedure or, in the case of an administrative proceeding, at any time more than 10 days before the proceeding begins;

> **(II)**  the offer is not accepted within 10 days; and

> **(III)**  the court or administrative hearing officer finds that the relief finally obtained by the parents is not more favorable to the parents than the offer of settlement.

**(ii)**  IEP Team meetings

Attorneys' fees may not be awarded relating to any meeting of the IEP Team unless such meeting is convened as a result of an administrative proceeding or judicial action, or, at the discretion of the State, for a mediation described in subsection (e).

**(iii)**  Opportunity to resolve complaints

A meeting conducted pursuant to subsection (f)(1)(B)(i) shall not be considered—

> **(I)**  a meeting convened as a result of an administrative hearing or judicial action; or

> **(II)**  an administrative hearing or judicial action for purposes of this paragraph.

**(E)**  **Exception to prohibition on attorneys' fees and related costs**

Notwithstanding subparagraph (D), an award of attorneys' fees and related costs may be made to a parent who is the prevailing party and who was substantially justified in rejecting the settlement offer.

**(F)**  **Reduction in amount of attorneys' fees**

Except as provided in subparagraph (G), whenever the court finds that—

NB: *This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

**(i)**  the parent, or the parent's attorney, during the course of the action or proceeding, unreasonably protracted the final resolution of the controversy;

**(ii)**  the amount of the attorneys' fees otherwise authorized to be awarded unreasonably exceeds the hourly rate prevailing in the community for similar services by attorneys of reasonably comparable skill, reputation, and experience;

**(iii)**  the time spent and legal services furnished were excessive considering the nature of the action or proceeding; or

**(iv)**  the attorney representing the parent did not provide to the local educational agency the appropriate information in the notice of the complaint described in subsection (b)(7)(A),

the court shall reduce, accordingly, the amount of the attorneys' fees awarded under this section.

**(G)  Exception to reduction in amount of attorneys' fees**

The provisions of subparagraph (F) shall not apply in any action or proceeding if the court finds that the State or local educational agency unreasonably protracted the final resolution of the action or proceeding or there was a violation of this section.

**(j)  Maintenance of current educational placement**

Except as provided in subsection (k)(4), during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child, or, if applying for initial admission to a public school, shall, with the consent of the parents, be placed in the public school program until all such proceedings have been completed.

**(k)  Placement in alternative educational setting**

**(1)  Authority of school personnel**

**(A)  Case-by-case determination**

School personnel may consider any unique circumstances on a case-by-case basis when determining whether to order a change in placement for a child with a disability who violates a code of student conduct.

**(B)  Authority**

School personnel under this subsection may remove a child with a disability who violates a code of student conduct from their current placement to an appropriate interim alternative educational setting, another setting, or suspension, for not more than 10 school days (to the extent such alternatives are applied to children without disabilities).

**(C)  Additional authority**

If school personnel seek to order a change in placement that would exceed 10 school days and the behavior that gave rise to the violation of the school code is determined not to be a manifestation of the child's disability pursuant to subparagraph (E), the relevant disciplinary procedures applicable to children without disabilities may be applied to the child in the same manner and for the same duration in which the procedures would be applied to children without disabilities, except as provided in section 1412 (a)(1) of this title although it may be provided in an interim alternative educational setting.

**(D)  Services**

A child with a disability who is removed from the child's current placement under subparagraph (G) (irrespective of whether the behavior is determined to be a manifestation of the child's disability) or subparagraph (C) shall—

NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).

**(i)** continue to receive educational services, as provided in section 1412 (a)(1) of this title, so as to enable the child to continue to participate in the general education curriculum, although in another setting, and to progress toward meeting the goals set out in the child's IEP; and

**(ii)** receive, as appropriate, a functional behavioral assessment, behavioral intervention services and modifications, that are designed to address the behavior violation so that it does not recur.

**(E)  Manifestation determination**

　**(i)**  In general

Except as provided in subparagraph (B), within 10 school days of any decision to change the placement of a child with a disability because of a violation of a code of student conduct, the local educational agency, the parent, and relevant members of the IEP Team (as determined by the parent and the local educational agency) shall review all relevant information in the student's file, including the child's IEP, any teacher observations, and any relevant information provided by the parents to determine—

　　**(I)**  if the conduct in question was caused by, or had a direct and substantial relationship to, the child's disability; or

　　**(II)**  if the conduct in question was the direct result of the local educational agency's failure to implement the IEP.

　**(ii)**  Manifestation

If the local educational agency, the parent, and relevant members of the IEP Team determine that either subclause (I) or (II) of clause (i) is applicable for the child, the conduct shall be determined to be a manifestation of the child's disability.

**(F)  Determination that behavior was a manifestation**

If the local educational agency, the parent, and relevant members of the IEP Team make the determination that the conduct was a manifestation of the child's disability, the IEP Team shall—

　**(i)**  conduct a functional behavioral assessment, and implement a behavioral intervention plan for such child, provided that the local educational agency had not conducted such assessment prior to such determination before the behavior that resulted in a change in placement described in subparagraph (C) or (G);

　**(ii)**  in the situation where a behavioral intervention plan has been developed, review the behavioral intervention plan if the child already has such a behavioral intervention plan, and modify it, as necessary, to address the behavior; and

　**(iii)**  except as provided in subparagraph (G), return the child to the placement from which the child was removed, unless the parent and the local educational agency agree to a change of placement as part of the modification of the behavioral intervention plan.

**(G)  Special circumstances**

School personnel may remove a student to an interim alternative educational setting for not more than 45 school days without regard to whether the behavior is determined to be a manifestation of the child's disability, in cases where a child—

　**(i)**  carries or possesses a weapon to or at school, on school premises, or to or at a school function under the jurisdiction of a State or local educational agency;

　**(ii)**  knowingly possesses or uses illegal drugs, or sells or solicits the sale of a controlled substance, while at school, on school premises, or at a school function under the jurisdiction of a State or local educational agency; or

*NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

**(iii)** has inflicted serious bodily injury upon another person while at school, on school premises, or at a school function under the jurisdiction of a State or local educational agency.

**(H) Notification**

Not later than the date on which the decision to take disciplinary action is made, the local educational agency shall notify the parents of that decision, and of all procedural safeguards accorded under this section.

**(2) Determination of setting**

The interim alternative educational setting in subparagraphs (C) and (G) of paragraph (1) shall be determined by the IEP Team.

**(3) Appeal**

**(A) In general**

The parent of a child with a disability who disagrees with any decision regarding placement, or the manifestation determination under this subsection, or a local educational agency that believes that maintaining the current placement of the child is substantially likely to result in injury to the child or to others, may request a hearing.

**(B) Authority of hearing officer**

**(i)** In general

A hearing officer shall hear, and make a determination regarding, an appeal requested under subparagraph (A).

**(ii)** Change of placement order

In making the determination under clause (i), the hearing officer may order a change in placement of a child with a disability. In such situations, the hearing officer may—

**(I)** return a child with a disability to the placement from which the child was removed; or

**(II)** order a change in placement of a child with a disability to an appropriate interim alternative educational setting for not more than 45 school days if the hearing officer determines that maintaining the current placement of such child is substantially likely to result in injury to the child or to others.

**(4) Placement during appeals**

When an appeal under paragraph (3) has been requested by either the parent or the local educational agency—

**(A)** the child shall remain in the interim alternative educational setting pending the decision of the hearing officer or until the expiration of the time period provided for in paragraph (1)(C), whichever occurs first, unless the parent and the State or local educational agency agree otherwise; and

**(B)** the State or local educational agency shall arrange for an expedited hearing, which shall occur within 20 school days of the date the hearing is requested and shall result in a determination within 10 school days after the hearing.

**(5) Protections for children not yet eligible for special education and related services**

**(A) In general**

A child who has not been determined to be eligible for special education and related services under this subchapter and who has engaged in behavior that violates a code of student conduct, may assert any of the protections provided for in this subchapter if the local educational agency had knowledge (as determined in accordance with this paragraph) that the child was a child with a disability before the behavior that precipitated the disciplinary action occurred.

NB: *This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

**(B)  Basis of knowledge**

A local educational agency shall be deemed to have knowledge that a child is a child with a disability if, before the behavior that precipitated the disciplinary action occurred—

> **(i)**  the parent of the child has expressed concern in writing to supervisory or administrative personnel of the appropriate educational agency, or a teacher of the child, that the child is in need of special education and related services;
>
> **(ii)**  the parent of the child has requested an evaluation of the child pursuant to section 1414 (a)(1)(B) of this title; or
>
> **(iii)**  the teacher of the child, or other personnel of the local educational agency, has expressed specific concerns about a pattern of behavior demonstrated by the child, directly to the director of special education of such agency or to other supervisory personnel of the agency.

**(C)  Exception**

A local educational agency shall not be deemed to have knowledge that the child is a child with a disability if the parent of the child has not allowed an evaluation of the child pursuant to section 1414 of this title or has refused services under this subchapter or the child has been evaluated and it was determined that the child was not a child with a disability under this subchapter.

**(D)  Conditions that apply if no basis of knowledge**

> **(i)**  In general
>
> If a local educational agency does not have knowledge that a child is a child with a disability (in accordance with subparagraph (B) or (C)) prior to taking disciplinary measures against the child, the child may be subjected to disciplinary measures applied to children without disabilities who engaged in comparable behaviors consistent with clause (ii).
>
> **(ii)**  Limitations
>
> If a request is made for an evaluation of a child during the time period in which the child is subjected to disciplinary measures under this subsection, the evaluation shall be conducted in an expedited manner. If the child is determined to be a child with a disability, taking into consideration information from the evaluation conducted by the agency and information provided by the parents, the agency shall provide special education and related services in accordance with this subchapter, except that, pending the results of the evaluation, the child shall remain in the educational placement determined by school authorities.

**(6)  Referral to and action by law enforcement and judicial authorities**

**(A)  Rule of construction**

Nothing in this subchapter shall be construed to prohibit an agency from reporting a crime committed by a child with a disability to appropriate authorities or to prevent State law enforcement and judicial authorities from exercising their responsibilities with regard to the application of Federal and State law to crimes committed by a child with a disability.

**(B)  Transmittal of records**

An agency reporting a crime committed by a child with a disability shall ensure that copies of the special education and disciplinary records of the child are transmitted for consideration by the appropriate authorities to whom the agency reports the crime.

**(7)  Definitions**

In this subsection:

Addendum 42

NB: *This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

**(A)  Controlled substance**

The term "controlled substance" means a drug or other substance identified under schedule I, II, III, IV, or V in section 202(c) of the Controlled Substances Act (21 U.S.C. 812 (c)).

**(B)  Illegal drug**

The term "illegal drug" means a controlled substance but does not include a controlled substance that is legally possessed or used under the supervision of a licensed health-care professional or that is legally possessed or used under any other authority under that Act [21 U.S.C. 801 et seq.] or under any other provision of Federal law.

**(C)  Weapon**

The term "weapon" has the meaning given the term "dangerous weapon" under section 930 (g)(2) of title 18.

**(D)  Serious bodily injury**

The term "serious bodily injury" has the meaning given the term "serious bodily injury" under paragraph (3) of subsection (h) of section 1365 of title 18.

**(l)  Rule of construction**

Nothing in this chapter shall be construed to restrict or limit the rights, procedures, and remedies available under the Constitution, the Americans with Disabilities Act of 1990 [42 U.S.C. 12101 et seq.], title V of the Rehabilitation Act of 1973 [29 U.S.C. 790 et seq.], or other Federal laws protecting the rights of children with disabilities, except that before the filing of a civil action under such laws seeking relief that is also available under this subchapter, the procedures under subsections (f) and (g) shall be exhausted to the same extent as would be required had the action been brought under this subchapter.

**(m)  Transfer of parental rights at age of majority**

**(1)  In general**

A State that receives amounts from a grant under this subchapter may provide that, when a child with a disability reaches the age of majority under State law (except for a child with a disability who has been determined to be incompetent under State law)—

**(A)**  the agency shall provide any notice required by this section to both the individual and the parents;

**(B)**  all other rights accorded to parents under this subchapter transfer to the child;

**(C)**  the agency shall notify the individual and the parents of the transfer of rights; and

**(D)**  all rights accorded to parents under this subchapter transfer to children who are incarcerated in an adult or juvenile Federal, State, or local correctional institution.

**(2)  Special rule**

If, under State law, a child with a disability who has reached the age of majority under State law, who has not been determined to be incompetent, but who is determined not to have the ability to provide informed consent with respect to the educational program of the child, the State shall establish procedures for appointing the parent of the child, or if the parent is not available, another appropriate individual, to represent the educational interests of the child throughout the period of eligibility of the child under this subchapter.

**(n)  Electronic mail**

A parent of a child with a disability may elect to receive notices required under this section by an electronic mail (e-mail) communication, if the agency makes such option available.

**(o)  Separate complaint**

Nothing in this section shall be construed to preclude a parent from filing a separate due process complaint on an issue separate from a due process complaint already filed.

*NB: This unofficial compilation of the U.S. Code is current as of Jan. 4, 2012 (see http://www.law.cornell.edu/uscode/uscprint.html).*

(Pub. L. 91–230, title VI, § 615, as added Pub. L. 108–446, title I, § 101, Dec. 3, 2004, 118 Stat. 2715.)

### References in Text

Section 327 of the District of Columbia Appropriations Act, 2005, referred to in subsec. (i)(3)(B)(ii), is section 327 of Pub. L. 108–335, title III, Oct. 18, 2004, 118 Stat. 1344, which is not classified to the Code.

The Federal Rules of Civil Procedure, referred to in subsec. (i)(3)(D)(i)(I), are set out in the Appendix to Title 28, Judiciary and Judicial Procedure.

The Controlled Substances Act, referred to in subsec. (k)(7)(B), is title II of Pub. L. 91–513, Oct. 27, 1970, 84 Stat. 1242, as amended, which is classified principally to subchapter I (§ 801 et seq.) of chapter 13 of Title 21, Food and Drugs. For complete classification of this Act to the Code, see Short Title note set out under section 801 of Title 21 and Tables.

The Americans with Disabilities Act of 1990, referred to in subsec. (l), is Pub. L. 101–336, July 26, 1990, 104 Stat. 327, as amended, which is classified principally to chapter 126 (§ 12101 et seq.) of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see Short Title note set out under section 12101 of Title 42 and Tables.

The Rehabilitation Act of 1973, referred to in subsec. (l), is Pub. L. 93–112, Sept. 26, 1973, 87 Stat. 355, as amended. Title V of the Act is classified generally to subchapter V (§ 790 et seq.) of chapter 16 of Title 29, Labor. For complete classification of this Act to the Code, see Short Title note set out under section 701 of Title 29 and Tables.

### Prior Provisions

A prior section 1415, Pub. L. 91–230, title VI, § 615, as added Pub. L. 105–17, title I, § 101, June 4, 1997, 111 Stat. 88; amended Pub. L. 106–25, § 6(a), Apr. 29, 1999, 113 Stat. 49, related to procedural safeguards, prior to the general amendment of subchapters I to IV of this chapter by Pub. L. 108–446.

Another prior section 1415, Pub. L. 91–230, title VI, § 615, as added Pub. L. 94–142, § 5(a), Nov. 29, 1975, 89 Stat. 788; amended Pub. L. 99–372, §§ 2, 3, Aug. 5, 1986, 100 Stat. 796, 797; Pub. L. 100–630, title I, § 102(e), Nov. 7, 1988, 102 Stat. 3294; Pub. L. 101–476, title IX, § 901(b)(71)–(75), Oct. 30, 1990, 104 Stat. 1145; Pub. L. 102–119, § 25(b), Oct. 7, 1991, 105 Stat. 607; Pub. L. 103–382, title III, § 314(a)(1), Oct. 20, 1994, 108 Stat. 3936, related to procedural safeguards, prior to the general amendment of subchapters I to IV of this chapter by Pub. L. 105–17.

▷

**Effective: January 14, 2013**

United States Code Annotated Currentness
  Title 20. Education
    Chapter 31. General Provisions Concerning Education (Refs & Annos)
      ◖▤ Subchapter III. General Requirements and Conditions Concerning Operation and Administration of Education Programs: General Authority of Secretary (Refs & Annos)
        ◖▤ Part 4. Records; Privacy; Limitation on Withholding Federal Funds
          �담➥ **§ 1232g. Family educational and privacy rights**

(a) Conditions for availability of funds to educational agencies or institutions; inspection and review of education records; specific information to be made available; procedure for access to education records; reasonableness of time for such access; hearings; written explanations by parents; definitions

**(1)(A)** No funds shall be made available under any applicable program to any educational agency or institution which has a policy of denying, or which effectively prevents, the parents of students who are or have been in attendance at a school of such agency or at such institution, as the case may be, the right to inspect and review the education records of their children. If any material or document in the education record of a student includes information on more than one student, the parents of one of such students shall have the right to inspect and review only such part of such material or document as relates to such student or to be informed of the specific information contained in such part of such material. Each educational agency or institution shall establish appropriate procedures for the granting of a request by parents for access to the education records of their children within a reasonable period of time, but in no case more than forty-five days after the request has been made.

**(B)** No funds under any applicable program shall be made available to any State educational agency (whether or not that agency is an educational agency or institution under this section) that has a policy of denying, or effectively prevents, the parents of students the right to inspect and review the education records maintained by the State educational agency on their children who are or have been in attendance at any school of an educational agency or institution that is subject to the provisions of this section.

**(C)** The first sentence of subparagraph (A) shall not operate to make available to students in institutions of postsecondary education the following materials:

  **(i)** financial records of the parents of the student or any information contained therein;

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

(ii) confidential letters and statements of recommendation, which were placed in the education records prior to January 1, 1975, if such letters or statements are not used for purposes other than those for which they were specifically intended;

(iii) if the student has signed a waiver of the student's right of access under this subsection in accordance with subparagraph (D), confidential recommendations--

(I) respecting admission to any educational agency or institution,

(II) respecting an application for employment, and

(III) respecting the receipt of an honor or honorary recognition.

(D) A student or a person applying for admission may waive his right of access to confidential statements described in clause (iii) of subparagraph (C), except that such waiver shall apply to recommendations only if (i) the student is, upon request, notified of the names of all persons making confidential recommendations and (ii) such recommendations are used solely for the purpose for which they were specifically intended. Such waivers may not be required as a condition for admission to, receipt of financial aid from, or receipt of any other services or benefits from such agency or institution.

(2) No funds shall be made available under any applicable program to any educational agency or institution unless the parents of students who are or have been in attendance at a school of such agency or at such institution are provided an opportunity for a hearing by such agency or institution, in accordance with regulations of the Secretary, to challenge the content of such student's education records, in order to insure that the records are not inaccurate, misleading, or otherwise in violation of the privacy rights of students, and to provide an opportunity for the correction or deletion of any such inaccurate, misleading or otherwise inappropriate data contained therein and to insert into such records a written explanation of the parents respecting the content of such records.

(3) For the purposes of this section the term "educational agency or institution" means any public or private agency or institution which is the recipient of funds under any applicable program.

(4)(A) For the purposes of this section, the term "education records" means, except as may be provided otherwise in subparagraph (B), those records, files, documents, and other materials which--

(i) contain information directly related to a student; and

(ii) are maintained by an educational agency or institution or by a person acting for such agency or institution.

(B) The term "education records" does not include--

(i) records of instructional, supervisory, and administrative personnel and educational personnel ancillary thereto

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

which are in the sole possession of the maker thereof and which are not accessible or revealed to any other person except a substitute;

**(ii)** records maintained by a law enforcement unit of the educational agency or institution that were created by that law enforcement unit for the purpose of law enforcement;

**(iii)** in the case of persons who are employed by an educational agency or institution but who are not in attendance at such agency or institution, records made and maintained in the normal course of business which relate exclusively to such person in that person's capacity as an employee and are not available for use for any other purpose; or

**(iv)** records on a student who is eighteen years of age or older, or is attending an institution of postsecondary education, which are made or maintained by a physician, psychiatrist, psychologist, or other recognized professional or paraprofessional acting in his professional or paraprofessional capacity, or assisting in that capacity, and which are made, maintained, or used only in connection with the provision of treatment to the student, and are not available to anyone other than persons providing such treatment, except that such records can be personally reviewed by a physician or other appropriate professional of the student's choice.

**(5)(A)** For the purposes of this section the term "directory information" relating to a student includes the following: the student's name, address, telephone listing, date and place of birth, major field of study, participation in officially recognized activities and sports, weight and height of members of athletic teams, dates of attendance, degrees and awards received, and the most recent previous educational agency or institution attended by the student.

**(B)** Any educational agency or institution making public directory information shall give public notice of the categories of information which it has designated as such information with respect to each student attending the institution or agency and shall allow a reasonable period of time after such notice has been given for a parent to inform the institution or agency that any or all of the information designated should not be released without the parent's prior consent.

**(6)** For the purposes of this section, the term "student" includes any person with respect to whom an educational agency or institution maintains education records or personally identifiable information, but does not include a person who has not been in attendance at such agency or institution.

**(b)** Release of education records; parental consent requirement; exceptions; compliance with judicial orders and subpoenas; audit and evaluation of federally-supported education programs; recordkeeping

**(1)** No funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of permitting the release of education records (or personally identifiable information contained therein other than directory information, as defined in paragraph (5) of subsection (a) of this section) of students without the written consent of their parents to any individual, agency, or organization, other than to the following--

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(A)** other school officials, including teachers within the educational institution or local educational agency, who have been determined by such agency or institution to have legitimate educational interests, including the educational interests of the child for whom consent would otherwise be required;

**(B)** officials of other schools or school systems in which the student seeks or intends to enroll, upon condition that the student's parents be notified of the transfer, receive a copy of the record if desired, and have an opportunity for a hearing to challenge the content of the record;

**(C)** (i) authorized representatives of (I) the Comptroller General of the United States, (II) the Secretary, or (III) State educational authorities, under the conditions set forth in paragraph (3), or (ii) authorized representatives of the Attorney General for law enforcement purposes under the same conditions as apply to the Secretary under paragraph (3);

**(D)** in connection with a student's application for, or receipt of, financial aid;

**(E)** State and local officials or authorities to whom such information is specifically allowed to be reported or disclosed pursuant to State statute adopted--

    **(i)** before November 19, 1974, if the allowed reporting or disclosure concerns the juvenile justice system and such system's ability to effectively serve the student whose records are released, or

    **(ii)** after November 19, 1974, if--

        **(I)** the allowed reporting or disclosure concerns the juvenile justice system and such system's ability to effectively serve, prior to adjudication, the student whose records are released; and

        **(II)** the officials and authorities to whom such information is disclosed certify in writing to the educational agency or institution that the information will not be disclosed to any other party except as provided under State law without the prior written consent of the parent of the student. [FN1]

**(F)** organizations conducting studies for, or on behalf of, educational agencies or institutions for the purpose of developing, validating, or administering predictive tests, administering student aid programs, and improving instruction, if such studies are conducted in such a manner as will not permit the personal identification of students and their parents by persons other than representatives of such organizations and such information will be destroyed when no longer needed for the purpose for which it is conducted;

**(G)** accrediting organizations in order to carry out their accrediting functions;

**(H)** parents of a dependent student of such parents, as defined in section 152 of Title 26;

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(I)** subject to regulations of the Secretary, in connection with an emergency, appropriate persons if the knowledge of such information is necessary to protect the health or safety of the student or other persons;

**(J)(i)** the entity or persons designated in a Federal grand jury subpoena, in which case the court shall order, for good cause shown, the educational agency or institution (and any officer, director, employee, agent, or attorney for such agency or institution) on which the subpoena is served, to not disclose to any person the existence or contents of the subpoena or any information furnished to the grand jury in response to the subpoena; and

**(ii)** the entity or persons designated in any other subpoena issued for a law enforcement purpose, in which case the court or other issuing agency may order, for good cause shown, the educational agency or institution (and any officer, director, employee, agent, or attorney for such agency or institution) on which the subpoena is served, to not disclose to any person the existence or contents of the subpoena or any information furnished in response to the subpoena;

**(K)** the Secretary of Agriculture, or authorized representative from the Food and Nutrition Service or contractors acting on behalf of the Food and Nutrition Service, for the purposes of conducting program monitoring, evaluations, and performance measurements of State and local educational and other agencies and institutions receiving funding or providing benefits of 1 or more programs authorized under the Richard B. Russell National School Lunch Act (42 U.S.C. 1751 et seq.) or the Child Nutrition Act of 1966 (42 U.S.C. 1771 et seq.) for which the results will be reported in an aggregate form that does not identify any individual, on the conditions that--

**(i)** any data collected under this subparagraph shall be protected in a manner that will not permit the personal identification of students and their parents by other than the authorized representatives of the Secretary; and

**(ii)** any personally identifiable data shall be destroyed when the data are no longer needed for program monitoring, evaluations, and performance measurements; and

**(L)** an agency caseworker or other representative of a State or local child welfare agency, or tribal organization (as defined in section 450b of Title 25), who has the right to access a student's case plan, as defined and determined by the State or tribal organization, when such agency or organization is legally responsible, in accordance with State or tribal law, for the care and protection of the student, provided that the education records, or the personally identifiable information contained in such records, of the student will not be disclosed by such agency or organization, except to an individual or entity engaged in addressing the student's education needs and authorized by such agency or organization to receive such disclosure and such disclosure is consistent with the State or tribal laws applicable to protecting the confidentiality of a student's education records.

Nothing in subparagraph (E) of this paragraph shall prevent a State from further limiting the number or type of State or local officials who will continue to have access thereunder.

**(2)** No funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of releasing, or providing access to, any personally identifiable information in education records other than directory information, or as is permitted under paragraph (1) of this subsection, unless--

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(A)** there is written consent from the student's parents specifying records to be released, the reasons for such release, and to whom, and with a copy of the records to be released to the student's parents and the student if desired by the parents, or

**(B)** except as provided in paragraph (1)(J), such information is furnished in compliance with judicial order, or pursuant to any lawfully issued subpoena, upon condition that parents and the students are notified of all such orders or subpoenas in advance of the compliance therewith by the educational institution or agency, except when a parent is a party to a court proceeding involving child abuse and neglect (as defined in section 3 of the Child Abuse Prevention and Treatment Act (42 U.S.C. 5101 note)) or dependency matters, and the order is issued in the context of that proceeding, additional notice to the parent by the educational agency or institution is not required.

**(3)** Nothing contained in this section shall preclude authorized representatives of (A) the Comptroller General of the United States, (B) the Secretary, or (C) State educational authorities from having access to student or other records which may be necessary in connection with the audit and evaluation of Federally-supported education programs, or in connection with the enforcement of the Federal legal requirements which relate to such programs: *Provided,* That except when collection of personally identifiable information is specifically authorized by Federal law, any data collected by such officials shall be protected in a manner which will not permit the personal identification of students and their parents by other than those officials, and such personally identifiable data shall be destroyed when no longer needed for such audit, evaluation, and enforcement of Federal legal requirements.

**(4)(A)** Each educational agency or institution shall maintain a record, kept with the education records of each student, which will indicate all individuals (other than those specified in paragraph (1)(A) of this subsection), agencies, or organizations which have requested or obtained access to a student's education records maintained by such educational agency or institution, and which will indicate specifically the legitimate interest that each such person, agency, or organization has in obtaining this information. Such record of access shall be available only to parents, to the school official and his assistants who are responsible for the custody of such records, and to persons or organizations authorized in, and under the conditions of, clauses (A) and (C) of paragraph (1) as a means of auditing the operation of the system.

**(B)** With respect to this subsection, personal information shall only be transferred to a third party on the condition that such party will not permit any other party to have access to such information without the written consent of the parents of the student. If a third party outside the educational agency or institution permits access to information in violation of paragraph (2)(A), or fails to destroy information in violation of paragraph (1)(F), the educational agency or institution shall be prohibited from permitting access to information from education records to that third party for a period of not less than five years.

**(5)** Nothing in this section shall be construed to prohibit State and local educational officials from having access to student or other records which may be necessary in connection with the audit and evaluation of any federally or State supported education program or in connection with the enforcement of the Federal legal requirements which relate to any such program, subject to the conditions specified in the proviso in paragraph (3).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(6)(A)** Nothing in this section shall be construed to prohibit an institution of postsecondary education from disclosing, to an alleged victim of any crime of violence (as that term is defined in section 16 of Title 18), or a nonforcible sex offense, the final results of any disciplinary proceeding conducted by such institution against the alleged perpetrator of such crime or offense with respect to such crime or offense.

**(B)** Nothing in this section shall be construed to prohibit an institution of postsecondary education from disclosing the final results of any disciplinary proceeding conducted by such institution against a student who is an alleged perpetrator of any crime of violence (as that term is defined in section 16 of Title 18), or a nonforcible sex offense, if the institution determines as a result of that disciplinary proceeding that the student committed a violation of the institution's rules or policies with respect to such crime or offense.

**(C)** For the purpose of this paragraph, the final results of any disciplinary proceeding--

**(i)** shall include only the name of the student, the violation committed, and any sanction imposed by the institution on that student; and

**(ii)** may include the name of any other student, such as a victim or witness, only with the written consent of that other student.

**(7)(A)** Nothing in this section may be construed to prohibit an educational institution from disclosing information provided to the institution under section 14071 of Title 42 concerning registered sex offenders who are required to register under such section.

**(B)** The Secretary shall take appropriate steps to notify educational institutions that disclosure of information described in subparagraph (A) is permitted.

(c) Surveys or data-gathering activities; regulations

Not later than 240 days after October 20, 1994, the Secretary shall adopt appropriate regulations or procedures, or identify existing regulations or procedures, which protect the rights of privacy of students and their families in connection with any surveys or data-gathering activities conducted, assisted, or authorized by the Secretary or an administrative head of an education agency. Regulations established under this subsection shall include provisions controlling the use, dissemination, and protection of such data. No survey or data-gathering activities shall be conducted by the Secretary, or an administrative head of an education agency under an applicable program, unless such activities are authorized by law.

(d) Students' rather than parents' permission or consent

For the purposes of this section, whenever a student has attained eighteen years of age, or is attending an institution of postsecondary education, the permission or consent required of and the rights accorded to the parents of the student shall thereafter only be required of and accorded to the student.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

(e) Informing parents or students of rights under this section

No funds shall be made available under any applicable program to any educational agency or institution unless such agency or institution effectively informs the parents of students, or the students, if they are eighteen years of age or older, or are attending an institution of postsecondary education, of the rights accorded them by this section.

(f) Enforcement; termination of assistance

The Secretary shall take appropriate actions to enforce this section and to deal with violations of this section, in accordance with this chapter, except that action to terminate assistance may be taken only if the Secretary finds there has been a failure to comply with this section, and he has determined that compliance cannot be secured by voluntary means.

(g) Office and review board; creation; functions

The Secretary shall establish or designate an office and review board within the Department for the purpose of investigating, processing, reviewing, and adjudicating violations of this section and complaints which may be filed concerning alleged violations of this section. Except for the conduct of hearings, none of the functions of the Secretary under this section shall be carried out in any of the regional offices of such Department.

(h) Disciplinary records; disclosure

Nothing in this section shall prohibit an educational agency or institution from--

(1) including appropriate information in the education record of any student concerning disciplinary action taken against such student for conduct that posed a significant risk to the safety or well-being of that student, other students, or other members of the school community; or

(2) disclosing such information to teachers and school officials, including teachers and school officials in other schools, who have legitimate educational interests in the behavior of the student.

(i) Drug and alcohol violation disclosures

(1) In general

Nothing in this Act or the Higher Education Act of 1965 [20 U.S.C.A. § 1001 et seq.] shall be construed to prohibit an institution of higher education from disclosing, to a parent or legal guardian of a student, information regarding any violation of any Federal, State, or local law, or of any rule or policy of the institution, governing the use or possession of alcohol or a controlled substance, regardless of whether that information is contained in the student's education records, if--

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

(A) the student is under the age of 21; and

(B) the institution determines that the student has committed a disciplinary violation with respect to such use or possession.

(2) State law regarding disclosure

Nothing in paragraph (1) shall be construed to supersede any provision of State law that prohibits an institution of higher education from making the disclosure described in subsection (a) of this section.

(j) Investigation and prosecution of terrorism

(1) In general

Notwithstanding subsections (a) through (i) of this section or any provision of State law, the Attorney General (or any Federal officer or employee, in a position not lower than an Assistant Attorney General, designated by the Attorney General) may submit a written application to a court of competent jurisdiction for an ex parte order requiring an educational agency or institution to permit the Attorney General (or his designee) to--

(A) collect education records in the possession of the educational agency or institution that are relevant to an authorized investigation or prosecution of an offense listed in section 2332b(g)(5)(B) of Title 18, or an act of domestic or international terrorism as defined in section 2331 of that title; and

(B) for official purposes related to the investigation or prosecution of an offense described in paragraph (1)(A), retain, disseminate, and use (including as evidence at trial or in other administrative or judicial proceedings) such records, consistent with such guidelines as the Attorney General, after consultation with the Secretary, shall issue to protect confidentiality.

(2) Application and approval

(A) In general

An application under paragraph (1) shall certify that there are specific and articulable facts giving reason to believe that the education records are likely to contain information described in paragraph (1)(A).

(B) The court shall issue an order described in paragraph (1) if the court finds that the application for the order includes the certification described in subparagraph (A).

(3) Protection of educational agency or institution

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

An educational agency or institution that, in good faith, produces education records in accordance with an order issued under this subsection shall not be liable to any person for that production.

(4) Record-keeping

Subsection (b)(4) of this section does not apply to education records subject to a court order under this subsection.

CREDIT(S)

(Pub.L. 90-247, Title IV, § 444, formerly § 438, as added Pub.L. 93-380, Title V, § 513(a), Aug. 21, 1974, 88 Stat. 571; amended Pub.L. 93-568, § 2(a), Dec. 31, 1974, 88 Stat. 1858; Pub.L. 96-46, § 4(c), Aug. 6, 1979, 93 Stat. 342; Pub.L. 101-542, Title II, § 203, Nov. 8, 1990, 104 Stat. 2385; Pub.L. 102-325, Title XV, § 1555(a), July 23, 1992, 106 Stat. 840; renumbered § 444 and amended Pub.L. 103-382, Title II, §§ 212(b)(1), 249, 261(h), Oct. 20, 1994, 108 Stat. 3913, 3924, 3928; Pub.L. 105-244, Title IX, §§ 951, 952, Oct. 7, 1998, 112 Stat. 1835, 1836; Pub.L. 106-386, Div. B, Title VI, § 1601(d), Oct. 28, 2000, 114 Stat. 1538; Pub.L. 107-56, Title V, § 507, Oct. 26, 2001, 115 Stat. 367; Pub.L. 107-110, Title X, § 1062(3), Jan. 8, 2002, 115 Stat. 2088; Pub.L. 111-296, Title I, § 103(d), Dec. 13, 2010, 124 Stat. 3192; Pub.L. 112-278, § 2, Jan. 14, 2013, 126 Stat. 2480.)

[FN1] So in original. The period probably should be a comma.

HISTORICAL AND STATUTORY NOTES

Revision Notes and Legislative Reports

1974 Acts. House Report No. 93-805 and Senate Conference Report No. 93-1026, see 1974 U.S. Code Cong. and Adm. News, p. 4093.

House Report No. 93-1056 and Senate Conference Report No. 93-1409, see 1974 U.S. Code Cong. and Adm. News, p. 6779.

1979 Acts. House Report No. 96-338, see 1979 U.S. Code Cong. and Adm. News, p. 819.

1990 Acts. House Report No. 101-518, see 1990 U.S. Code Cong. and Adm. News, p. 3363.

1992 Acts. House Report No. 102-447 and House Conference Report No. 102-630, see 1992 U.S. Code Cong. and Adm. News, p. 334.

1994 Acts. House Report No. 103-425 and House Conference Report No. 103-761, see 1994 U.S. Code Cong. and Adm. News, p. 2807.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

1998 Acts. House Conference Report No. 105-750, see 1998 U.S. Code Cong. and Adm. News, p. 417.

2000 Acts. House Report No. 106-939, see 2000 U.S. Code Cong. and Adm. News, p. 1380.

2002 Acts. House Conference Report No. 107-334 and Statement by President, see 2001 U.S. Code Cong. and Adm. News, p. 1230.

References in Text

The Richard B. Russell National School Lunch Act, referred to in subsec. (b)(1)(K), is Act June 4, 1946, c. 281, 60 Stat. 230, originally entitled National School Lunch Act, which is classified principally to chapter 13 of Title 42, 42 U.S.C.A. § 1751 et seq. See Tables for complete classification.

The Child Nutrition Act of 1966, referred to in subsec. (b)(1)(K), is Pub.L. 89-642, Oct. 11, 1966, 80 Stat. 885, which is classified principally to chapter 13A of Title 42, 42 U.S.C.A. § 1771 et seq. For complete classification, see Short Title note set out under 42 U.S.C.A. § 1771 and Tables.

Section 3 of the Child Abuse Prevention and Treatment Act, referred to in subsec. (b)(2)(B), is Pub.L. 93-247, § 3, as added Pub.L. 111-320, Title I, § 142(a), Dec. 20, 2010, 124 Stat. 3482, is set out as a note under 42 U.S.C.A. § 5101.

This Act, referred to in subsec. (i)(1), is Pub.L. 90-247, Jan. 2, 1968, 80 Stat. 783, as amended, known as the Elementary and Secondary Education Amendments of 1967. Title IV of the Act, known as the General Education Provisions Act, is classified generally to this chapter. For complete classification, see Short Title note set out under 20 U.S.C.A. § 6301 and Tables.

The Higher Education Act of 1965, referred to in subsec. (i)(1), is Pub.L. 89-329, Nov. 8, 1965, 79 Stat. 1219, as amended, which is classified principally to chapter 28 of this title, 20 U.S.C.A. § 1001 et seq. For complete classification, see Short Title note set out under 20 U.S.C.A. § 1001 and Tables.

Amendments

2013 Amendments. Subsec. (b)(1)(J)(ii). Pub.L. 112-278, § 2(1)(A), struck out "and" after the semicolon at the end.

Subsec. (b)(1)(K)(ii). Pub.L. 112-278, § 2(1)(B), struck out the period at the end and inserting "; and".

Subsec. (b)(1)(L). Pub.L. 112-278, § 2(1)(C), added subpar. (L).

Subsec. (b)(2)(B). Pub.L. 112-278, § 2(2), inserted ", except when a parent is a party to a court proceeding involving

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

child abuse and neglect (as defined in section 3 of the Child Abuse Prevention and Treatment Act (42 U.S.C. 5101 note)) or dependency matters, and the order is issued in the context of that proceeding, additional notice to the parent by the educational agency or institution is not required" following "educational institution or agency".

2010 Amendments. Subsec. (b)(1)(I). Pub.L. 111-296, § 103(d)(1), struck out "and" at the end.

Subsec. (b)(1)(J)(ii). Pub.L. 111-296, § 103(d)(2), struck out the period at the end and inserted "; and".

Subsec. (b)(1)(K). Pub.L. 111-296, § 103(d)(3), added subpar. (K).

2002 Amendments. Subsec. (b)(1)(J). Pub.L. 107-110, § 1062(3), in the undesignated par. following (b)(1)(J)(ii) struck "clause (E)" and inserted "subparagraph (E)", and made other technical amendments.

2001 Amendments. Subsec. (j). Pub.L. 107-56, § 507, added subsec. (j).

2000 Amendments. Subsec. (b)(7). Pub.L. 106-386, § 1601(d), added par. (7).

1998 Amendments. Subsec. (b)(1)(C). Pub.L. 105-244, § 951(1), rewrote subpar. (C), which formerly read: "authorized representatives of (i) the Comptroller General of the United States, (ii) the Secretary, or (iii) State educational authorities under the conditions set forth in paragraph (3) of this subsection;".

Subsec. (b)(6)(A). Pub.L. 105-244, § 951(2)(A), (B), designated existing provisions as subpar. (A) and, as so designated, substituted "or a nonforcible sex offense, the final results" for "the results" and "such crime or offense with respect to such crime or offense." for "such crime with respect to such crime.".

Subsec. (b)(6)(B), (C). Pub.L. 105-244, § 951(2)(C), added subpars. (B) and (C).

Subsec. (i). Pub.L. 105-244, § 952, added subsec. (i).

1994 Amendments. Subsec. (a)(1)(B). Pub.L. 103-382, § 249(1)(A)(i), (ii), added subpar. (B) and redesignated former subpar. (B) as (C).

Subsec. (a)(1)(C). Pub.L. 103-382, § 249(1)(A)(i), (ii), redesignated former subpar. (B) as (C) and, in subcl. (iii) of subpar. (C) as so redesignated, substituted "(D)" for "(C)".

Subsec. (a)(1)(D). Pub.L. 103-382, § 249(A)(1)(i), (iv), redesignated former subpar. (C) as (D) and, in subpar. (D) as so redesignated, substituted "(C)" for "(B)".

Subsec. (a)(2). Pub.L. 103-382, § 249(1)(B), substituted "rights" for "or other rights".

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Subsec. (a)(4)(B)(ii). Pub.L. 103-382, § 261(h)(1), substituted a semicolon for the period.

Subsec. (b)(1)(A). Pub.L. 103-382, § 249(2)(A)(ii), inserted ", including the educational interests of the child for whom consent would otherwise be required" after "interests".

Subsec. (b)(1)(C). Pub.L. 103-382, § 261(h)(2)(A), substituted "or (iii)" for "(iii) an administrative head of an education agency (as defined in section 1221e-3(c) of this title, or (iv)".

Subsec. (b)(1)(E). Pub.L. 103-382, § 249(2)(A)(ii), amended subpar. (E) generally. Prior to amendment subpar. (E) read as follows: "State and local officials or authorities to whom such information is specifically required to be reported or disclosed pursuant to State statute adopted prior to November 19, 1974;"

Subsec. (b)(1)(H). Pub.L. 103-382, § 261(h)(2)(B), substituted "1986" for "1954", which for purposes of codification required no change in text.

Subsec. (b)(1)(J). Pub.L. 103-382, § 249(2)(A)(iii)-(v), added subpar. (J).

Subsec. (b)(2). Pub.L. 103-382, § 249(2)(B), in provision preceding subpar. (A) substituted ", unless--" for a period and in subpar. (B) inserted "except as provided in paragraph (1)(J)," before "such information".

Subsec. (b)(3). Pub.L. 103-382, § 261(h)(2)(C), substituted "or (C)" for "(C) an administrative head of an education agency or (D)" and "education programs" for "education program".

Subsec. (b)(4). Pub.L. 103-382, § 249(2)(C), inserted provision that if a third party outside the educational institution permits access to information or fails to destroy information in violation of subpars. (2)(A) and (1)(F), respectively, the educational institution or agency be prohibited from permitting access to information from education records to that third party for a period of not less than five years.

Subsec. (c). Pub.L. 103-382, § 249(3), substituted "Not later than 240 days after October 20, 1994, the Secretary shall adopt appropriate regulations or procedures, identify existing regulations or procedures, which" for "The Secretary shall adopt appropriate regulations to".

Subsec. (d). Pub.L. 103-382, § 261(h)(3), inserted a comma after "education".

Subsec. (e). Pub.L. 103-382, § 249(4), inserted "effectively" before "informs".

Subsec. (f). Pub.L. 103-382, § 261((h)(4), struck out ", or an administrative head of an education agency," and substituted "enforce this section" for "enforce provisions of this section", "in accordance with" for "according to the provisions of", and "comply with this section" for "comply with the provisions of this section".

Subsec. (g). Pub.L. 103-382, § 261(h)(5), struck out "of Health, Education, and Welfare" after "the Department" and

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

"the provisions of" after "adjudicating violations of".

Subsec. (h). Pub.L. 103-382, § 249(5), added subsec. (h).

1992 Amendments. Subsec. (a)(4)(B)(ii). Pub.L. 102-325, § 1555(a), substituted provisions excluding records created for purpose of law enforcement from definition of "education records", for provisions excluding from such definition records that are kept apart from other records, are maintained for law enforcement purposes, and are unavailable to persons other than law enforcement officials, and struck out provision conditioning such exception upon lack of access to such records.

1990 Amendments. Subsec. (b)(6). Pub.L. 101-542, § 203, added par. (6).

1979 Amendments. Subsec. (b)(5). Pub.L. 96-46 added subsec. (b)(5).

1974 Amendments. Subsec. (a)(1). Pub.L. 93-568, § 2(a)(1)(A) to (C), (2)(A) to (C), (3), designated existing par. (1) as subpar. (A), and in subpar. (A) as so designated, substituted reference to educational agencies and institutions for reference to state or local educational agencies, institutions of higher education, community colleges, schools, agencies offering preschool programs, and other educational institutions, substituted the generic term education records for the enumeration of such records, and extended the right to inspect and review such records to parents of children who have been in attendance, and added subpars. (B) and (C).

Subsec. (a)(2). Pub.L. 93-568, § 2(a)(4), substituted provisions making the availability of funds to educational agencies and institutions conditional on the granting of an opportunity for a hearing to parents of students who are or have been in attendance at such institution or agency to challenge the contents of the student's education records for provisions granting the parents an opportunity for such hearing, and added provisions authorizing insertion into the records a written explanation of the parents respecting the content of such records.

Subsec. (a)(3). Pub.L. 93-568, § 2(a)(1)(G), added subsec. (a)(3).

Subsec. (a)(4), (5). Pub.L. 93-568, § 2(a)(2)(F), added subsec. (a)(4) and (5).

Subsec. (a)(6). Pub.L. 93-568, § 2(a)(5), added subsec. (a)(6).

Subsec. (b)(1). Pub.L. 93-568, § 2(a)(1)(D), (2)(D), (3), (8)(A) to (C), (10)(A), in provisions preceding subpar. (A), substituted "educational agency or institution which has a policy of permitting the release of education records (or personally identifiable information contained therein other than directory information, as defined in paragraph (5) of subsection (a) of this section)" for "state or local educational agency, any institution of higher education, any community college, any school, agency offering a preschool program, or any other educational institution which has a policy or practice of permitting the release of personally identifiable records or files (or personal information contained therein)", in subpar. (A), substituted "educational agency, who have been determined by such agency or institution to have" for "educational agency who have", in subpar. (B), substituted "the student seeks or intends to" for

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

"the student intends to", in subpar. (C), substituted reference to "section 408(c)" for reference to "section 409 of this Act" which for purposes of codification has been translated as "section 1221e-3(c) of this title", and added subpars. (E) to (I).

Subsec. (b)(2). Pub.L. 93-568, § 2(a)(1)(E), (2)(E), substituted "educational agency or institution which has a policy or practice of releasing, or providing access to, any personally identifiable information in education records other than directory information, or as is permitted under paragraph (1) of this subsection" for "state or local educational agency, any institution of higher education, any community college, any school, agency offering a preschool program, or any other educational institution which has a policy or practice of furnishing, in any form, any personally identifiable information contained in personal school records, to any persons other than those listed in subsection (b)(1) of this section".

Subsec. (b)(3). Pub.L. 93-568, § 2(a)(8)(D), substituted "information is specifically authorized by Federal law, any data collected by such officials shall be protected in a manner which will not permit the personal identification of students and their parents by other than those officials, and such personally identifiable data shall be destroyed when no longer needed for such audit, evaluation, and enforcement of Federal legal requirements" for "data is specifically authorized by Federal law, any data collected by such officials with respect to individual students shall not include information (including social security numbers) which would permit the personal identification of such students or their parents after the data so obtained has been collected".

Subsec. (b)(4). Pub.L. 93-568, § 2(a)(9), substituted provisions that each educational agency or institution maintain a record, kept with the education records of each student, indicating individuals, agencies, or organizations who obtained access to the student's record and the legitimate interest in obtaining such information, that such record of access shall be available only to parents, school officials, and their assistants having responsibility for the custody of such records, and as a means of auditing the operation of the system, for provisions that with respect to subsecs. (c)(1), (c)(2), and (c)(3) of this section, all persons, agencies, or organizations desiring access to the records of a student shall be required to sign forms to be kept with the records of the student, but only for inspection by the parents or the student, indicating specifically the legitimate educational or other interest of the person seeking such information, and that the form shall be available to parents and school officials having responsibility for record maintenance as a means of auditing the operation of the system.

Subsec. (e). Pub.L. 93-568, § 2(a)(1)(F), substituted "to any educational agency or institution unless such agency or institution" for "unless the recipient of such funds".

Subsec.(g). Pub.L. 93-568, § 2(a)(7), (10)(B), struck out reference to §§ 1232c and 1232f of this title and added provisions that except for the conduct of hearings, none of the functions of the Secretary under this section shall be carried out in any of the regional offices of such Department.

Effective and Applicability Provisions

2010 Acts. Except as otherwise specifically provided, Pub.L. 111-296 and amendments made by that Act take effect on Oct. 1, 2010, see Pub.L. 111-296, § 445, set out as a note under 42 U.S.C.A. § 1751.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

2002 Acts. Except as otherwise provided, amendments by Pub.L. 107-110 effective Jan. 8, 2002, see Pub.L. 107-110, § 5, set out as a note under 20 U.S.C.A. § 6301.

1998 Acts. Amendment by Pub.L. 105-244 effective Oct. 1, 1998, except as otherwise provided, see section 3 of Pub.L. 105-244, set out as a note under section 1001 of this title.

1994 Acts. Amendment by Title II of Pub.L. 103-382 effective Oct. 20, 1994, see section 3(a)(2) of Pub.L. 103-382, set out as a note under section 1221 of this title.

1992 Acts. Section 1555(b) of Pub.L. 102-325 provided that: "The amendment made by this section [amending subsec. (a)(4)(B)(ii) of this section] shall take effect on the date of enactment of this Act [July 23, 1992]."

1974 Acts. Section 2(b) of Pub.L. 93-568 provided that: "The amendments made by subsection (a) [amending this section] shall be effective, and retroactive to, November 19, 1974."

Section 513(b)(1) of Pub.L. 93-380 provided that: "The provisions of this section [classified to this section and provisions set out as a note under section 1221 of this title] shall become effective ninety days after the date of enactment [Aug. 21, 1974] of section 438 of the General Education Provisions Act [this section]."

CROSS REFERENCES

Applicability of this section to program to collect information relating to nonimmigrant foreign students and other exchange program participants, see 8 USCA § 1372.
Crime victims' rights, rights afforded and best efforts to accord rights, procedures to promote compliance, see 18 USCA § 3771.
Privacy rights accorded information collected regarding,
  Education of handicapped, see 20 USCA § 1417.
  School records of homeless youth, see 42 USCA § 11432.

CODE OF FEDERAL REGULATIONS

Privacy rights accorded information collected regarding privacy rights of parents and students, see 34 CFR § 99.1 et seq.

LAW REVIEW COMMENTARIES

Applicants laid bare: The privacy economics of university application files. Martin C. Mcwilliams, Jr. 34 Hofstra L. Rev. 185 (2005).

Cleaning up Buckley: How the Family Educational Rights and Privacy Act shields academic corruption in

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

C

**Effective:[See Text Amendments]**

United States Code Annotated Currentness
  Title 5. Government Organization and Employees (Refs & Annos)
    Part I. The Agencies Generally
      Chapter 7. Judicial Review (Refs & Annos)
        → → **§ 705. Relief pending review**

When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

CREDIT(S)

(Pub.L. 89-554, Sept. 6, 1966, 80 Stat. 393.)

HISTORICAL AND STATUTORY NOTES

Revision Notes and Legislative Reports

**1966 Acts.**

| Derivation: | United States Code | Revised Statutes and Statutes at Large |
|---|---|---|
| | 5 U.S.C. 1009(d) | June 11, 1946, ch. 324, § 10(d), 60 Stat. 243. |

Standard changes are made to conform with the definitions applicable and the style of this title as outlined in the preface of this report.

CROSS REFERENCES

Consumer Product Safety Commission determinations and standards subject to granting of appropriate relief pending conclusion of review proceedings as provided in this section,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Hazardous substance determinations, see 15 USCA § 1262.
Household substance special packaging standards for protection of children, see 15 USCA § 1474.
Federal Energy Regulatory Commission rules or orders regarding natural gas policy subject to review under this chapter excluding the process issuance provision of this section, see 15 USCA § 3416.
Secretary of Commerce rules and regulations subject to review in accordance with this chapter, excluding this section, in provisions relating to,
Fishery management plans, see 16 USCA § 1855.
Pacific Salmon Treaty Act of 1985, see 16 USCA § 3636.
Securities and Exchange Commission orders and rules subject to issuance of process pending review only under certain conditions notwithstanding this section, see 15 USCA § 78y.

CODE OF FEDERAL REGULATIONS

Food and drugs, see 21 CFR §§ 10.1 et seq., 12.1, and 13.1 et seq.

LAW REVIEW COMMENTARIES

Delegalizing administrative law. Keith Werhan, 1996 U.Ill.L.Rev. 423.

LIBRARY REFERENCES

American Digest System

Administrative Law and Procedure ☞674, 675.

Key Number System Topic No. 15A.

Corpus Juris Secundum

CJS Carriers § 264, Stays and Interim Relief.

RESEARCH REFERENCES

ALR Library

35 ALR, Fed. 2nd Series 421, Validity, Construction, and Application of Judicial Review Provisions of Magnuson Fishery Conservation and Management Act (16 U.S.C.A. § 1855(F)).

45 ALR, Fed. 2nd Series 179, Construction and Application of Virus-Serum-Toxin Act.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Westlaw.

34 C.F.R. § 300.518

C

**Effective: October 13, 2006**

Code of Federal Regulations Currentness
   Title 34. Education
      Subtitle B. Regulations of the Offices of the Department of Education
         Chapter III. Office of Special Education and Rehabilitative Services, Department of Education
            Part 300. Assistance to States for the Education of Children with Disabilities (Refs & Annos)
               ▸▣ Subpart E. Procedural Safeguards
               ▸▣ Due Process Procedures for Parents and Children
                  ➜ **§ 300.518 Child's status during proceedings.**

(a) Except as provided in § 300.533, during the pendency of any administrative or judicial proceeding regarding a due process complaint notice requesting a due process hearing under § 300.507, unless the State or local agency and the parents of the child agree otherwise, the child involved in the complaint must remain in his or her current educational placement.

(b) If the complaint involves an application for initial admission to public school, the child, with the consent of the parents, must be placed in the public school until the completion of all the proceedings.

(c) If the complaint involves an application for initial services under this part from a child who is transitioning from Part C of the Act to Part B and is no longer eligible for Part C services because the child has turned three, the public agency is not required to provide the Part C services that the child had been receiving. If the child is found eligible for special education and related services under Part B and the parent consents to the initial provision of special education and related services under § 300.300(b), then the public agency must provide those special education and related services that are not in dispute between the parent and the public agency.

(d) If the hearing officer in a due process hearing conducted by the SEA or a State review official in an administrative appeal agrees with the child's parents that a change of placement is appropriate, that placement must be treated as an agreement between the State and the parents for purposes of paragraph (a) of this section.

   (Authority: 20 U.S.C. 1415(j))

SOURCE: 71 FR 46755, Aug. 14, 2006; 72 FR 17781, April 9, 2007, unless otherwise noted.

AUTHORITY: 20 U.S.C. 1221e–3, 1406, 1411–1419, unless otherwise noted.

34 C. F. R. § 300.518, 34 CFR § 300.518

Current through July 10, 2014; 79 FR 39912.

© 2014 Thomson Reuters.
END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.